Mark D. Flanagan (State Bar No. 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
 HALE & DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Fax: (650) 858-6100

Robert J. Gunther, Jr. (NY SBN: 1967652)
robert.gunther@wilmerhale.com
Christopher R. Noyes (pro hac vice forthcoming)
christopher.noyes@wilmerhale.com
WILMER CUTLER PICKERING
 HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888

Attorneys for Plaintiffs
ROCHE MOLECULAR SYSTEMS, INC. and
ROCHE SEQUENCING SOLUTIONS, INC.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCHE MOLECULAR SYSTEMS, INC. and ROCHE SEQUENCING SOLUTIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> FORESIGHT DIAGNOSTICS INC., DAVID KURTZ, an individual, and BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, <br><br> Defendants. | **Case No.:**  5:24-cv-03972 <br><br> **COMPLAINT** <br> 1. **Trade Secret Misappropriation Under 18 U.S.C. § 1836, et seq.** <br> 2. **Trade Secret Misappropriation Under Cal. Civ. Code §§ 3426-3426.11** <br> 3. **Breach of Contract** <br> 4. **Breach of Implied Covenant of Good Faith and Fair Dealing** <br> 5. **Unfair Competition Under Cal. Business and Professions Code § 17200, et seq.** <br> 6. **Declaratory Judgment of Patent Ownership** <br><br> **DEMAND FOR JURY TRIAL** |

Roche Molecular Systems, Inc. and Roche Sequencing Solutions, Inc. (collectively, "Roche" or "Plaintiffs") allege as follows:

**INTRODUCTION**

1.      This matter arises out of Defendant Kurtz's decision, along with his colleagues, to breach their contracts with Roche, secretly founding a new company—Defendant Foresight Diagnostics Inc.—using Roche's proprietary technology for cancer detection and monitoring without permission.

2.      In 2015, Roche acquired Capp Medical, Inc. ("CappMed"), a company in the field of cancer detection and monitoring founded by two Stanford University professors, Drs. Maximilian Diehn and Ash Alizadeh.  Roche acquired the company to obtain CappMed's proprietary "CAPP-Seq" technology, which analyzes circulating tumor DNA ("ctDNA") for cancer detection.  Roche's goal was to incorporate CAPP-Seq into commercially viable products for non-invasive cancer detection and monitoring of certain cancers in patients.  As a result of the acquisition, Roche obtained the CAPP-Seq technology, including trade secrets and know-how.  In exchange, Dr. Diehn, Dr. Alizadeh, and the other CappMed shareholders received tens of millions of dollars.

3.      Since 2015, Roche has invested significant resources, including tens of millions of additional dollars, to develop the CAPP-Seq technology so that Roche could bring transformative clinical diagnostic cancer assays to patients.  In May 2017, Roche announced the global commercial launch of its AVENIO ctDNA Analysis Kits, a portfolio of three next-generation sequencing (NGS) liquid biopsy assay kits for oncology research based on the CAPP-Seq technology: the AVENIO ctDNA Targeted Kit, Expanded Kit, and Surveillance Kit.[1]  Roche continues to make substantial investments in the research and development of clinically relevant next generation sequencing assays based on the CAPP-Seq technology,

---

[1] https://sequencing.roche.com/us/en/products/group/avenio-ctdna-targeted-kits.html,
https://sequencing.roche.com/us/en/products/group/avenio-ctdna-expanded-kits.html,
https://sequencing.roche.com/us/en/products/group/avenio-ctdna-surveillance-kits.html.

including the AVENIO Non-Hodgkin's lymphoma ("NHL") assay. In connection with its efforts to further develop the CAPP-Seq technology, Roche is currently engaged in multiple partnerships and collaborations with pharmaceutical companies and academic researchers that use Roche's AVENIO assays for cancer research.

4.      Following Roche's acquisition of CappMed, Drs. Diehn and Alizadeh worked as consultants for Roche until June 10, 2021. A third Stanford professor, Defendant Dr. David Kurtz, worked as a contractor for Roche from September 2017 to July 2020. In his role at Roche, Dr. Kurtz worked on developing the CAPP-Seq technology that Roche had acquired from CappMed. Each of Drs. Diehn, Alizadeh, and Kurtz had written agreements with Roche that required them to protect the confidentiality of Roche information, assign certain inventions to Roche, and disclose information to Roche about potential conflicts of interest. Exs. A, B.

5.      In January 2022, Defendant Foresight Diagnostics, Inc. ("Foresight") approached Roche about a possible commercial partnership. On information and belief, Foresight was founded in May 2020 by Drs. Diehn, Alizadeh, and Kurtz, where they continue to serve as executives and advisors. Like CappMed before it, the business of Foresight is non-invasive cancer detection and monitoring.

6.      On information and belief, Drs. Diehn, Alizadeh, and Kurtz secretly co-founded Foresight at the same time they were serving as consultants and contractors for Roche. On information and belief, notwithstanding their contractual obligations to Roche, Drs. Diehn, Alizadeh, and Kurtz did not notify Roche that they were founding a company that would be developing competing non-invasive cancer detection and monitoring technology, which they call "PhasED-Seq." In addition, Drs. Diehn, Alizadeh, and Kurtz applied for patents relating to cancer detection using Roche confidential information and know-how, including technology that Drs. Diehn and Alizadeh had sold to Roche for tens of millions of dollars in the CappMed acquisition.

7.      On information and belief, Stanford University has filed over a dozen patent applications naming Drs. Diehn, Alizadeh, and Kurtz as inventors, disclosing technical data

belonging to Roche.

8.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz assigned those patents to Stanford, where they were also employed as professors.  On information and belief, Stanford exclusively licensed these patents to Foresight.

9.    Foresight purports to be the leader in cancer detection through ultra-sensitive liquid biopsy.  Foresight has raised over $70 million in Series A and Series B financing.

10.    The PhasED-Seq technology that Stanford licensed and that Foresight now touts in connection with its fundraising activities uses the proprietary technology that Roche previously acquired from Dr. Diehn, Dr. Alizadeh, and Stanford through its acquisition of CappMed, including improvements to that technology made by Roche.

11.    In seeking and obtaining funding from the National Institutes of Health, Dr. Kurtz and Stanford asserted that this technology seeks to "extend ctDNA detection by CAPP-Seq." Ex. N.  Stanford has also admitted that "PhasED-Seq builds upon a technique called CAPP-Seq, or cancer personalized profiling by deep sequencing, developed in 2014 by Alizadeh and Diehn."  Ex. L.

**THE PARTIES**

12.    Plaintiff Roche Molecular Systems, Inc. ("RMS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 4300 Hacienda Drive, Pleasanton, California 94588.

13.    Plaintiff Roche Sequencing Solutions, Inc. ("RSS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 4300 Hacienda Drive, Pleasanton, California 94588.

14.    On information and belief, Defendant Foresight Diagnostics Inc. ("Foresight") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 12705 East Montview Boulevard Suite 360, Aurora, Colorado 80045.

15.    On information and belief, Defendant The Board of Trustees of the Leland Stanford Junior University ("Stanford") is a trust possessing corporate powers that is organized

1   under the laws of the State of California, with a principal place of business at Building 10 Main

2   Quad, Stanford, California 94305.

3       16.     On information and belief, Defendant David Kurtz is an individual who resides in

4   Oakland, California, and is employed by Defendant Stanford in Stanford, California.[2]

5                                    **JURISDICTION**

6       17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, 2201,

7   2202, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839.  This Court

8   also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C.

9   § 1367(a) because the federal and state law claims derive from a common nucleus of operative

10  facts.

11              Personal Jurisdiction Over Defendant Foresight

12      18.     This Court has personal jurisdiction over Foresight because Foresight has

13  continuous and systematic business contacts with the State of California and this judicial

14  district.  On information and belief, Foresight conducts business extensively in the State of

15  California and in this judicial district, including by advertising (including the provision of

16  interactive web pages) its services in the State of California and in this judicial district.  On

17  information and belief, Foresight has engaged in unfair competition and has misappropriated

18  Roche's trade secrets in California and in this judicial district.  On information and belief,

19  Foresight derives significant benefits from its unfair competition and misappropriation, and

20  knows or should have known that its actions will have consequences within this judicial district.

21      19.     On information and belief, Foresight funds research conducted in the State of

22  California and in this judicial district, including research conducted at Stanford which, as set

23  forth below, is built on and uses proprietary technology previously sold to Roche by Foresight's

24  founders, was developed while Foresight's founders were subject to contractual obligations to

25  Roche regarding the same technology, and has used and continues to use misappropriated

26

27  [2] A separate action is being concurrently filed in the United States District Court for the District
    of Delaware naming Drs. Alizadeh and Diehn as defendants pursuant to forum selection clauses
28  in their contracts with Roche.

Roche trade secrets.

20.     On information and belief, in December 2023, Foresight employees attended the 65th annual meeting of the American Society of Hematology in San Diego, at which Foresight was a participating exhibitor, promoting its products and services, including those incorporating technology misappropriated from Roche.

21.     On information and belief, senior executives at Foresight live and work from locations within the State of California and within this judicial district.  These include former Roche contractors and consultants Defendant Kurtz and Drs. Diehn and Alizadeh who, as set forth below, served as conduits for Foresight's unfair competition and misappropriation of Roche's trade secrets.

22.     On information and belief, Dr. Alizadeh, Foresight's co-founder, advisor, and executive—and former Roche consultant—resides in the State of California and performs research funded by Foresight in the State of California and in this judicial district, including research built on and using proprietary technology that Dr. Alizadeh previously sold to Roche, performed while Dr. Alizadeh was subject to contractual obligations to Roche regarding the same technology, and using trade secrets misappropriated from Roche.  On information and belief, Dr. Alizadeh has served on the faculty of Stanford since at least 2011.

23.     On information and belief, Dr. Diehn, Foresight's Scientific Advisor, co-founder, and Board Member—and former Roche consultant—resides in the State of California and performs work for Foresight and research funded by Foresight in the State of California and in this judicial district, including research built on and using proprietary technology that Dr. Diehn previously sold to Roche, performed while Dr. Diehn was subject to contractual obligations to Roche regarding the same technology, and using trade secrets misappropriated from Roche.  On information and belief, Dr. Diehn has served on the faculty of Stanford since at least 2009.

24.     On information and belief, Dr. Kurtz, Foresight's Scientific Advisor and co-founder—and former Roche contractor—resides in the State of California and performs work for Foresight and research funded by Foresight in the State of California and in this judicial

district, including research developed while Dr. Kurtz was subject to contractual obligations to Roche regarding the same technology and using trade secrets misappropriated from Roche.

Personal Jurisdiction Over Defendant Dr. Kurtz

25.     This Court has personal jurisdiction over Dr. Kurtz because, on information and belief, he is a citizen of the State of California.  Furthermore, on information and belief, Dr. Kurtz derives significant benefits from his unfair competition, breach of contract, and misappropriation of Roche's trade secrets and knows or should have known that his actions will have consequences within this judicial district.

26.     On September 23, 2017, Dr. Kurtz signed a Proprietary Information and Invention Agreement (the "Kurtz Agreement"), with Plaintiff Roche Molecular Systems.  Ex. B.  The Kurtz Agreement is governed by California law.  On information and belief, Dr. Kurtz performed work under the Kurtz Agreement in California, including in this judicial district.

Personal Jurisdiction Over Defendant Stanford

27.     This Court has personal jurisdiction over Defendant Stanford because Stanford is organized under the laws of the State of California and has a principal place of business in this judicial district, regularly does business in this judicial district, and, on information and belief, has misappropriated Roche's trade secrets in the State of California and in this judicial district.

**VENUE**

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

**INTRADISTRICT ASSIGNMENT**

29.     Pursuant to Civil Local Rules 3-2(c) and 3-2(e), assignment of this action is proper in the San Jose division because a substantial part of the events or omissions giving rise to the claim occurred in Santa Clara County.

**FACTUAL BACKGROUND**

Roche's Acquisition of CappMed

30.     On information and belief, Dr. Diehn, Dr. Alizadeh, and Ashok Kirshnamurthi

founded CappMed in October 2013 to develop technology for cancer screening and monitoring by detecting circulating tumor DNA using novel DNA sequencing methods.

31.     On April 28, 2014, CappMed entered into an Exclusive Equity Agreement with Stanford (the "Stanford Agreement").  As part of the Stanford Agreement, Stanford granted CappMed an exclusive license to U.S. Provisional Patent Application 61/798,925, titled "Identification and Use of Circulating Tumor Markers," and any U.S. or foreign application claiming priority therefrom.

32.     On information and belief, pursuant to the Stanford Agreement, Dr. Diehn, Dr. Alizadeh, and Stanford received equity in CappMed.

33.     In 2014, CappMed approached Roche about a potential acquisition.  CappMed provided Roche a confidential presentation in September 2014, (the "CappMed Presentation"), in which Dr. Diehn, Dr. Alizadeh, and Mr. Kirshnamurthi explained CappMed's proprietary technology and the intellectual property and other assets that Roche would receive through an acquisition of CappMed.  Ex. C.

34.     In the CappMed Presentation, CappMed described its "CAPP-Seq" technology for non-invasive screening for identifying and monitoring cancer using blood samples.  CappMed further represented that it had developed eight CAPP-Seq tumor selectors, including three for non-small cell lung cancer (NSCLC) and one each for esophageal cancer, pancreatic adenocarcinoma, ovarian adenocarcinoma, diffuse large B cell lymphoma (DLBCL), and follicular lymphoma.  In the CappMed presentation, CappMed further described its intellectual property as relating to selector design and library preparation.  Ex. C at 57.

35.     CappMed further represented to Roche that as part of an acquisition, Roche would acquire all of its intellectual property.  That intellectual property included patent rights and proprietary technology (including ctDNA know-how and an implementation-ready assay), and "Sequencing platform agnostic IVDs + analytic software."  Ex. C at 60.

36.     Roche acquired CappMed on April 7, 2015 (the "Acquisition").  Through the Acquisition, Roche acquired all of CappMed's assets and intellectual property, including all

patent rights and know-how relating to the CAPP-Seq technology, in exchange for tens of millions of dollars that were paid to CappMed's shareholders, including at least Drs. Diehn and Alizadeh.

37.     As part of the Acquisition, Roche acquired all of CappMed's analysis pipeline, including source code, executables, and dependencies.  These included, for example, dozens of source code files and index files containing genetic information.  Roche further acquired supporting documentation and instructions for using the CappMed analysis pipeline, and CappMed personnel further trained existing Roche personnel on use of the pipeline.

38.     In connection with the Acquisition Agreement, on April 1, 2015, CappMed and Stanford executed a Fourth Amendment to the Stanford Agreement by which Stanford "consent[ed] to any deemed assignment by CappMed of the [Stanford] Agreement in connection with" the Acquisition.  Ex. D.  On information and belief, Stanford received a cash payment of $75,000 as an "assignment fee."

### Dr. Diehn's and Dr. Alizadeh's Contractual Obligations to Roche

39.     After the Acquisition, Drs. Diehn and Alizadeh had continuing, ongoing contractual obligations to Roche.

40.     In 2015, Drs. Diehn and Alizadeh entered into Non-Competition Agreements (the "Non-Competition Agreements") and Consulting Services Agreements (the "2015 Consulting Agreements") with Plaintiff RMS.  The term of the Non-Competition Agreements began on the date of the Acquisition and continued for two years.  Ex. E.  The term of the 2015 Consulting Agreements began on the date of the Acquisition and continued for two years.  Ex. A.

41.     The Non-Competition Agreements provide that Drs. Diehn and Alizadeh would not compete with Roche or CappMed during the term of the agreements by, *inter alia*, "research (other than Permitted Clinical Research), development or commercialization of assays, biomarkers or algorithms to detect, quantify, measure or analyze cell-free circulating nucleic acid derived from tumors."  Ex. E, ¶ 15(c).  Pursuant to these agreements, "Permitted Clinical Research" was limited to use of existing tools, with publicly disclosed DNA sequences, for a

1   narrow set of applications that were part of previously ongoing research being conducted in Drs.

2   Diehn and Alizadeh's labs at Stanford.  Ex. E, ¶ 15(d).

3          42.     The 2015 Consulting Agreements acknowledged that Drs. Diehn and Alizadeh

4   were employees of Stanford subject to certain obligations to Stanford regarding ownership of

5   intellectual property and required Drs. Diehn and Alizadeh to notify Roche of any conflict

6   between their obligations under the 2015 Consulting Agreements and their obligations to

7   Stanford.  On information and belief, during the term of the 2015 Consulting Agreements, Drs.

8   Diehn and Alizadeh never notified Roche of any such conflicts.

9          43.     Under the 2015 Consulting Agreements, Drs. Diehn and Alizadeh assigned to

10  RMS: "any Inventions conceived or developed in whole or in part by [Drs. Diehn and Alizadeh]

11  during the Restricted Period (as defined in the Noncompetition Agreement[s] entered into by

12  and between RMS and [Drs. Diehn and Alizadeh] in connection with the transactions

13  contemplated by the Merger Agreement … arising or resulting from Provider engaging in

14  Competition," in violation of the Non-Competition Agreements.  Ex. A, ¶ 7.1.  The

15  Noncompetition Agreements originally defined the Restricted Period as continuing for two

16  years after the closing date of the Acquisition.

17         44.     Under the 2015 Consulting Agreements, Drs. Diehn and Alizadeh represented that

18  they did not own or control any intellectual property conceived or developed before the 2015

19  Consulting Agreements that was related to the services being performed under the 2015

20  Consulting Agreements—namely services "related to RMS's research, development or

21  commercialization of assays or biomarkers to detect, quantify, measure or analyze cell-free

22  circulating nucleic acid derived from tumors"—but to the extent any such intellectual property

23  existed, they assigned it to Roche.  Ex. A, ¶ 8.1; *id*. at Exhibit A.

24         45.     The 2015 Consulting Agreements prohibited Drs. Diehn and Alizadeh from

25  disclosing confidential information, which the 2015 Consulting Agreements defined as

26  including, *inter alia*, technical information known to Drs. Diehn and Alizadeh through

27  performance of consulting services with Roche.

28

46.     Drs. Diehn and Alizadeh entered into Restated Consulting Services Agreements with Plaintiff RSS on April 9, 2017 (the "2017 Consulting Agreements"). Exs. F, G. The 2017 Consulting Agreements included substantially similar non-competition, invention assignment, and confidentiality provisions as the 2015 Consulting Agreements. The 2017 Consulting Agreements extended Drs. Diehn's and Alizadeh's relationship with Roche for one year.

47.     Drs. Diehn and Alizadeh entered into second Restated Consulting Services Agreements with Plaintiff RSS on June 11, 2018 (the "2018 Consulting Agreements"). Exs. H, I. The 2018 Consulting Agreements included similar invention assignment and confidentiality provisions as the 2015 and 2017 Consulting Agreements. The 2018 Consulting Agreements extended Drs. Diehn's and Alizadeh's relationship with Roche for one year.

48.     Drs. Diehn and Alizadeh executed amendments to the 2018 Consulting Agreements on June 10, 2019 (the "2019 Consulting Agreements," together with the 2015, 2017, and 2018 Consulting Agreements, the "Consulting Agreements"). Exs. J, K. The 2019 Consulting Agreements extended the term of the 2018 Consulting Agreements for two years until June 10, 2021. All other terms and conditions of the 2018 Consulting Agreements otherwise remained in effect.

<u>Defendant Kurtz's Contractual Obligations to Roche</u>

49.     From September 2017 to July 2020, Dr. Kurtz served as an independent contractor for Roche. On information and belief, during this time, and pursuant to his contractual obligations to Roche, Dr. Kurtz engaged in extensive work for Roche analyzing and processing the DLBCL panel data—a set of genes identified as being disproportionally mutated in patients with diffuse large B cell lymphoma—that Roche had acquired through its acquisition of CappMed.

50.     In 2017, Dr. Kurtz entered into the Kurtz Agreement with Plaintiff RMS. Ex. B.

51.     Under the Kurtz Agreement, Dr. Kurtz was prohibited from carrying on any outside employment relating to Roche's defined "Area of Interest" without Roche's approval. Ex. B, ¶ 15. The Kurtz Agreement defined Roche's "Area of Interest" as "any operations, field

of research, investigation or business that relates to (i) Roche's or an Affiliates actual business or (ii) an actual or demonstrably anticipated research or development that Roche is preparing or planning to engage." Ex. B, ¶ 22(b).

52.    Under the Kurtz Agreement, Dr. Kurtz was required to "immediately disclose to Roche or its designee and keep adequate records of any invention, discovery, improvement, process, product or device, that is conceived, discovered, made or reduced to practice, whether patentable or not, either solely or jointly, by [Dr. Kurtz] during [Dr. Kurtz's] employment by Roche, if such invention, discovery, improvement, process, product or device (i) relates to Roche's Area of Interest, (ii) is developed specifically by [Dr. Kurtz] for Roche or its Affiliates, (iii) is developed in the course of performing work for Roche or its Affiliates or (iii) [*sic*] is based on Roche secret, confidential or proprietary ideas and/or information." Ex. B, ¶ 3.

53.    For three years following the termination Dr. Kurtz's employment with Roche, the Kurtz Agreement required Dr. Kurtz to disclose to Roche inventions developed for Roche, developed in the course of performing work for Roche, or based on secret, confidential, or proprietary ideas or information obtained by Dr. Kurtz during the term of his employment from Roche. Ex. B, ¶ 14(b).

54.    Under the Kurtz Agreement, Dr. Kurtz assigned to Roche inventions conceived during his employment with Roche. Ex. B, ¶ 5. He further agreed to notify Roche if he was asked to "work in an area that conflicts with or is believed to conflict with an invention of [Dr. Kurtz's] that existed prior to the date on which [Dr. Kurtz's] employment with Roche began or that conflict with an invention of [Dr. Kurtz's]" made on his own time, using his own resources, and not using any Roche information. Ex. B, ¶ 6. On information and belief, Dr. Kurtz never notified Roche of any such conflict.

55.    The Kurtz Agreement provides that "any invention, discovery, improvement, process, product or device that is conceived, discovered, made or reduced to practice, whether patentable or not, whether solely or jointly, by [Dr. Kurtz], during [Dr. Kurtz's] employment by Roche, is the property of Roche, if, at the time of conception, discovery, creation or reduction to

practice, such invention, discovery, improvement, process, product or device (i) relates to

(a) Roche's business or (b) an actual or demonstrably anticipated research or development on

the part of Roche, or (ii) results from work that [Dr. Kurtz] (a) performed for Roche, (b) did not

develop exclusively on [Dr. Kurtz's] own time, or (c) created through access to or use of

Roche's equipment, supplies, facilities or trade secret information."  Ex. B, ¶ 5.

56.    The Kurtz Agreement prohibited Dr. Kurtz from disclosing confidential

information during his employment with Roche and for three years following the termination of

his employment with Roche.  Ex. B, ¶ 14(a).

57.    The Kurtz Agreement provides that Dr. Kurtz "will not copy, disclose, utilize or

otherwise use any secret, confidential or proprietary idea and/or information that is

(i) developed by me for Roche or its affiliates or (ii) obtained while [he is] employed by Roche

from Roche, its employee, its consultants, vendors or affiliates for a period of three (3) years

after termination of the employment relationship between [him] and Roche or until such idea or

information becomes public knowledge, whichever comes first, or as required by law."  Ex. B,

¶ 14(a).

<u>Roche's Development of the CappMed Technology</u>

58.    In connection with its development of the technology it acquired from CappMed,

Roche relied extensively on data collected by researchers and analytical tools for processing

these data.  Raw genetic data from cancer patients and healthy individuals must be collected,

processed, and analyzed to locate genetic markers that can be used to identify a particular

cancer or the status of an existing known cancer.  The tools Roche used to do this include, at

least, CAPP-Seq tumor selectors, CAPP-Seq selector design software, Roche's data analysis

pipeline, and panel data (the "Roche Trade Secrets").  The Roche Trade Secrets include both

materials acquired as part of the CappMed Acquisition and Roche's improvements thereto.

59.    For example, Roche has used the Roche Trade Secrets to develop its AVENIO

ctDNA Analysis Kits, which serve as important tools for cancer researchers.  Roche continues

to use the Roche Trade Secrets in the development of the CappMed technology, including in the

1  research and development of next generation sequencing assays for the detection of additional

2  cancer types.

3      60.     The Roche Trade Secrets have independent economic value to Roche from not

4  being generally known to the public, to Roche's competitors, or to other persons who can obtain

5  economic value from the trade secrets, including the CAPP-Seq tumor selectors, CAPP-Seq

6  selector design software, data analysis pipeline, and panel data.  The Roche Trade Secrets all

7  have economic value in the development of precise and accurate tools for cancer detection and

8  monitoring.

9      61.     One specific aspect used as part of the Roche Trade Secrets is confidential data

10 relating to genetic mutations in patients with DLBCL.  This data is stored in files known as

11 browser extensible data files or "BED Files."  Drs. Diehn, Alizadeh, and Kurtz provided BED

12 Files that corresponded to genetic regions identified as containing mutations in patients with

13 DLBCL as part of the CAPPMed Acquisition and in connection with work done pursuant to

14 their consulting and employment agreements.  This data was then used by Roche to develop

15 tools for detecting DLBCL in patients from ctDNA samples.

16                        Roche's Protection of the Roche Trade Secrets

17     62.     To protect the Roche Trade Secrets, Roche has implemented technical measures

18 restricting access to data and information on its internal systems.  Roche also has adopted

19 policies governing the non-disclosure of confidential information and trade secrets and has

20 trained its employees on these policies.

21     63.     Roche requires contract employees with access to its trade secrets, such as Dr.

22 Kurtz, to sign confidentiality and non-disclosure agreements.

23     64.     Roche further requires non-employee consultants with access to its trade secrets,

24 such as Drs. Diehn and Alizadeh, to sign confidentiality and non-disclosure agreements.

25     65.     Roche has maintained the Roche Trade Secrets as confidential and has taken

26 reasonable precautions to maintain their secrecy by restricting their access, adopting policies

27 governing the non-disclosure of confidential information and trade secrets, training its

28

1
2
3

employees on these policies, and requiring employees and non-employees with access to its trade secrets, such as Drs. Diehn, Alizadeh, and Kurtz, to sign confidentiality and non-disclosure agreements.

4
5

<u>Defendants' Misappropriation of Roche's Trade Secrets,</u>
<u>Breach of Contractual Obligations, and Unfair Competition with Roche</u>

6
7
8

66.     On information and belief, after the Acquisition of CappMed by Roche and during the term of the Consulting Agreements, Drs. Alizadeh and Diehn partnered with Dr. Kurtz to continue developing DNA sequencing techniques built on the proprietary CAPP-Seq technology that Drs. Alizadeh and Diehn sold to Roche as part of the CappMed Acquisition.

9
10
11
12

67.     Defendant Foresight purports to own a proprietary technology referred to as "PhasED-Seq."  Foresight describes PhasED-Seq as "a liquid-biopsy powered platform that detects minimal residual disease (MRD) from circulating tumor DNA (ctDNA)."

13
14
15

68.     On information and belief, during the term of the Consulting Agreements and the Kurtz Agreement, Drs. Diehn, Alizadeh, and Kurtz developed PhasED-Seq using tools, software, and data previously acquired by Roche as part of the CappMed Acquisition.

16
17
18
19
20

69.     A December 11, 2023, public statement by Stanford touts the PhasED-Seq technology asserting that that "PhasED-Seq *builds upon a technique called CAPP-Seq*, or cancer personalized profiling by deep sequencing, developed in 2014 by Alizadeh and Diehn to assess lung cancer levels and response to treatment," Ex. L (emphasis added), indicating that Defendants made use Roche's confidential CAPP-Seq data and analytical tools in developing PhasED-Seq.

21
22
23

70.     On information belief, Drs. Diehn, Alizadeh, and Kurtz knew during the term of their contractual relationships with Roche that Roche possessed this data and related data and analytical tools and was using them to develop new products.

24
25

71.     On information and belief, Dr. Kurtz did not disclose PhasED-Seq to Roche despite having a contractual obligation to do so under the Kurtz Agreement.

26
27
28

72.     While Dr. Kurtz's rights in PhaseED-Seq were assigned to Roche by operation of contract under the Kurtz Agreement, on information and belief, Dr. Kurtz did not formally

1    execute an assignment of his rights in PhasED-Seq to Roche.

2        73.    On November 6, 2019, during the term of the Consulting Agreements and the

3    Kurtz Agreement, Defendant Stanford filed U.S. Provisional Patent Application 62/931,688 (the

4    "'688 application").  The '688 application is titled "Method and Systems for Assessment and

5    Treatment of Cancer" and names Drs. Diehn, Alizadeh, and Kurtz as inventors.

6        74.    Stanford has filed and continues to file additional patent applications claiming

7    priority from the '688 application ("the Disputed Patent Applications"), including:

| Application Number | Filing Date | Publication Date |
|---|---|---|
| PCT/US2020/059526 | 11/06/2020 | 05/14/2021 |
| 17/107,668 | 11/30/2020 | 06/10/2021 |
| 17/308,958 | 05/05/2021 | 11/05/2021 |
| 17/455,209 | 11/16/2021 | 05/05/2022 |
| 17/646,472 | 12/29/2021 | 08/11/2022 |
| 17/646,473 | 12/29/2021 | 06/30/2022 |
| 17/661,730 | 05/02/2022 | 10/27/2022 |
| 17/820,200 | 08/16/2022 | 12/08/2022 |
| 18/056,652 | 11/17/2022 | 06/29/2023 |
| 18/056,656 | 11/17/2022 | 04/20/2023 |
| 18/167,803 | 02/10/2023 | 08/10/2023 |
| 18/167,804 | 02/10/2023 | 01/25/2024 |
| 18/172,957 | 02/22/2023 | 06/15/2023 |
| 18/481,092 | 10/04/2023 | 02/01/2024 |

21        75.    On information and belief, U.S. Patent 11,634,779 (the "'779 patent") issued on

22    April 25, 2023, from U.S. Patent Application 17/661,730 (the "'730 application"), which was

23    filed on May 2, 2022.

24        76.    The '779 patent states that the invention was made with Government support

25    under CA241076 and CA188298, two projects supported by National Institutes of Health.

26        77.    Drs. Diehn and Alizadeh are listed as the Project Leaders for NIH project number

27    CA188298.  Ex. M.  The project start date for CA188298 was June 1, 2015.  At that time, Drs.

28

1    Diehn and Alizadeh were consultants for Roche and subject to the terms of the Non-

2    Competition Agreements.

3        78.    The Abstract for NIH project CA188298 states in relevant part: "We have

4    designed and implemented a novel, high throughput sequencing-based technique for

5    measurement of circulating tumor-derived DNA termed CAPP-Seq (CAncer Personalized

6    Profiling [] by deep Sequencing).  We propose to evaluate the utility of ctDNA analysis via

7    CAPP-Seq in NSCLC patients treated with radiotherapy and to explore mechanisms of ctDNA

8    release and clearance in human patients."

9        79.    Dr. Kurtz is listed as the Project Leader for NIH project number CA241076.

10    Ex. N.  The project start date for CA241076 was August 1, 2019.

11        80.    In August 2019, Dr. Kurtz was a contractor for Roche and subject to non-

12    competition obligations.

13        81.    In his role as a contractor for Roche, Dr. Kurtz worked on Roche's efforts to

14    develop CAPP-Seq for use in detecting DLBCL in patients from ctDNA samples, including by

15    providing input on which mutations and genetic sequences to focus the analysis on.

16        82.    The Abstract for project CA241076, which Dr. Kurtz filed on behalf of Stanford,

17    states in relevant part: "I will further extend ctDNA detection by CAPP-Seq to develop

18    methods to comprehensively molecularly characterize DLBCL directly from the blood plasma,

19    including genome-wide copy-number profiling and detection of phased haplotypes, a unique

20    entity in B-cell malignancies (Aim 1)."

21        83.    Drs. Diehn, Alizadeh, and Kurtz did not disclose or provide notice to Roche of the

22    inventions described or claimed in any of the Disputed Patent Applications, despite having

23    contractual obligations to do so under the Consulting Agreements and the Kurtz Agreement.

24        84.    Drs. Diehn, Alizadeh, and Kurtz executed assignments of the '730 application to

25    Stanford on December 8, 2020; January 11, 2021; and March 10, 2021, respectively, despite

26    their contractual obligations to disclose and assign these inventions to Roche.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Stanford's Knowledge and Conduct</u>

85.     As it acknowledged in the Fourth Amendment to the Stanford Agreement, Stanford was aware that Roche had acquired CappMed.

86.     Stanford's Office of Technology Licensing's "Start-Up Guide" identifies CappMed as an example of a "start-up[] based on intellectual property owned by Stanford and licensed through the Office of Technology Licensing (OTL)," and explains that it was "acquired by Roche."

87.     On information and belief, Stanford employees, including at least Drs. Diehn and Alizadeh, were aware that Roche had acquired all of CappMed's intellectual property, including the CAPP-Seq technology and CappMed's trade secrets.

88.     On information and belief, Stanford was aware that Roche had acquired all of CappMed's intellectual property, including the CAPP-Seq technology and CappMed's trade secrets.

89.     On information and belief, Stanford, including through its employees Drs. Diehn, Alizadeh, and Kurtz, was aware that Drs. Diehn, Alizadeh, and Kurtz had ongoing contractual obligations to Roche.

90.     Stanford was aware, and has publicly acknowledged, that "PhasED-Seq *builds upon*" Roche's CAPP-Seq technology.  Ex. L (emphasis added).

91.     Stanford received millions of dollars in research funding for NIH projects CA188298 and CA241076, in which it represented to the NIH that the research it was performing built upon and extended the CAPP-Seq technology that was owned by Roche.

92.     On information and belief, Stanford employees, including at least Drs. Diehn, Alizadeh, and Kurtz, knew that the Disputed Patent Applications disclose and claim inventions built on technology that Drs. Diehn and Alizadeh previously sold to Roche, and that Dr. Kurtz was contractually obligated to disclose and assign to Roche under the Kurtz Agreement.

93.     On information and belief, Stanford was aware that the Disputed Patent Applications disclose and claim inventions built on technology that Drs. Diehn and Alizadeh

previously sold to Roche, and that Dr. Kurtz was contractually obligated to disclose and assign to Roche under the Kurtz Agreement.

94.    On information and belief, Stanford employees, including at least Drs. Diehn, Alizadeh, and Kurtz, knew that the Disputed Patent Applications disclose and claim inventions built on and developed using the Roche Trade Secrets.

95.    On information and belief, Stanford was aware that the Disputed Patent Applications disclose and claim inventions built on and developed using the Roche Trade Secrets.

<u>Dr. Diehn's, Dr. Alizadeh's, and Dr. Kurtz's Knowledge and Conduct</u>

96.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz knew that the technology disclosed and claimed in the patents and applications was developed using data and analytical tools that had previously been sold to Roche through its acquisition of CappMed and provided to Roche during the term of the Consulting Agreements and Kurtz Agreement.

97.    Drs. Diehn, Alizadeh, and Kurtz informed the federal government that the research giving rise to the '730 application arose from their use of Roche's CAPP-Seq technology "in NSCLC patients" and their efforts to "extend ctDNA detection by CAPP-Seq." Exs. M, N.

98.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz improperly included data previously sold to Roche in the '730 application. The '730 application includes Table 3, which discloses the coordinates of a "unified targeted sequencing panel." Table 3 is identical to the data in a BED File provided to Roche by Drs. Diehn, Alizadeh, and/or Kurtz and maintained by Roche as confidential and used as part of and to develop the Roche Trade Secrets.

99.    On information and belief, the earliest publication date for any of the Disputed Patent Applications is May 14, 2021. Roche could not have been reasonably aware of Defendants' breach of contract and trade secret misappropriation before that date.

<u>Founding of Foresight</u>

100.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz co-founded Foresight

Diagnostics on May 8, 2020 with the intention of commercializing competing DNA sequencing techniques built on the proprietary CAPP-Seq technology previously acquired by Roche through the CappMed Acquisition and developed during the term of the Consulting Agreements and the Kurtz Agreement, despite knowing that they had ongoing contractual obligations to Roche and at least Dr. Kurtz was obligated to disclose and assign the improvements to Roche under the Kurtz Agreement.

101.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz co-founded Foresight Diagnostics with the intention of commercializing the inventions disclosed and claimed in the Disputed Patent Applications, despite knowing that at least Dr. Kurtz was obligated to disclose and assign the inventions to Roche under the Kurtz Agreement and that the Disputed Patent Applications rely on Roche Trade Secrets, including those that had previously been sold to Roche as part of the CappMed Acquisition.

102.    On information and belief, at the time that he co-founded Foresight, Dr. Kurtz was serving as a contractor for Roche, was obligated under the Kurtz Agreement to disclose to Roche any inventions or improvements that "relat[e] to Roche's Area of Interest," was obligated to assign to Roche any invention or improvement that "relates to Roche's business," was obligated to protect the confidentiality of Roche's confidential information—including the Roche Trade Secrets—was permitted to use Roche's confidential information only in providing services to Roche, and was barred from "enter[ing] into or carry[ing] on … any outside employment, business or other activity relating to [his] duties at Roche, [his] profession, or Roche's Area of Interest," absent written authorization from Roche.

103.    On information and belief, Dr. Kurtz co-founded Foresight to commercialize and make use of improved DNA sequencing techniques developed during the term of the Kurtz Agreement and that make use of the Roche Trade Secrets in violation of his disclosure, assignment, and confidentiality obligations and the prohibition on entering into outside employment or business.

104.    On information and belief, at the time that he co-founded Foresight, Dr. Diehn

was serving as a consultant for Roche, was obligated under the Consulting Agreements to protect the confidentiality of Roche's confidential information—including the Roche Trade Secrets—was permitted to use Roche's confidential information only in providing services to Roche, and was representing to Roche that he had no agreements with any third party that conflicted with his obligations to Roche.

105.    On information and belief, Dr. Diehn co-founded Foresight to commercialize and make use of improvements to the CAPP-Seq technology he previously sold to Roche and the Roche Trade Secrets in violation of his confidentiality obligations and his representations that he had no conflicting obligations to any third party.

106.    On information and belief, at the time that he co-founded Foresight, Dr. Alizadeh was serving as a consultant for Roche, was obligated under the Consulting Agreements to protect the confidentiality of Roche's confidential information—including the Roche Trade Secrets—was permitted to use Roche's confidential information only in providing services to Roche, and was representing to Roche that he had no agreements with any third party that conflicted with his obligations to Roche.

107.    On information and belief, Dr. Alizadeh co-founded Foresight to commercialize and make use of improvements to the CAPP-Seq technology he previously sold to Roche and the Roche Trade Secrets in violation of his confidentiality obligations and his representations that he had no conflicting obligations to any third party.

108.    Drs. Diehn, Alizadeh, and Kurtz are listed as three of the four co-founders on Foresight's website.  Ex. O.

109.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz have served in senior executive roles at Foresight since its founding.

110.    Drs. Diehn, Alizadeh, and Kurtz are listed as three of the six "advisors" on Foresight's website.  Ex. P.

111.    Dr. Alizadeh is listed as an "executive" on Foresight's webpage.  Ex. Q.

112.    On information and belief, Drs. Diehn, Alizadeh, and Kurtz perform ongoing

research on behalf of Foresight.  Foresight highlights their ongoing research for potential investors.

113.     On information and belief, in connection with and in furtherance of their founding of Foresight, Drs. Diehn, Alizadeh, and Kurtz, prepared and filed the '730 application that became the '779 Patent.

114.     On information and belief, Drs. Diehn, Alizadeh, and Kurtz purported to assign rights to the '779 patent to Stanford despite having ongoing contractual obligations to Roche that they keep Roche Trade Secrets confidential and assign intellectual property to Roche.

115.     On information and belief, Stanford granted an exclusive license to Foresight for the '779 patent and all related patent applications.  As a result, Foresight knowingly and improperly gained access to Roche Trade Secrets that Drs. Diehn and Alizadeh had previously sold to Roche as part of the CappMed Acquisition.

<u>Foresight's Misappropriation of the Roche Trade Secrets</u>

116.     On information and belief, Foresight has used and continues to use the Roche Trade Secrets.

117.     In January 2022, Foresight approached Roche about a potential partnership in the same field in which Drs. Diehn, Alizadeh, and Kurtz had been working in for Roche just months before.

118.     On information and belief, Foresight's technology builds on and uses Roche Trade Secrets.

119.     On information and belief, Foresight has raised over $70 million touting technology that improperly uses and relies on Roche Trade Secrets.

120.     On information and belief, Foresight and its co-founders Drs. Diehn, Alizadeh, and Kurtz know that Foresight's technology builds on and uses Roche Trade Secrets, including proprietary data that Drs. Diehn and Alizadeh sold to Roche as part of the CappMed Acquisition.

Tolling and Standstill Agreement

121.    On January 9, 2024, Roche entered into a Tolling and Standstill Agreement with Foresight, Stanford, Dr. Alizadeh, Dr. Diehn, and Dr. Kurtz, which was subsequently amended to extend the tolling period.

122.    The tolling period began on January 9, 2024 and, as amended, extended through June 30, 2024.

## CLAIMS FOR RELIEF

*First Claim for Relief*

**Trade Secret Misappropriation Under 18 U.S.C. § 1836, et seq.**

*(Against Foresight, Stanford, and Kurtz)*

123.    Roche re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

124.    The Roche Trade Secrets, as described above, relate to products and services developed, engineered, used, sold, purchased, and intended for use, sale, and purchase in interstate and foreign commerce.

125.    As set forth above, Defendants Foresight, Stanford, and Dr. Kurtz misappropriated the Roche Trade Secrets, including scientific and technical information, compilations, procedures, processes, programs, and codes, all of which constitute "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* Roche is the owner of the Roche Trade Secrets.

126.    The Roche Trade Secrets that Defendants Foresight, Stanford, and Dr. Kurtz have misappropriated derive independent economic value to Roche from not being generally known to the public, to Roche's competitors, or to other persons who can obtain economic value from the disclosure of the trade secrets.

127.    The Roche Trade Secrets are not readily ascertainable through proper means or from generally available, public sources.

128.    At all relevant times, Roche made reasonable efforts to protect and preserve the

secrecy of the Roche Trade Secrets.

129.    Foresight, Stanford, and Dr. Kurtz misappropriated the Roche Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, *inter alia*, knowingly acquiring the trade secrets through improper means and disclosing and/or using them without Roche's express or implied consent.

130.    Dr. Kurtz knew, or had reason to know, at the time that he used and disclosed the Roche Trade Secrets that he was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

131.    Dr. Kurtz acquired the Roche Trade Secrets by virtue of his employment contract with Roche, not through his own independent research and efforts, in direct violation of the legal obligations he owed to Roche.

132.    Stanford knew, or had reason to know, at the time that it used and disclosed the Roche Trade Secrets that it was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

133.    Stanford was aware or should have been aware that Drs. Diehn, Alizadeh, and Kurtz had ongoing confidentiality obligations to Roche regarding the subject matter of the Roche Trade Secrets.

134.    Foresight knew, or had reason to know, at the time that it used and disclosed the Roche Trade Secrets that it was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

135.    Foresight was aware or should have been aware that Drs. Diehn, Alizadeh, and Kurtz had ongoing confidentiality obligations to Roche regarding the subject matter of the Roche Trade Secrets given that they were founders of Foresight and held various positions with the company.

136.    As a direct, proximate, and foreseeable result of Foresight, Stanford, and Dr. Kurtz's misappropriation of the Roche Trade Secrets, Roche has been damaged in an amount not yet ascertained, including, but not limited to, loss of profits, goodwill, competitive

advantage, and business opportunities.

137.    Foresight, Stanford, and Dr. Kurtz have been unjustly enriched as a further proximate result of their misappropriation of the Roche Trade Secrets.

138.    Foresight, Stanford, and Dr. Kurtz's unlawful actions were willful and malicious, thereby entitling Roche to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(D).

139.    Roche is entitled to an order enjoining Foresight, Stanford, and Dr. Kurtz, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Roche Trade Secrets that they misappropriated, and enjoining them from obtaining any benefit from their wrongful possession and use of the trade secrets.  Unless so ordered, Foresight, Stanford, and Dr. Kurtz's misappropriation of the Roche Trade Secrets will cause great and irreparable injury to Roche.  Roche has no adequate or other remedy at law for such acts and threatened acts.

*Second Claim for Relief*

**Trade Secret Misappropriation Under Cal. Civ. Code §§ 3426-3426.11**

*(Against Foresight, Stanford, and Kurtz)*

140.    Roche re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

141.    As set forth above, Foresight, Stanford, and Dr. Kurtz misappropriated the Roche Trade Secrets, including information and processes, programs, all of which constitute "trade secrets" under the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq.*  Roche is the owner of the Roche Trade Secrets.

142.    The Roche Trade Secrets that Foresight, Stanford, and Dr. Kurtz misappropriated derive independent economic value to Roche from not being generally known to the public, to Roche's competitors, or to other persons who can obtain economic value from the disclosure of the trade secrets.

143.    The Roche Trade Secrets are not readily ascertainable through proper means or

from generally available, public sources.

144.    At all relevant times, Roche made reasonable efforts to protect and preserve the secrecy of its trade secrets.

145.    Foresight, Stanford, and Dr. Kurtz misappropriated the Roche Trade Secrets within the meaning of Cal. Civ. Code §§ 3426.1(b) by, *inter alia*, knowingly acquiring the trade secrets through improper means and disclosing and/or using them without Roche's express or implied consent.

146.    Dr. Kurtz knew, or had reason to know, at the time that he used and disclosed the Roche Trade Secrets that he was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

147.    Dr. Kurtz acquired the Roche Trade Secrets by virtue of his work for Roche, not through his own independent research and efforts, in direct violation of the legal obligations he owed to Roche.

148.    Stanford knew, or had reason to know, at the time that it used and disclosed the Roche Trade Secrets that it was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

149.    Stanford was aware or should have been aware that Drs. Diehn, Alizadeh, and Kurtz had ongoing confidentiality obligations to Roche regarding the subject matter of the Roche Trade Secrets.

150.    Foresight knew, or had reason to know, at the time that it used and disclosed the Roche Trade Secrets, that it was acquiring this information by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

151.    Foresight was aware or should have been aware that Drs. Diehn, Alizadeh, and Kurtz had ongoing confidentiality obligations to Roche regarding the subject matter of the Roche Trade Secrets.

152.    On information and belief, Foresight, Stanford, and Dr. Kurtz have gained, or will gain, substantial benefit from their misappropriation of the Roche Trade Secrets, to Roche's

substantial detriment.

153.    As a result of Foresight, Stanford, and Dr. Kurtz's unlawful conduct, the Roche Trade Secrets have been compromised, and Roche is substantially threatened by Foresight, Stanford, and Dr. Kurtz's further use and dissemination of that information.

154.    As a direct, proximate, and foreseeable result of Foresight, Stanford, and Dr. Kurtz's misappropriation of the Roche Trade Secrets, Roche has been damaged in an amount not yet ascertained, including, but not limited to, loss of profits, goodwill, competitive advantage, and business opportunities.

155.    Foresight, Stanford, and Dr. Kurtz have been unjustly enriched as a further proximate result of their misappropriation of the Roche Trade Secrets.

156.    Foresight, Stanford, and Dr. Kurtz's unlawful actions were willful and malicious, and with the deliberate intent to injure Roche's business, thereby entitling Roche to exemplary damages pursuant to Cal. Civ. Code § 3426.3(c) and/or attorney's fees in an amount to be proven at trial pursuant to Cal. Civ. Code § 3246.4.

157.    Roche is entitled to an order enjoining Foresight, Stanford, and Dr. Kurtz, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Roche Trade Secrets that they misappropriated, and enjoining them from obtaining any benefit from their wrongful possession and use of the trade secrets.  Unless so ordered, Foresight, Stanford, and Dr. Kurtz's misappropriation of the Roche Trade Secrets will cause great and irreparable injury to Roche.  Roche has no adequate or other remedy at law for such acts and threatened acts.

*Third Claim for Relief*

**Breach of Contract**

*(Against Kurtz)*

158.    Roche re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

159.    The Kurtz Agreement provides that "any invention, discovery, improvement,

process, product or device that is conceived, discovered, made or reduced to practice, whether patentable or not, whether solely or jointly, by [Dr. Kurtz], during [Dr. Kurtz's] employment by Roche, is the property of Roche, if, at the time of conception, discovery, creation or reduction to practice, such invention, discovery, improvement, process, product or device (i) relates to (a) Roche's business or (b) an actual or demonstrably anticipated research or development on the part of Roche, or (ii) results from work that [Dr. Kurtz] (a) performed for Roche, (b) did not develop exclusively on [Dr. Kurtz's] own time, or (c) created through access to or use of Roche's equipment, supplies, facilities or trade secret information."

160.    The Kurtz Agreement also provides that Dr. Kurtz "will not copy, disclose, utilize or otherwise use any secret, confidential or proprietary idea and/or information that is (i) developed by [him] for Roche or its affiliates or (ii) obtained while [he is] employed by Roche from Roche, its employee, its consultants, vendors or affiliates for a period of three (3) years after termination of the employment relationship between me and Roche or until such idea or information becomes public knowledge, whichever comes first, or as required by law."

161.    The Kurtz Agreement also provides that "[Dr. Kurtz] will not enter into or carry on during the term of [Dr. Kurtz's] employment by Roche any outside employment, business or other activity relating to [Dr. Kurtz's] duties at Roche, [Dr. Kurtz's] profession, or Roche's Area of Interest, except as may be specifically authorized in writing by Roche."  The Kurtz Agreement defined Roche's "Area of Interest" as "any operations, field of research, investigation or business that relates to (i) Roche's or an Affiliates actual business or (ii) an actual or demonstrably anticipated research or development that Roche is preparing or planning to engage."

162.    The Kurtz Agreement also provides that "[Dr. Kurtz] must immediately disclose to Roche or its designee and keep adequate records of any invention, discovery, improvement, process, product or device, that is conceived, discovered, made or reduced to practice, whether patentable or not, either solely or jointly, by [Dr. Kurtz] during [Dr. Kurtz's] employment by Roche, if such invention, discovery, improvement, process, product or device (i) relates to

Roche's Area of Interest, (ii) is developed specifically by [Dr. Kurtz] for Roche or its Affiliates, (iii) is developed in the course of performing work for Roche or its Affiliates or (iii) [*sic*] is based on Roche secret, confidential or proprietary ideas and/or information."

163.    Pursuant to the Kurtz Agreement, Dr. Kurtz was subject to obligations to assign to Roche inventions relating to Roche's business, refrain from carrying on outside employment or business without Roche's consent, protect the confidentiality of the Roche Trade Secrets, and to refrain from disclosing such information to third parties without the consent of Roche.  Dr. Kurtz was further obligated to disclose to Roche inventions conceived during his employment with Roche and inventions relating to Roche's "Areas of Interest" for three years following termination of his employment with Roche.  Dr. Kurtz was also obligated to notify Roche if his work with Stanford or Foresight conflicted with his obligations to Roche.

164.    On information and belief, Dr. Kurtz breached the Kurtz Agreement by failing to disclose to Roche the inventions disclosed and claimed in the Disputed Patent Applications and the PhasED-Seq techniques described therein.

165.    On information and belief, to the extent that the inventions disclosed and claimed in the Disputed Patents Applications and the PhasED-Seq techniques described therein were not assigned to or otherwise owned by Roche by operation of contract, Dr. Kurtz breached the Kurtz Agreement by failing to assign to Roche the inventions disclosed and claimed in the Disputed Patent Applications and the PhasED-Seq techniques described therein.

166.    On information and belief, Dr. Kurtz breached the Kurtz Agreement by using and disclosing the Roche Trade Secrets in patent applications upon which he was a named inventor and by assigning his interest in the Disputed Patent Applications to Stanford.

167.    On information and belief, Dr. Kurtz breached the Kurtz Agreement by entering into employment with Foresight in Roche's areas of interest without notifying Roche or obtaining Roche's prior written approval.

168.    At all relevant times, Roche has performed its obligations under the Kurtz Agreement.

169.     Roche has sustained and will sustain damages as a direct and proximate result of Dr. Kurtz's breach of contract.

### Fourth Claim for Relief

**Breach of Implied Covenant of Good Faith and Fair Dealing**

*(Against Defendant Kurtz)*

170.     Roche re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

171.     As set forth above, Dr. Kurtz is a party to the Kurtz Agreement.

172.     Dr. Kurtz unfairly interfered with Roche's rights to receive the benefits of the Kurtz Agreement by carrying on business relating to his duties at Roche and in Roche's Area of Interest without Roche's consent.

173.     Dr. Kurtz unfairly interfered with Roche's rights to receive the benefits of the Kurtz Agreement by failing to disclose the inventions disclosed and claimed in the Disputed Patent Applications.

174.     Dr. Kurtz unfairly interfered with Roche's rights to receive the benefits of the Kurtz Agreement by assigning his interest in the Disputed Patent Applications to Stanford.

175.     Dr. Kurtz unfairly interfered with Roche's rights to receive the benefits of the Kurtz Agreement by using the confidential information, including the Roche Trade Secrets, that he received access to subject to the Kurtz Agreement to develop his own work on behalf of Foresight and Stanford.

176.     Dr. Kurtz's conduct has breached the implied covenant of good faith and fair dealing because it has caused Roche harm, losses, and damages, and continues to expose Roche to harm from the public disclosure of the Roche Trade Secrets.

### Fifth Claim for Relief

**Unfair Competition Under Cal. Business and Professions Code § 17200, et seq.**

*(Against Foresight and Stanford)*

177.     Roche re-alleges and incorporates by reference the allegations of the preceding

paragraphs of this Complaint, as if fully set forth herein.

178.    The California Unfair Competition Law defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200.

179.    On information and belief, Stanford filed the Disputed Patent Applications disclosing and claiming inventions that it knew or should have known were based on proprietary technology that belonged to Roche as a result of the CappMed Acquisition or as a result of later work conducted on Roche's behalf, and licensed the Disputed Patent Applications to Foresight in exchange for monetary compensation, including royalty payments.

180.    On information and belief, Stanford filed the Disputed Patent Applications disclosing and claiming inventions that it knew or should have known that Dr. Kurtz was obligated to assign to Roche, and licensed the Disputed Patent Applications to Foresight in exchange for monetary compensation, including royalty payments.

181.    On information and belief, Stanford filed the Disputed Patent Applications using confidential data that it knew or should have known belonged to Roche as a result of the CappMed Acquisition, and licensed the Disputed Patent Applications to Foresight in exchange for monetary compensation, including royalty payments.

182.    On information and belief, Foresight was aware that at least Dr. Kurtz was under an obligation to assign his interest in the Disputed Patent Applications to Roche, and it has promoted its exclusive license to the Disputed Patent Applications to obtain funding to perform research and raise funding to compete against Roche in the field of cancer diagnostics and monitoring using ctDNA.

183.    On information and belief, Foresight was aware that Drs. Diehn, Alizadeh, and Kurtz developed PhasED-Seq while subject to ongoing contractual obligations to Roche relating to development of cancer diagnostics and monitoring using ctDNA.

184.    On information and belief, Foresight was aware that the Disputed Patent Applications properly belong to Roche, and it has used and continues to use confidential information that its cofounders Drs. Diehn and Alizadeh had previously developed and sold to

Roche through the CappMed Acquisition.

185.    On information and belief, Foresight has knowingly used the Roche Trade Secrets, including those disclosed and claimed in the Disputed Patent Applications, to perform research and raise funding to compete against Roche in the field of cancer diagnostics and monitoring using ctDNA.

186.    On information and belief, Foresight violated California's Unfair Competition Law by engaging in unlawful, unfair, and fraudulently deceptive business acts or practices, which were immoral, unethical, oppressive, unscrupulous, and substantially damaging to Plaintiffs.

187.    As a result of Foresight's fraudulent and unlawful conduct, Plaintiffs have suffered irreparable injury and are entitled to restitution and injunctive relief.  Cal. Bus. & Prof. Code § 17203.

*Sixth Claim for Relief*

**Declaratory Judgment of Ownership**

*(Against Foresight and Stanford)*

188.    Roche re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint, as if fully set forth herein.

189.    An actual controversy has arisen and now exists between Roche on one hand and Foresight and Stanford on the other hand regarding each party's rights to an interest in at least the Disputed Patent Applications.

190.    On information and belief, the Disputed Patent Applications contain Roche confidential information and trade secrets, which Drs. Diehn, Alizadeh, and Kurtz were contractually obligated to keep confidential.

191.    On information and belief, the inventions disclosed and claimed in the Disputed Patent Applications arose from, or alternatively derived from, work performed by Drs. Diehn and Alizadeh at CappMed and by Dr. Kurtz while he was a contractor for Roche.

192.    Pursuant to the Consulting Agreements and the Kurtz Agreement, Drs. Diehn,

Alizadeh, and Kurtz assigned the inventions disclosed and claimed in the Disputed Patent Applications to Roche.

193.    At all relevant times, Stanford was aware that Drs. Diehn and Alizadeh had contractual obligations to Roche, including Diehn's and Alizadeh's obligations not to disclose confidential information and to assign certain intellectual property rights to Roche.  Likewise, Stanford knew or should have known that Dr. Kurtz had contractual obligations to Roche, including Dr. Kurtz's obligations not to disclose confidential information and to assign certain intellectual property rights to Roche.

194.    Pursuant to the Consulting Agreements and the Kurtz Agreement, the inventions described and claimed in the Disputed Patent Applications were assigned to Roche.

195.    Stanford improperly claims to be the true owner of the Stanford Applications, which constitute an improper and unauthorized assignment of Roche's interest and ownership of the disclosed inventions to Stanford.

196.    Pursuant to the terms of the Consulting Agreements and the Kurtz Agreement, Roche is entitled to a declaration that Roche is the true and lawful owner of all right, title, and interest in and to the Disputed Patent Applications and all patents issued therefrom, or, in the alternative, to an order reassigning all rights in the Disputed Patent Applications and all patents issuing therefrom to Roche, or alternatively that Roche is at least a co-owner.  Furthermore, Roche is entitled to a declaration that all rights in the Disputed Patent Applications and patents issuing therefrom granted to Foresight are null and void.

## **PRAYER FOR RELIEF**

Roche requests that the Court enter judgment against Foresight, Stanford, and Dr. Kurtz as follows:

    a.    finding that Foresight, Stanford, and Dr. Kurtz misappropriated one or more of Roche's trade secrets in violation of 18 U.S.C. § 1836(b);

    b.    finding that Foresight, Stanford, and Dr. Kurtz misappropriated one or more of Roche's trade secrets in violation of Cal. Civ. Code §§ 3426-3426.11;

c.    finding that Dr. Kurtz breached his contractual obligations to Roche under the Kurtz Agreement;

d.    finding that Dr. Kurtz breached his implied covenant of good faith and fair dealing;

e.    finding that Foresight and Stanford engaged in unfair business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;

f.    finding and issuing declaratory judgment that Roche is the true and lawful owner of the entire right, title, and interest in the Disputed Patent Applications and any patents that issue therefrom, including but not limited to:

   i.    U.S. Serial No. PCT/US20/59526, filed November 6, 2020

   ii.    U.S. Serial No. 17/107,668, filed November 30, 2020

   iii.    U.S. Serial No. 17/308,958, filed May 5, 2021

   iv.    U.S. Serial No. 17/455,209, filed November 16, 2021, now U.S. Patent 11,447,833

   v.    U.S. Serial No. 17/646,472, filed December 29, 2021

   vi.    U.S. Serial No. 17/646,473, filed December 29, 2021, now U.S. Patent 11,613,787

   vii.    U.S. Serial No. 17/661,730, filed May 2, 2022, now U.S. Patent 11,634,779

   viii.    U.S. Serial No. 17/820,200, filed August 16, 2022

   ix.    U.S. Serial No. 18/056,652, filed November 17, 2022, now U.S. Patent 11,851,716

   x.    U.S. Serial No. 18/056,656, filed November 17, 2022

   xi.    U.S. Serial No. 18/167,803, filed February 10, 2023

   xii.    U.S. Serial No. 18/167,804, filed February 10, 2023

   xiii.    U.S. Serial No. 18/172,957, filed February 22, 2023

   xiv.    U.S. Serial No. 18/481,092, filed October 4, 2023

g.    ordering specific performance of Dr. Kurtz's contractual obligations to assign his

entire right, title, and interest in the Disputed Patent Applications and any patents issuing therefrom to Roche;

h.  ordering a constructive trust in favor of Roche and/or patent reassignment to Roche with respect to the Disputed Patent Applications and any patents issuing therefrom to Roche;

i.  declaring that Roche possesses legal or equitable ownership or another interest in the Disputed Patent Applications inconsistent with and/or superior to any interest asserted by Foresight, Dr. Kurtz, or Stanford;

j.  issuing a judgment that any license granted by Stanford to Foresight for the Disputed Patent Applications or any patents issuing therefrom is null and void;

k.  enjoining Dr. Kurtz, Stanford, and Foresight from making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, any products that practice the claims of any patents issuing from the Disputed Patent Applications without authorization from Roche;

l.  enjoining Dr. Kurtz and Stanford from further prosecution of the Disputed Patent Applications;

m.  enjoining Dr. Kurtz, Stanford, and Foresight from further unauthorized use and disclosure of Roche's confidential information, including the Roche Trade Secrets;

n.  ordering disgorgement of all unjust enrichment and monies and/or profits resulting from Dr. Kurtz's breach of contract;

o.  ordering disgorgement of all unjust enrichment and monies and/or profits resulting from Dr. Kurtz, Stanford, and Foresight's misappropriation of the Roche Trade Secrets;

p.  awarding Roche appropriate damages for Dr. Kurtz's breach of his agreement to assign the Disputed Patent Applications to Roche and their agreements not to disclose confidential Roche information and trade secrets;

q.   ordering an accounting and paying over to Roche of all sums by which Dr. Kurtz, Stanford, and Foresight have been unjustly enriched;

r.   awarding costs and interests to Roche;

s.   awarding Roche attorneys' fees; and

t.   granting such other and future relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 3-6 of this Court, Roche hereby demands a trial by jury as to all issues so triable.


Dated:  July 1, 2024

WILMER CUTLER PICKERING
 HALE & DORR LLP

*/s/ Mark D. Flanagan*
Mark D. Flanagan
mark.flanagan@wilmerhale.com
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Fax: (650) 858-6100

Robert J. Gunther, Jr. (NY SBN: 1967652)
robert.gunther@wilmerhale.com
Christopher R. Noyes (pro hac vice forthcoming)
christopher.noyes@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiffs*
Roche Molecular Systems, Inc. and
Roche Sequencing Solutions, Inc.