IRELL & MANELLA LLP
Morgan Chu (CA 70446)
MChu@irell.com
Alan Heinrich (CA 212782)
AHeinrich@irell.com
Jordan Nafekh (CA 328151)
JNafekh@irell.com
Henry White (CA 351549)
HWhite@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:     (310) 277-1010
Facsimile:     (310) 203-7199

*Attorneys for Dr. Kurtz*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| ROCHE MOLECULAR SYSTEMS, INC. and ROCHE SEQUENCING SOLUTIONS, INC., <br><br> Plaintiffs <br><br> v. <br><br> FORESIGHT DIAGNOSTICS INC., DAVID KURTZ, an individual, and BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, <br><br> Defendants. | Case No. 5:24-cv-03972-EKL <br><br> **DR. DAVID KURTZ'S ANSWER TO PLAINTIFFS' COMPLAINT** |

Dr. David Kurtz answers Plaintiffs Roche Molecular Systems, Inc.'s ("RMS") and Roche Sequencing Solutions, Inc.'s ("RSS") Complaint for Trade Secret Misappropriation, Breach of Contract, and Breach of Implied Covenant of Good Faith and Fair Dealing (the "Complaint") as follows (his "Answer"):

### INTRODUCTORY STATEMENT

Two subsidiaries of the multi-hundred billion dollar global biopharma conglomerate F. Hoffmann-La Roche AG ("Roche") have brought meritless lawsuits against three practicing oncologists who care for cancer patients, teach, and conduct research at Stanford University: Dr. Maximilian Diehn, Dr. Ash Alizadeh and their colleague and former graduate student, Dr. David Kurtz

(collectively, the "Stanford Oncologists"). Roche has also sued Stanford University itself and a cancer diagnostic company the Stanford Oncologists co-founded in 2020, Foresight Diagnostics, Inc. ("Foresight").

Dr. Kurtz is an oncologist and assistant professor at Stanford. He has dedicated his career to caring for cancer patients and developing novel methods to improve patient care. Dr. Kurtz is a member of the Stanford Cancer Institute, the American Society of Clinical Oncology, the American Society of Hematology, and the American Association for Cancer Research. He was named the Åke Bertil Eriksson Endowed Young Investigator Award from the ASCO Conquer Cancer Foundation and was named a Lymphoma Clinical Research Mentoring Program Scholar by the Lymphoma Research Foundation. He has also received awards from the Damon Runyon Cancer Research Foundation, the Leukemia Research Foundation, Gabrielle's Angel Foundation for Cancer Research, and many others.

In 2015, Roche purchased a previous company that Drs. Diehn and Alizadeh co-founded (Capp Medical, Inc. ("CappMed")) based on a Stanford-developed cancer diagnostic technology called CAPP-Seq, which was cutting edge when they developed it in 2011. Following the CappMed acquisition, as part of their ongoing work as Stanford faculty members, Drs. Diehn and Alizadeh continued their academic research in their quest to develop even better ways to perform cancer diagnostics and improve care for cancer patients. Years later, they and Dr. Kurtz, while at Stanford and as Stanford researchers, invented a new and different technology called PhasED-Seq specifically for detecting minimal residual disease ("MRD") in cancer patients. Stanford—PhasED-Seq's rightful owner—patented the Stanford Oncologists' PhasED-Seq technology and exclusively licensed the patents to Foresight. Roche's claims against the Stanford Oncologists fail for many reasons, including because (i) Roche's claims make no technical sense; (ii) Roche's alleged secrets were neither secret nor owned by Roche; (iii) Stanford owns PhasED-Seq under pre-existing patent assignment agreements with the Stanford Oncologists; and (iv) Roche's claims are untimely in any event.

First, Roche's claim that PhasED-Seq is based on CAPP-Seq trade secrets makes no technical sense, as there are fundamental differences between CAPP-Seq and PhasED-Seq. CAPP-Seq is a multi-purpose circulating tumor DNA ("ctDNA") assay, capable of identifying cancer-related single nucleotide variants, insertions/deletions, genetic fusions, and copy number variants. PhasED-Seq

1    tracks a different type of cancer-related genetic mutation ("phased variants") than CAPP-Seq, using a

2    completely different data analysis pipeline. CAPP-Seq does not and cannot identify or track the type

3    of genetic mutation to which PhasED-Seq and PhaseED-Seq-related patents and patent applications

4    are directed. Roche's misappropriation of trade secret claims against the Stanford Oncologists thus

5    fails out of the gate.

6        Second, Roche's alleged trade secrets were neither secret nor even owned by Roche. Stanford

7    is the owner of the CAPP-Seq know-how that Roche vaguely points to as its trade secrets, and Stanford

8    publicly disclosed that know-how years ago. For example, more than six months before Roche

9    acquired CappMed, Stanford's PCT application on CAPP-Seq published, disclosing across its 547

10   pages intricate details of CAPP-Seq technology, including the very aspects of that technology that

11   Roche now baselessly claims as its trade secrets. As another example, Roche is claiming as one of its

12   "trade secrets" a listing of regions of the genome that are recurrently mutated in lymphoma patients

13   ("BED File"), even though multiple Roche employees explicitly acknowledged in 2017 that that

14   listing was developed at and owned by Stanford. In fact, Dr. Kurtz, who was not affiliated with

15   CappMed, developed this listing in 2016 as part of his graduate student research at Stanford. This

16   post-dated the 2015 CappMed acquisition and pre-dated his contracting for Roche in Fall 2017.

17   Roche's misappropriation of trade secret claims against the Stanford Oncologists fail for these further

18   reasons, as well.

19       Third, Stanford properly owns the PhaseED-Seq technology at issue. The Stanford

20   Oncologists have pre-existing patent assignment agreements with Stanford that precede any claim

21   Roche purports to have related to Stanford's PhasED-Seq patents. In 2011 and 2012, years before they

22   consulted for Roche, and as a standard requirement for Stanford employment, the Stanford

23   Oncologists entered into patent assignment agreements pursuant to which Stanford immediately and

24   automatically acquired all right, title and interest in their future inventions developed using Stanford

25   resources. All of the work that culminated in the PhaseED-Seq technology at issue was done by the

26   Stanford Oncologists at Stanford using Stanford resources. It was not done at Roche, nor can Roche

27   plausibly contend that it was. Thus, under their Stanford assignment agreements, the Stanford

28   Oncologists had no further ownership interest in their PhasED-Seq inventions to convey years later to

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT
Case No. 5:24-cv-03972-EKL

1    Roche or anyone else.

2          Moreover, Roche was well aware of the Stanford Oncologists' patent assignment obligations

3    to Stanford. For example, within weeks of starting his contracting position with Roche in the fall of

4    2017 while still a Stanford graduate student, Dr. Kurtz specifically informed Roche by email that "[a]s

5    part of my position at Stanford, any work I perform at Stanford that has potential IP needs to continue

6    to belong to Stanford and not Roche, even if in a related area." He further disclosed that he had

7    "existing work that can potentially turn into filings for patents, that are unrelated to Roche. However,

8    I do not think I can list all of these here today, and I am not sure that Stanford would allow me to

9    disclose all of these here as well." Dr. Kurtz was referring to his "existing work" at Stanford on

10   PhasED-Seq, which he identified as "unrelated to Roche." Roche did not object or even respond to

11   Dr. Kurtz's email. Roche's attempt to gain rights to PhasED-Seq through Dr. Kurtz (then a Stanford

12   graduate student) is in particular bad faith given that (i) Roche paid him a grand total of just $12,380.97

13   for all of his contracting services (over the course of 2017-2019) under an agreement that Roche itself

14   breached due to underpayment, and (ii) Dr. Kurtz specifically informed Roche of his intellectual

15   property obligations to Stanford and the fact that he had pre-existing patentable work at Stanford that

16   was unrelated to Roche. Roche's claims for breach of contract and breach of the implied covenant

17   against the Stanford Oncologists therefore fail, as well.

18         Fourth, Roche's claims are untimely in any event, as the statutes of limitations for any claims

19   Roche might believe it has have long since run. Roche has been aware of PhasED-Seq and its

20   superiority over CAPP-Seq for MRD detection since no later than 2019. For example, Roche had

21   multiple key employees in the audience at the December 2019 American Society of Hematology

22   ("ASH") Conference held in Orlando, Florida, when Drs. Alizadeh and Kurtz presented detailed data

23   on PhasED-Seq, including its superior sensitivity for MRD compared to CAPP-Seq. In March 2020,

24   Roche had the opportunity to take a license to PhasED-Seq but declined. Within weeks of Foresight's

25   founding in May 2020, Roche began having business discussions with Foresight. Now that it

26   apparently wants or needs access to Foresight's proprietary PhasED-Seq technology, Roche is

27   attempting to rewrite history, but its baseless claims come much too late. Roche has been aware of

28   PhasED-Seq and the Stanford Oncologists' founding of Foresight for many years.

1    Roche has no rights to PhasED-Seq and has asserted its claims against the Stanford

2    Oncologists in bad faith, as Dr. Kurtz answers in detail below.

3    **RESPONSE TO INTRODUCTION**

4    The numbered paragraphs in this Answer correspond to the like-numbered paragraphs of the

5    Complaint, to the extent applicable. Dr. Kurtz denies all allegations and characterizations in the

6    Complaint unless expressly admitted in the following paragraphs.

7    1.    Paragraph 1 contains legal conclusions for which no response is required. To the extent

8    a response is required, Dr. Kurtz admits that he co-founded Defendant Foresight Diagnostics Inc. Dr.

9    Kurtz denies all other allegations of Paragraph 1.

10    2.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth

11    of the allegations of Paragraph 2, and on that basis, denies them. Dr. Kurtz also incorporates his

12    response to Paragraph 58 here.

13    3.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth

14    of the allegations of Paragraph 3, and on that basis, denies them.

15    4.    Dr. Kurtz admits that Drs. Diehn and Alizadeh worked as consultants for Roche

16    following the acquisition of CappMed, and in particular that they consulted on clinical trial design

17    within the Medical Affairs group at Roche. Dr. Kurtz admits that he began working for Roche as a

18    contractor at the end of September 2017 but denies that he contracted for Roche until July 2020 and

19    further denies Roche's allegation that "Dr. Kurtz worked on developing the CAPP-Seq technology."

20    Dr. Kurtz states that his agreement with Roche speaks for itself. Dr. Kurtz denies the remaining

21    allegations of Paragraph 4.

22    5.    Dr. Kurtz denies that Foresight Diagnostics approached Roche about a possible

23    commercial partnership in 2022. Instead, Sloan Rausser (Senior Director, Alliance Management and

24    Integration for plaintiff RMS) and Tod Bedilion (Senior Director, Business Development for plaintiff

25    RMS) approached Foresight about a possible commercial partnership in January 2022, as part of

26    multiple ongoing discussions between Foresight, Rausser and other Roche personnel that Roche

27    initiated shortly after Foresight was founded in May 2020, as summarized in Dr. Kurtz's response to

28    Paragraph 6, which he incorporates here. Dr. Kurtz admits that he, along with Drs. Diehn and Alizadeh

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

and Dr. Jake Chabon, co-founded Foresight and that they continue to serve as advisors to Foresight. Dr. Kurtz denies all other allegations of Paragraph 5.

6.    Dr. Kurtz denies the allegations of Paragraph 6. For example, Roche's allegation that "Drs. Diehn, Alizadeh, and Kurtz did not notify Roche that they were founding a company that would be developing competing non-invasive cancer detection and monitoring technology, which they call 'PhasED-Seq'" is false. Dr. Kurtz further states as follows:

PhasED-Seq was first publicly disclosed at the ASH 2019 conference, with the associated abstract published online in November 2019. At a December 6, 2019 "ctDNA Working Group" side meeting at the ASH conference, Dr. Alizadeh gave a presentation titled "Analytical Considerations for Clinical Translation of ctDNA Profiling." *See* Ex. 4. Roche employees were in the audience, as was Dr. Kurtz. Slide 12 of the presentation disclosed PhasED-Seq's significantly better sensitivity compared to CAPP-Seq for MRD. Data was presented on "Patients with ***undetectable ctDNA by CAPP-Seq*** Stratified by PhasE-Seq":

## Emerging data – how sensitive is sensitive enough?

- Early and Major Molecular Response (ctDNA after 1-2 cycles) prognostic for outcomes in DLBCL
- Still, ~20% of patients with ctDNA undetectable experience relapse – are we sensitive enough?




Kurtz DM et al, *ASH* 2019

At another ASH 2019 side meeting, Dr. Alizadeh informed a group of attendees, which included Roche employees, that he and his colleagues would be starting a company to commercialize their new PhasED-Seq technology.

On December 9, 2019, Dr. Kurtz gave an even more detailed PhasED-Seq presentation: "Phased Variant Enrichment for Enhanced Minimal Residual Disease Detection from Cell-free DNA." *See* Ex. 5. Dr. Kurtz's presentation disclosed the details of PhasED-Seq technology to the world, including Roche, who again had employees in the audience. Nine slides of Dr. Kurtz's presentation compared PhasED-Seq head-to-head to CAPP-Seq, showing PhasED-Seq's superior sensitivity for MRD, including the following:

## PhasE-Seq improves on MRD detection

☐ PhasE-Seq and CAPP-Seq applied to cfDNA samples after 1 and 2 cycles of first-line therapy in 107 large B-cell lymphoma patients

| | Clinical Cohort |
|---|---|
| Number of Subjects | 107 |
| Median Age | 56 |
| Male (%) | 57% |
| Diagnosis, n (%) | |
| DLBCL | 74% |
| DLBCL, transformed | 18% |
| PMBCL | 8% |
| Stage, n (%) | |
| 1 or 2 | 34% |
| 3 or 4 | 66% |
| IPI, n (%) | |
| 0 to 1 | 39% |
| 2 | 26% |
| 3 | 21% |
| 4 to 5 | 14% |
| Line of Therapy | |
| Frontline | 100% |





## PhasE-Seq improves on MRD detection

- PhasE-Seq outperforms CAPP-Seq for prediction of clinical events
  - Strongest for patients with lowest disease burden (achieving molecular response)





## PhasE-Seq improves on molecular recovery, error profile compared to alternative methods



- 12 healthy control cfDNA samples sequenced, assessed for unmatched patient specific SNVs, PVs from 3 cases
- Depth of PVs depended on the distance between component SNVs
  - PVs < 20bps → identical depth to SNVs
  - PVs < 80bps → ~50% depth of single SNVs
  - Duplex recovery ~15% depth of single SNVs

- Error profile across 12 samples assessed by multiple methods of error suppression

*Id.* at 10, 11, 18; *see also* slides 8, 12-15. At no point during the ASH 2019 Conference, or for many years thereafter, did anyone from Roche claim ownership of PhasED-Seq or make any claim of wrongdoing whatsoever against Drs. Diehn, Alizadeh or Kurtz.

In March 2020, Stanford's Office of Technology Licensing offered a license to its PhasED-Seq patent estate to key industry contacts, including to Roche. Thus, Roche had an opportunity to license Stanford's PhasED-Seq patents before Foresight was even formed, but Roche passed on the opportunity. Roche did not claim ownership over the PhasED-Seq patent estate.

Foresight was formed in May 2020. Initial business discussions between Roche and Foresight began shortly thereafter and were initiated by Roche, no later than July 2020. During the course of these interactions in 2020, Roche once more never alleged any trade secret misappropriation, breach of contract, or any other wrongful conduct on the part of Drs. Diehn, Alizadeh or Kurtz. Nor did Roche make any claims to ownership of PhasED-Seq.

Dr. Kurtz further incorporates his response to Paragraph 54 here.

7.      Paragraph 7 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that Stanford has filed over a dozen patent applications naming the Stanford Oncologists as inventors. Dr. Kurtz denies that any of the referenced patent applications "disclos[e] technical data belonging to Roche," and incorporates his response to Paragraphs 58, 61, and 98 here.

8.      Dr. Kurtz admits the allegations of Paragraph 8.

9.      Dr. Kurtz admits the allegations of Paragraph 9.

10.     Dr. Kurtz denies the allegations of Paragraph 10. Dr. Kurtz also incorporates his response to Paragraph 58 here.

11.     Dr. Kurtz states that Exhibits N and L speak for themselves and otherwise denies the allegations of Paragraph 11.

**RESPONSE TO ALLEGATIONS REGARDING THE PARTIES**

12.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and on that basis, denies them.

13.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13, and on that basis, denies them.

14.     Dr. Kurtz admits the allegations of Paragraph 14.

15.     Dr. Kurtz admits the allegations of Paragraph 15.

16.     Dr. Kurtz denies that he resides in Oakland, California but admits that he resides within this district.

**RESPONSE TO ALLEGATIONS REGARDING JURISDICTION AND VENUE**

17.     Dr. Kurtz does not contest that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, 2201, 2202, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839. Dr. Kurtz not contest that this Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

18.     Paragraph 18 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz denies the allegations of Paragraph 18.

19.     Paragraph 19 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz denies the allegations of Paragraph 19.

20.     Paragraph 20 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that, in December 2023, Foresight employees attended the 65th annual meeting of the American Society of Hematology in San Diego and that Foresight was a participating exhibitor, promoting its products and services. Dr. Kurtz denies the remaining allegations of Paragraph 20.

21.     Paragraph 21 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that he and Drs. Diehn and Alizadeh live within this judicial district. Dr. Kurtz further admits that he is a former Roche contractor and that Drs. Diehn and Alizadeh are former Roche consultants. Dr. Kurtz denies the remaining allegations of Paragraph 21.

22.     Paragraph 22 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits Dr. Alizadeh resides in the State of California. Dr. Kurtz admits that Dr. Alizadeh has served on the faculty of Stanford since at least 2011. Dr. Kurtz denies the remaining allegations of Paragraph 22.

23.     Paragraph 23 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that Dr. Diehn resides in the State of California. Dr. Kurtz admits that Diehn has served on the faculty of Stanford since 2010. Dr. Kurtz denies the

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT
Case No. 5:24-cv-03972-EKL

remaining allegations of Paragraph 23.

24.     Paragraph 24 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that he resides in the State of California and performs work for Foresight. Dr. Kurtz denies the remaining allegations of Paragraph 24.

25.     Paragraph 25 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits he is a citizen of the State of California. Dr. Kurtz denies the remaining allegations of Paragraph 25.

26.     Dr. Kurtz admits that on September 23, 2017, he signed an "Employee Services Agreement (Exempt)" with "PRO Unlimited, Inc.," along with an accompanying Proprietary Information and Invention Agreement (Collectively the "Kurtz 9/23/2017 ESA (Exempt)"). Ex. 6. Dr. Kurtz further states that the Kurtz 9/23/2017 ESA (Exempt) included provisions purporting to address intellectual property assignment issues. Dr. Kurtz otherwise states that that agreement speaks for itself and incorporates his response to Paragraphs 54, 72, and 83 here.

27.     Paragraph 27 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz admits that Stanford is organized under the laws of the State of California and has a principal place of business in this judicial district and regularly does business in this judicial district. Dr. Kurtz denies the remaining allegations of Paragraph 27 and incorporates his response to Paragraphs 6, 54, 58, 61, 72, 83 and 98 here.

28.     Paragraph 28 contains legal conclusions for which no response is required.

29.     Paragraph 29 contains legal conclusions for which no response is required.

**RESPONSE TO ALLEGATIONS REGARDING FACTUAL BACKGROUND**

30.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30, and on that basis, denies them.

31.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31, and on that basis, denies them.

32.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32, and on that basis, denies them.

33.     Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 33, and on that basis, denies them.

34.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34, and on that basis, denies them.

35.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35, and on that basis, denies them.

36.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36, and on that basis, denies them.

37.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37, and on that basis, denies them.

38.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38, and on that basis, denies them.

39.    Paragraph 39 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39, and on that basis, denies them.

40.    Paragraph 40 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40, and on that basis, denies them.

41.    Paragraph 41 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41, and on that basis, denies them.

42.    Paragraph 42 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42, and on that basis, denies them.

43.    Paragraph 43 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 43, and on that basis, denies them.

44.    Paragraph 44 contains legal conclusions for which no response is required. Dr. Kurtz is also without knowledge or information sufficient to form a belief as to the truth of the allegations

1  of Paragraph 44, and on that basis, denies them.

2       45.    Paragraph 45 contains legal conclusions for which no response is required. Dr. Kurtz

3  is also without knowledge or information sufficient to form a belief as to the truth of the allegations

4  of Paragraph 45, and on that basis, denies them.

5       46.    Paragraph 46 contains legal conclusions for which no response is required. Dr. Kurtz

6  is also without knowledge or information sufficient to form a belief as to the truth of the allegations

7  of Paragraph 46, and on that basis, denies them.

8       47.    Paragraph 47 contains legal conclusions for which no response is required. Dr. Kurtz

9  is also without knowledge or information sufficient to form a belief as to the truth of the allegations

10  of Paragraph 47, and on that basis, denies them.

11       48.    Paragraph 48 contains legal conclusions for which no response is required. Dr. Kurtz

12  is also without knowledge or information sufficient to form a belief as to the truth of the allegations

13  of Paragraph 48, and on that basis, denies them.

14       49.    Dr. Kurtz admits that he served as an independent contractor for Roche starting in

15  September 2017 but denies that he continued contracting for Roche until July 2020. Dr. Kurtz

16  otherwise denies the allegations of Paragraph 49. Dr. Kurtz further states that he was recruited to

17  contract for Roche after he gave a presentation at the 2017 ASCO conference on Stanford's CAPP-

18  Seq assay for DLBCL. The Stanford research Dr. Kurtz presented at that conference was later

19  published in Kurtz et al., "Circulating Tumor DNA Measurements As Early Outcome Predictors in

20  Diffuse Large B-Cell Lymphoma." *J Clin Oncol*. 2018 Oct 1;36(28):2845-2853. doi:

21  10.1200/JCO.2018.78.5246 ("Kurtz 2018"). Dr. Kurtz's work as a Roche contractor was focused on

22  helping Roche incorporate Stanford's CAPP-Seq assay for DLBCL into Roche's AVENIO product.

23  At the ASH 2019 conference, Roche publicly acknowledged that its AVENIO DLBCL assay was

24  based on Dr. Kurtz's Stanford research published in Kurtz 2018:

25

26

27

28

50.     Dr. Kurtz admits that on September 23, 2017, he signed the Kurtz 9/23/2017 ESA (Exempt). Dr. Kurtz further states that under the terms of the Kurtz 9/23/2017 ESA (Exempt), Roche agreed to pay Dr. Kurtz a fixed amount of $1440 per week for a standard work week of 8 hours per week—payment provisions that "exempted" Dr. Kurtz from the protections of the federal Fair Labor Standards Act:

As an exempt employee, Employer agrees to pay Employee a weekly rate of $ 1440.00 based on Employee's standard work week (Monday through Friday), 8      hours per week.  Employer shall periodically review Employee's standard work week and may amend it at any time going forward upon written notice to Employee with the intent being to properly capture Employee's actual standard work week.

Ex. 6 at 1. Dr. Kurtz further states that the Kurtz 9/23/2017 ESA (Exempt) included provisions purporting to address intellectual property assignment issues. Dr. Kurtz otherwise denies the allegations of Paragraph 50 and incorporates his response to Paragraph 54 here.

51.     Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph 51 also contains legal conclusions for which no response is required. Dr. Kurtz otherwise denies the allegations of Paragraph 51 and incorporates his response to Paragraph 54 here.

52.     Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph 52 also contains legal conclusions for which no response is required. Dr. Kurtz otherwise denies the

allegations of Paragraph 52 and incorporates his response to Paragraph 54 here.

53.     Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph 53 also contains legal conclusions for which no response is required. Dr. Kurtz otherwise denies the allegations of Paragraph 53 and incorporates his response to Paragraph 54 here.

54.     Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph 54 also contains legal conclusions for which no response is required. Dr. Kurtz otherwise denies the allegations of Paragraph 46. Dr. Kurtz further states as follows: Within just a few weeks of Dr. Kurtz's starting at Roche, Roche decided to no longer pay Dr. Kurtz a fixed amount of $1440 per week, opting instead to pay him solely on an hourly basis. As a result of this change in the terms of his employment, Dr. Kurtz was covered by the protections of the Fair Labor Standards Act. Roche accordingly sent Dr. Kurtz a new contractor agreement that would change his employment status from "exempt" to "non-exempt" for purposes of the FLSA protections and specify that he would now be paid on an hourly basis only. Exhibit 11, Employee Services Agreement (Non-Exempt) (the "unsigned ESA (Non-Exempt)"):

> Employer agrees to pay Employee at the base rate of $180.00 per hour.  Employee will be paid overtime in accordance with applicable law.  Working overtime requires prior written approval. Unless otherwise agreed, Employee understands that:
>
> a)     Employee will accurately complete the time record each week and will obtain an approval of the time record from an authorized representative of Client.
> b)     If Employee participates in direct deposit of electronic funds transfer (EFT), then the EFT will be sent to Employee's bank by Friday 5:00 p.m. and if Employee elects US mail, then Employee's paycheck will be mailed no later than Friday at 5:00 p.m.

Ex. 7 at 1. The unsigned ESA (Non-Exempt) contained the same intellectual property provisions as the Kurtz 9/23/2017 ESA (Exempt). *Id.* at 1, 4.

Upon receiving the unsigned ESA (Non-Exempt), Dr. Kurtz took a closer look at those intellectual property provisions. On November 8, 2017, Dr. Kurtz emailed his point of contact at Roche Human Resources, copying Drs. Diehn and Alizadeh, with questions about those provisions. In particular, he notified Roche that:

- The Roche assignment provision "seems to conflict with [his] position at Stanford."
- Both his consulting at Roche and his work at Stanford "relate to circulating tumor DNA."

- "As part of [his] position at Stanford, any work [he] performs at Stanford that has potential IP needs to continue to belong to Stanford and not Roche, even if in a related area."

- He further disclosed that, while he had not yet filed for any patents, he "do[es] have existing work that can potentially turn into filings for patents, that are unrelated to Roche. However, I do not think I can list all of these here today, and I am not sure that Stanford would allow me to disclose all of these here as well." Dr. Kurtz states that he was referring to his work on PhasED-Seq, which he identified as "unrelated to Roche," and disclosed as pre-dating his contractor relationship with Roche.

Dr. Kurtz also provided attachments that described his position at Stanford and "how intellectual property that is developed outside of Roche (and at Stanford) is handled," namely, Stanford's "Requirements for Faculty Consulting Activities and Agreements," which had previously been disclosed to Roche as part of the CappMed acquisition. Dr. Kurtz's email is reproduced below:

1

> **From:** David Matthew Kurtz dkurtz@stanford.edu  🔗
> **Subject:** Questions regarding new contract aggreement
> **Date:** November 8, 2017 at 11:11 AM
> **To:** Galas, Leah leah.galas@contractors.roche.com
> **Bcc:** Ash Alizadeh arasha@stanford.edu, Dr. Maximilian Diehn MD/PhD diehn@stanford.edu

2

3

Hi Leah,

Thanks for sending the paperwork along. I was looking things over, and I have a few questions prior to signing the new paperwork. Specifically, I have questions regarding the intellectual property agreement (Section 2870, attached). I understand that any inventions made while working on projects for Roche or using Roche equipment, data, or existing IP will belong entirely to Roche, and I completely agree with this. However, I believe that the clause that any inventions that:
"1) Relate at the time of conception or reduction to practice of the Invention to the employers business, or actual or demonstrably anticipated research or development of the employer."

seems to conflict with my position at Stanford. This clause seems to state that anything that I work on that is related in any way to work at Roche I cannot have independent IP around; however, both my consulting at Roche and my work at Stanford relate to circulating tumor DNA. As part of my position at Stanford, any work I perform at Stanford that has potential IP needs to continue to belong to Stanford and not Roche, even if in a related area.

Of course I understand that anything that is developed at Roche, or that uses Roche equipment, data, or existing IP will belong to Roche; however I would like to clarify the above clause to make sure there is no conflict with Stanford. Can we add an addendum to clarify this?

I am attaching some text that describes my position and obligations to Stanford regarding my time availability as a consultant, as well as how intellectual property that is developed outside of Roche (and at Stanford) is handled. I would like to include this as an attachment / addendum to my contract as well - I think this should serve as enough clarification.

Also, this form asks me to list my any prior inventions. I have not filed for any patents currently, however, I do have existing work that can potentially turn into filings for patents, that are unrelated to Roche. However, I do not think I can list all of these here today, and I am not sure that Stanford would allow me to disclose all of these here as well.

And one final question - the top of this form says "Employee Service Agreement" - does this mean that under this new paperwork I will be an employee of Roche rather than a contractor? I would prefer stay as a contractor if possible.

I apologize for not bringing this up sooner with the first round of paperwork, but I did want to address this in the set of forms I am currently signing.

Let me know if it is easier to go over all of this on the phone or in person; I am definitely excited to keep things moving with Roche but just want to make sure everything is kosher with my current position at Stanford as well!
Best,
David

In addition, before he even started his contractor relationship with Roche on September 23, 2017, Roche was already aware that Dr. Kurtz was a Stanford graduate student and as such subject to Stanford's standard intellectual property policies and agreements.

Receiving no response to his November 8, 2017 email, Dr. Kurtz followed up with Roche through multiple emails and phone calls over the following months. For example, Dr. Kurtz followed up with another email on November 14, 2017:

> **From:** David Matthew Kurtz dkurtz@stanford.edu
> **Subject:** Re: Questions regarding new contract aggreement
> **Date:** November 14, 2017 at 9:19 AM
> **To:** Galas, Leah leah.galas@contractors.roche.com

Hi Leah,
Just wanted to follow up on this; apologies for the last email. Any updates on this? The major piece that I need from the Stanford end is for the attached text from Stanford regarding the hours I am allowed to work as a consultant and how IP that is created at Stanford (outside of Roche) is dealt with. I believe if this text can be attached to my contract that would suffice.
Thanks,
David

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

In March 2018, after giving Dr. Kurtz the "run around" for months, Roche for the first time told Dr. Kurtz on a call that they would not add the Stanford policies to his Roche contract, although they declined to provide any reason for their refusal to do so. Following that call, Dr. Kurtz shared with Dr. Alizadeh his concern that Roche could be "try[ing] to stake some claim" to "any IP that we may develop here at Stanford."

On Thu, Mar 1, 2018 at 4:41 PM, Dr. David Matthew Kurtz <dkurtz@stanford.edu> wrote:

Hey Ash,

Not sure if you remember this, but there was a clause in the contract the RSS had me sign that was extremely broad. The solution that you and Max had was to include the attachment for consulting policies from Stanford to my contract. I've been getting the run around from Roche regarding this, and they finally came back to me and said that they *can't* (or won't) add that to my contract.

I am now concerned about any IP that we may develop here at Stanford, having Roche try to claim some stake in it. I am not sure how to proceed here. Is there someone at Stanford who can review the Roche contract to see if it conflicts with my role at Stanford? Or do I just need to stop consulting?

Not sure how to proceed...
Thanks!
Dave

> On Nov 8, 2017, at 11:11 AM, David Matthew Kurtz <dkurtz@stanford.edu> wrote:
>
> Hi Leah,
> Thanks for sending the paperwork along. I was looking things over, and I have a few questions prior to signing the new paperwork. Specifically, I have questions regarding the intellectual property agreement (Section 2870, attached). I understand that any inventions made while working on projects for Roche or using Roche equipment, data, or existing IP will belong entirely to Roche, and I completely agree with this. However, I believe that the clause that any inventions that:
> "1) Relate at the time of conception or reduction to practice of the Invention to the employers business, or actual or demonstrably anticipated research or development of the employer."
>
> seems to conflict with my position at Stanford. This clause seems to state that anything that I work on that is related in any way to work at Roche I cannot have independent IP around; however, both my consulting at Roche and my work at Stanford relate to circulating tumor DNA. As part of my position at Stanford, any work I perform at Stanford that has potential IP needs to continue to belong to Stanford and not Roche, even if in a related area.
>
> Of course I understand that anything that is developed at Roche, or that uses Roche equipment, data, or existing IP will belong to Roche; however I would like to clarify the above clause to make sure there is no conflict with Stanford. Can we add an addendum to clarify this?
>
> I am attaching some text that describes my position and obligations to Stanford regarding my time availability as a consultant, as well as how intellectual property that is developed outside of Roche (and at Stanford) is handled. I would like to include this as an attachment / addendum to my contract as well - I think this should serve as enough clarification.
>
> Also, this form asks me to list my any prior inventions. I have not filed for any patents currently, however, I do have existing work that can potentially turn into filings for patents, that are unrelated to Roche. However, I do not think I can list all of these here today, and I am not sure that Stanford would allow me to disclose all of these here as well.
>
> And one final question - the top of this form says "Employee Service Agreement" - does this mean that under this new paperwork I will be an employee of Roche rather than a contractor? I would prefer stay as a contractor if possible.
>
> I apologize for not bringing this up sooner with the first round of paperwork, but I did want to address this in the set of forms I am currently signing.
>
> Let me know if it is easier to go over all of this on the phone or in person; I am definitely excited to keep things moving with Roche but just want to make sure everything is kosher with my current position at Stanford as well!
> Best,
> David
>
> <DMK_Stanford-rph_4.1_4.3_attachment_a_su_requirements_for_faculty_consulting_activities_and_agreements.pdf>
> <Section 2870 IP clause.pdf>

1  But Dr. Kurtz quickly convinced himself—erroneously, as it turns out—that Roche would not act in

2  such an underhanded manner, and was further reassured by the fact that he had already fully disclosed

3  to Roche his IP obligations to Stanford and that he had existing patentable work at Stanford that was

4  unrelated to his work at Roche.

5       Dr. Kurtz never signed Roche's new contractor agreement, including its intellectual property

6  and assignment provisions, but Roche nevertheless operated pursuant to the terms of that new

7  unsigned (and objected-to) agreement, and not under the Kurtz 9/23/2017 ESA (Exempt). In

8  particular, Roche did not pay Dr. Kurtz $1440 per week as it had agreed to do under the Kurtz

9  9/23/2017 ESA (Exempt), but instead paid Dr. Kurtz on an hourly basis as provided by the unsigned

10 (and objected-to) ESA (Non-Exempt). Indeed, for 2017, Roche only paid Dr. Kurtz $4,523.97; for the

11 entirety of 2018, Roche only paid Dr. Kurtz $6,722.10, and for 2019, Roche only paid Dr. Kurtz

12 $1,134.90. (Dr. Kurtz did no further work for Roche after 2019, and thus received no further payments

13 from Roche). Roche was thus in material breach of the Kurtz 9/23/2017 ESA (Exempt) from the very

14 start of Dr. Kurtz's contracting. On information and belief, Roche opted not to comply with its

15 obligations to Dr. Kurtz under the Fair Labor Standards Act rather than to memorialize Dr. Kurtz's

16 pre-existing intellectual property obligations to Stanford in a new Employee Services Agreement that

17 complied with the FLSA. But Roche was fully on notice of those obligations.

18      Roche is thus attempting to gain rights to Stanford's PhasED-Seq patent estate based on

19 Roche's contractor agreement with a Stanford graduate student whom Roche paid a grand total of

20 $12,380.97, under an agreement that Roche itself breached, and despite the fact that Roche was

21 informed of the graduate student's intellectual property obligations to Stanford and the fact that he

22 had pre-existing patentable work at Stanford that was unrelated to Roche. Dr. Kurtz also incorporates

23 his response to Paragraph 49 here.

24      55.    Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph

25 55 also contains legal conclusions for which no response is required. Dr. Kurtz otherwise denies the

26 allegations of Paragraph 55 and incorporates his response to Paragraph 54 here.

27      56.    Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph

28 56 also contains legal conclusions for which no response is required. Dr. Kurtz incorporates his

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

1    response to Paragraph 54 here.

2        57.    Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself. Paragraph

3    57 also contains legal conclusions for which no response is required. Dr. Kurtz incorporates his

4    response to Paragraph 54 here.

5        58.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth

6    of the allegations in the first sentence of Paragraph 58, and on that basis, denies them. Dr. Kurtz denies

7    that CAPP-Seq tumor selectors, CAPP-Seq selector design software, Roche's data analysis pipeline

8    or panel data constitute "Roche Trade Secrets." Dr. Kurtz further states as follows: On September 25,

9    2014, Stanford's PCT/US/2014/025020 (the "'020 Application") published, containing 547 pages

10   extensively describing and publicly disclosing the CAPP-Seq technology. Further, CAPP-Seq had

11   already been robustly described in Newman et al., "An ultrasensitive method for quantitating

12   circulating tumor DNA with broad patient coverage." *Nature Medicine*, 20(5), (May 14, 2014) 548–

13   554. https://doi.org/10.1038/nm.3519 (the "*Nature Medicine* Publication") and Newman et al.,

14   "FACTERA: a practical method for the discovery of genomic rearrangements at breakpoint

15   resolution." *Bioinformatics*, 1;30(23):3390-3 (Epub. Aug. 20, 2014).

16   https://doi.org/10.1093/bioinformatics/btu549 (the "*FACTERA* Publication"). *See* Exs. 1-3.

17       For example, the '020 Application discloses in detail each category of alleged "Roche Trade

18   Secrets" identified in Paragraph 58:

19   •    **CAPP-Seq tumor selectors**: The '020 Application publicly disclosed 14 different

20        CAPP-Seq tumor selectors: "Exemplary selector sets are provided in Tables 2, and 6-18.

21        The Selector set comprising one or more genomic regions identified in Table 2 may be

22        useful for [non-small cell lung cancer]." Ex. 1 at [00554]. Tables 6-18 set forth CAPP-

23        Seq tumor selectors for such other cancers as breast cancer, colorectal cancer, diffuse

24        large B-cell lymphoma, follicular lymphoma, pancreatic cancer and adenocarcinomas.

25        *Id.* Roche acquired no trade secrets involving CAPP-Seq tumor selectors in its acquisition

26        of CappMed in April 2015 because such selectors had already been published, including

27        in the '020 Application.

28   •    **CAPP-Seq selector design software**: The '020 Application includes many paragraphs

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT
Case No. 5:24-cv-03972-EKL

directed to CAPP-Seq selector design software. For example, a section expressly entitled "CAPP-Seq Selector Design" begins at paragraph [00823]. The '020 Application explains, "We employed a six-phase design strategy to identify and prioritize genomic regions for the CAPP-Seq NSCLC selector as detailed below . . . The following algorithm was used to design the CAPP-Seq selector . . . ." *Id.* at [00824]-[00825]. Similarly, the '020 Application also includes 38 paragraphs that provide additional details on CAPP-Seq selector design in a section entitled "*Methods for producing a selector set.*" *Id.* at [00555 – 00593]. Again, Roche's Complaint makes no effort to distinguish its alleged "CAPP-Seq selector design software" trade secrets from the details on such selector design software published in the '020 Application, nor does it offer an explanation as to why any unidentified details of such selector design software were maintained as trade secrets despite such publication.

- **CAPP-Seq data analysis pipeline**: The '020 Application includes many paragraphs describing in detail the CAPP-Seq data analysis pipeline. Figure 6 is described as the "CAPP-Seq computational pipeline," and "schematically illustrate[s] the "[m]ajor steps of the bioinformatics pipeline for mutation discovery and quantitation in plasma." Ex. 1 at [00448 and Fig. 6]. A detailed section on "Bioinformatics and Statistical Methods starts at [00807]. A section on the "CAPP-Seq Computational Pipeline" starts at [00827]. A particularly important component of the CAPP-Seq data analysis pipeline is called FACTERA, which stands for FACile Translocation Enumeration and Recovery Algorithm. The FACTERA algorithm is described in detail starting at [00829]. "These initial results illustrate the utility of FACTERA as part of the CAPP-Seq analysis pipeline." *Id.* at [00838]. FACTERA is also illustrated in Figure 8: "FACTERA analytical pipeline for breakpoint mapping. Major steps used by FACTERA to precisely identify genomic breakpoints from aligned paired-end sequencing data are anecdotally illustrated using two hypothetical genes, w and v." *Id.* at [00450].

- **CAPP-Seq panel data**: Examples of panel data are presented in Tables 19-21 of the '020 Application. *Id.* at [00771].

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

Dr. Kurtz further states that the CAPP-Seq technology was so clearly disclosed in the '020 Application, the *Nature Medicine* Publication, the *FACTERA* Publication, publicly-available CAPP-Seq software and other public disclosures that multiple scientific groups have independently established their own CAPP-Seq workflows, doing so in separate laboratories across the world, and for applications to diverse cancer types. Dr. Kurtz denies the remaining allegations of Paragraph 58.

59.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59, and on that basis, denies them. Dr. Kurtz also incorporates his response to Paragraph 58 here.

60.    Paragraph 60 contains legal conclusions for which no response is required. To the extent a response is required, Dr. Kurtz denies the allegations of Paragraph 60. Dr. Kurtz also incorporates his response to Paragraph 58 here.

61.    Dr. Kurtz denies the allegations of Paragraph 53 as follows. Roche alleges that "*One specific aspect used as part of the Roche Trade Secrets is confidential data relating to genetic mutations in patients with DLBCL. This data is stored in files known as browser extensible data files or 'BED Files.'*" Dr. Kurtz admits that BED Files are browser extensible data files and that they can store data relating to genetic mutations (e.g., the coordinates of genomic regions that may harbor mutations in a particular disease setting), but otherwise denies this allegation. Roche further alleges that "*Drs. Diehn, Alizadeh, and Kurtz provided BED Files that corresponded to genetic regions identified as containing mutations in patients with DLBCL as part of the CappMed Acquisition and in connection with work done pursuant to their consulting and employment agreements.*" Dr. Kurtz denies this allegation as follows: Table 8 of the '020 Application, which published on September 25, 2014, provides the data for the original CAPP-Seq BED File for DLBCL. As a result, at the time of the CappMed Acquisition, there was nothing confidential about the CappMed DLBCL BED File and it was not used as part of any Roche Trade Secret. Dr. Kurtz further denies that he provided any BED Files to Roche as part of the CappMed Acquisition, as Dr. Kurtz was not involved in CappMed or in the CappMed Acquisition. Dr. Kurtz also did not create any BED Files as a Roche contractor, which position he started in late September 2017. In 2016, as part of his research work as a graduate student at Stanford and using substantial Stanford resources (and no Roche resources), Dr. Kurtz designed a

new BED File for DLBCL. It was not shared with Roche as part of the CappMed acquisition (which it post-dated) or as part of a contracting relationship with Roche (which it pre-dated by over a year). In August 2017, Roche employees acknowledged that Dr. Kurtz's BED File was a "Stanford design" and that Roche accordingly needed Stanford's express permission to use it to synthesize probe panels. Dr. Kurtz further incorporates his response to Paragraphs 49 and 98 here. Dr. Kurtz is without personal knowledge as to how Roche may have used this data, and hence denies the remaining allegations of Paragraph 61.

62.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 62, and on that basis, denies them.

63.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 63, and on that basis, denies them.

64.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64, and on that basis, denies them.

65.    Dr. Kurtz denies that the technology Roche has defined as the "Roche Trade Secrets" are in fact trade secrets. Dr. Kurtz incorporates his response to Paragraph 58 here. Dr. Kurtz denies the remaining allegations of Paragraph 65.

66.    Dr. Kurtz denies the allegations of Paragraph 66.

67.    Dr. Kurtz admits that Foresight owns, and has exclusively licensed Stanford patents covering, a proprietary technology referred to as "PhasED-Seq" and has described it as "a liquid-biopsy powered platform that detects minimal residual disease (MRD) from circulating tumor DNA (ctDNA)."

68.    Dr. Kurtz denies the allegations of Paragraph 68. Dr. Kurtz also incorporates his response to Paragraph 6 here.

69.    Dr. Kurtz states that Exhibit L speaks for itself and otherwise denies the allegations of Paragraph 69.

70.    Dr. Kurtz denies the allegations of Paragraph 70.

71.    Dr. Kurtz denies the allegations of Paragraph 71. Roche's allegation that "Dr. Kurtz did not disclose PhasED-Seq to Roche despite having a contractual obligation to do so under the Kurtz

Agreement" is false. Referring to his work on PhasED-Seq, Dr. Kurtz notified Roche at the start of his contractor engagement with Roche in 2017 that he had "existing work" at Stanford "that can potentially turn into filings for patents, that are unrelated to Roche" but that he could not disclose that work to Roche due to his confidentiality obligations to Stanford. When Dr. Kurtz first publicly disclosed PhasED-Seq at the ASH 2019 conference, key Roche employees were in the audience. At that conference, Drs. Kurtz and Alizadeh presented data demonstrating that PhasED-Seq was different from CAPP-Seq. Then in March 2020, Stanford offered to license its PhasED-Seq patent estate to Roche but Roche passed. At no point during this time did Roche make any claims to ownership of PhasED-Seq or any charge of wrongdoing whatsoever against Drs. Diehn, Alizadeh or Kurtz. Dr. Kurtz also incorporates his response to Paragraphs 6 and 54 here.

72.    Dr. Kurtz denies that "Dr. Kurtz's rights in PhasED-Seq were assigned to Roche by operation of contract." Dr. Kurtz's rights in PhasED-Seq had already been assigned to Stanford under his September 16, 2012 "Patent and Copyright Agreement for Personnel at Stanford" (SU18), pursuant to which Dr. Kurtz agreed, "I will disclose to Stanford all potentially patentable inventions conceived or first reduced to practice in whole or in part in the course of my University responsibilities or with more than incidental use of University resources. I hereby assign to Stanford all my right, title and interest in such patentable inventions and to execute and deliver all documents and do any and all things necessary and proper on my part to effect such assignment." Ex. 8. PhasED-Seq was conceived and reduced to practice using substantial Stanford resources and no Roche resources. Dr. Kurtz admits that Dr. Kurtz did not execute an assignment of his rights in PhasED-Seq to Roche. Dr. Kurtz had no such rights to assign to Roche, because he had already assigned all of his rights in PhasED-Seq to Stanford before he commenced his contractor relationship with Roche. Dr. Kurtz further states that Dr. Kurtz expressly informed Roche at the start of his contractor relationship that "[a]s part of my position at Stanford, any work I perform at Stanford that has potential IP needs to continue to belong to Stanford and not Roche, even if in a related area." Roche did not object or even respond to Dr. Kurtz's email. Dr. Kurtz also incorporates his response to Paragraph 54 here

73.    Dr. Kurtz admits that on November 6, 2019, Stanford filed the '688 application, which is titled "Method and Systems for Assessment and Treatment of Cancer" and names Drs. Diehn,

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

1  Alizadeh, and Kurtz as inventors. Dr. Kurtz otherwise denies the allegations of Paragraph 73.

2      74.    Dr. Kurtz admits the allegations of Paragraph 74.

3      75.    Dr. Kurtz admits the allegations of Paragraph 75.

4      76.    Dr. Kurtz admits the allegations of Paragraph 76.

5      77.    Paragraph 77 contains legal conclusions for which no response is required. To the

6  extent a response is required, Dr. Kurtz admits Drs. Diehn and Alizadeh are listed as the Project

7  Leaders for NIH project number CA188298 and otherwise denies the allegations of Paragraph 77.

8      78.    Dr. Kurtz states that the abstract for NIH project CA188298 speaks for itself.

9      79.    Dr. Kurtz admits the allegations of Paragraph 79.

10     80.    Dr. Kurtz denies the allegations of Paragraph 80.

11     81.    Dr. Kurtz admits that his work as a Roche contractor was focused on helping Roche

12  incorporate Stanford's CAPP-Seq assay for DLBCL into Roche's AVENIO product, which only to

13  that extent included "providing input on which mutations and genetic sequences to focus the analysis

14  on." Dr. Kurtz otherwise denies the allegations of Paragraph 81.

15     82.    Dr. Kurtz states that the abstract for project CA241076 speaks for itself.

16     83.    Dr. Kurtz denies the allegations of Paragraph 83. Dr. Kurtz further states that he and

17  Drs. Diehn and Alizadeh assigned all of their right, title in interest in the so-called "Disputed Patent

18  Applications" to Stanford pursuant to their Stanford SU18s dated July 21, 2011, July 2, 2011, and

19  September 16, 2012, respectively. As a result, they had no rights to PhasED-Seq to assign to Roche

20  pursuant to their agreements with Roche. Dr. Kurtz further states that Roche was fully aware of the

21  Stanford Oncologists' pre-existing assignment obligations to Stanford. Dr. Kurtz further incorporates

22  his responses to Paragraphs 6, 54, 71, and 72 here.

23     84.    Dr. Kurtz admits that he and Drs. Diehn and Alizadeh executed assignments of the

24  '730 Application to Stanford on December 8, 2020, January 11, 2021, and March 10, 2021,

25  respectively. Dr. Kurtz denies all other allegations of Paragraph 84. Dr. Kurtz further incorporates his

26  response to Paragraph 83 here.

27     85.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth

28  of the allegations of Paragraph 85, and on that basis, denies them.

86.    Dr. Kurtz states that Stanford's Office of Technology Licensing's Start-Up Guide speaks for itself.

87.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 87, and on that basis, denies them. Dr. Kurtz incorporates his responses to Paragraphs 54, 58, 61 and 98 here.

88.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 88, and on that basis, denies them. Dr. Kurtz incorporates his responses to Paragraphs 54, 58, 61 and 98 here.

89.    Dr. Kurtz is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 89, and on that basis, denies them.

90.    Dr. Kurtz states that Exhibit L speaks for itself and otherwise denies the allegations of Paragraph 90.

91.    Dr. Kurtz denies the allegations of Paragraph 91. Dr. Kurtz further incorporates his responses to Paragraphs 54, 58, 61, 72, 83 and 98 here.

92.    Dr. Kurtz denies the allegations of Paragraph 92. Dr. Kurtz further incorporates his responses to Paragraphs 54, 58, 61, 72, 83 and 98 here.

93.    Dr. Kurtz denies the allegations of Paragraph 93. Dr. Kurtz further incorporates his responses to Paragraphs 54, 58, 61, 72, 83 and 98 here.

94.    Dr. Kurtz denies the allegations of Paragraph 94. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61 and 98 here.

95.    Dr. Kurtz denies the allegations of Paragraph 95. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61 and 98 here.

96.    Dr. Kurtz denies the allegations of Paragraph 96. Dr. Kurtz further incorporates his responses to Paragraphs 54, 58, 61, 72, 83 and 98 here.

97.    Dr. Kurtz states that Exhibits M and N speak for themselves and otherwise denies the allegations of Paragraph 97.

98.    Dr. Kurtz admits that the '730 application includes Table 3, which discloses the coordinates of a "unified targeted sequencing panel." Dr. Kurtz denies that Table 3 contains "data

previously sold to Roche." The data in Table 3 was developed by Dr. Kurtz at Stanford in 2016, for a Stanford-owned DLBCL BED File. Dr. Kurtz's 2016 BED File was thus created after Roche's acquisition of CappMed and before Dr. Kurtz began his contractor relationship with Roche in September 2017. Dr. Kurtz's 2016 BED File was submitted to Roche NimbleGen to use to synthesize a panel of probes, with the Design Identifier 160414_HG19_DLBCL_ 2_final2_EZ_HX3. An email Dr. Kurtz sent on April 15, 2016 bearing that Design Identifier for his 2016 DLBCL BED File is copied below:

From: **David Matthew Kurtz** dkurtz@stanford.edu  📎
Subject: Re: DLBCL selector v2.0, final
Date: April 15, 2016 at 8:12 AM
To: Chih Long Liu cll@stanford.edu
Cc: Ash Alizadeh arasha@stanford.edu, Dr. Maximilian Diehn MD/PhD diehn@stanford.edu, Aaron Matthew Newman amnewman@stanford.edu, Florian Scherer fscherer@stanford.edu, Mohammad Shahrokh Esfahani shahrokh@stanford.edu, Alexander McEvoy Craig amcraig@stanford.edu

Thanks Ash and CLL! I think the design number is on the pdf; "Final Design Identifier: 160414_HG19_DLBCL_2_final2_EZ_HX3". You could also share the attached pdf too.
Thanks for the hard work everyone!
dmk

Dr. Kurtz further denies that his BED File was "maintained by Roche as confidential and used as part of and to develop the Roche Trade Secrets." To the contrary, plaintiff RSS acknowledged in writing that this BED File was not owned by Roche at all, but rather was a design created by Stanford. RSS further acknowledged that it needed Stanford's permission to use this BED File. For example, in 2017, a principal scientist at plaintiff RSS placed an order to have RSS's sister company, Roche NimbleGen, synthesize a panel of probes based on Dr. Kurtz's 2016 DLBCL BED File. On August 14, 2017, Roche Nimblegen's customer support specialist emailed the RSS scientist stating, "You have placed an order with us for a ***design created by Stanford***." The design name she referenced was identical to the design name of Dr. Kurtz's 2016 BED File, identified in Dr. Kurtz's April 15, 2016 email above: 160414_HG19_DLBCL_2_final2_EZ_HX3. The Roche Nimblegen representative further explained to the RSS scientist that, since this was a "design created by Stanford," RSS needed Stanford's approval "to move the order into production." A copy of this August 14, 2017 email appears below.

1

2

3

4

5

6

7

8

9

10

> On Aug 14, 2017, at 9:04 AM, Minter, Amy <amy.minter@roche.com> wrote:
>
> Hi Alex,
>
> You have placed an order with us for an design created by Stanford, Alexander Craig.
>
> I am wondering if you have received approval from him to use this design.
> An email with the approval will allow us to move the order into production.
>
> Config no: 0200234935
> Design Name: 160414_HG19_DLBCL_2_final2_EZ_HX3
>
> I have included Emma Murphy on this email she is a Account manager for Stanford.
> If you need to get approval please work with her
>
> Let me know if you have additional questions.
>
> Amy

11    Stanford's submission of its 2016 BED File to Roche NimbleGen was covered by a standing

12 purchase order agreement between Stanford and Roche NimbleGen. That was the only agreement

13 applicable to this BED File, as it was created after Roche's acquisition of CappMed and before Dr.

14 Kurtz's contractor relationship with Roche. Under that Roche NimbleGen-Stanford agreement, Roche

15 Nimblegen was required to seek approval from Stanford before using Stanford's BED File to

16 synthesize a probe panel for its sister company, RSS. The agreement specifically provided that

17 Stanford retained ownership of all work product (such as the synthesis of probe panels) produced by

18 Roche NimbleGen ("Contractor") for Stanford, and that Roche NimbleGen may only use such

19 Stanford-owned work product "with the approval of Stanford":

20

21

22

23

24

25

26

27

28

- Article 18 | Data
- 18.1: Non-Disclosure. Contractor acknowledges that Stanford continually develops confidential information for Stanford and that Contractor may learn of confidential information, including confidential information of third parties, during the term of this Agreement. Contractor will comply with the policies and procedures of Stanford for protecting confidential information set forth below and, in any event, shall not disclose to any person or entity (except as required by applicable law or for the proper performance of Contractor's duties and responsibilities to Stanford), or use for Contractor's or any third party's benefit or gain, any confidential information obtained by Contractor incident to Contractor's consultancy or other association with Stanford. Contractor understands that this restriction shall continue to apply after this Agreement terminates, regardless of the reason for such termination.
- 18.2: Ownership of Work Product. Ownership of work product produced for Stanford by Contractor or any of its agents or employees in the course of performing the Services hereunder and of all proprietary rights therein shall vest in and shall be delivered, upon request, to Stanford. For the purposes hereof, the term work product includes, but is not limited to, all data, writings, photographs or other pictorial reproductions, drawings or other graphical representations, video or audio recordings, reports, calculations, tables and other documents, whether copyrightable or copyrighted, which are made in the course of performing the Services as specified. Contractor may, however, use work product prepared or produced under this Agreement, where such work product is otherwise made publicly available or with the specific written approval of Stanford.

After being informed that he needed Stanford's express approval before Roche NimbleGen could synthesize a probe panel for RSS based on a "design [i.e., BED File] created by Stanford," the RSS scientist emailed Drs. Kurtz and Alizadeh and asked for their permission, which Dr. Kurtz then granted.

99.    Dr. Kurtz admits that the earliest publication date for any of the so-called "Disputed Patent Applications" is May 14, 2021. Dr. Kurtz otherwise denies the allegations of Paragraph 99. Dr. Kurtz also incorporates his responses to Paragraphs 6, 54 and 98 here.

100.    Dr. Kurtz denies the allegations of Paragraph 100. Dr. Kurtz further incorporates his

responses to Paragraphs 6, 54, 58, 61, 72, 83 and 98 here.

101.    Dr. Kurtz denies the allegations of Paragraph 101. Dr. Kurtz further incorporates his responses to Paragraphs 6, 54, 58, 61, 72, 83 and 98 here.

102.    Paragraph 102 contains legal conclusions to which no response is required. Dr. Kurtz further states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself and otherwise denies the allegations of Paragraph 102. Dr. Kurtz further incorporates his responses to Paragraphs 6, 54, 58, 71, 72, and 98 here.

103.    Dr. Kurtz denies the allegations of Paragraph 103. Dr. Kurtz further incorporates his responses to Paragraphs 54, 58, 61, 72, and 98 here.

104.    Paragraph 104 contains legal conclusions to which no response is required. Dr. Kurtz otherwise denies the allegations of Paragraph 104. Dr. Kurtz further incorporates his responses to Paragraphs 6, 58, 61, and 98 here.

105.    Dr. Kurtz denies the allegations of Paragraph 105. Dr. Kurtz further incorporates his responses to Paragraphs 6, 58, 61, and 98 here.

106.    Dr. Kurtz denies the allegations of Paragraph 106. Dr. Kurtz further incorporates his responses to Paragraphs 6, 58, 61, and 98 here.

107.    Dr. Kurtz denies the allegations of Paragraph 107. Dr. Kurtz further incorporates his responses to Paragraphs 6, 58, 61, and 98 here.

108.    Dr. Kurtz admits the allegations of Paragraph 108.

109.    Dr. Kurtz admits that Dr. Diehn is a member of Foresight's board of directors and that Dr. Kurtz is currently Foresight's Chief Medical Officer. Dr. Kurtz denies the remaining allegations of Paragraph 109.

110.    Dr. Kurtz admits the allegations of Paragraph 110.

111.    Dr. Kurtz admits the allegations of Paragraph 111.

112.    Dr. Kurtz admits the allegations of Paragraph 112.

113.    Dr. Kurtz admits that the '730 application that became the '779 patent was filed by Stanford on behalf of Drs. Diehn, Alizadeh and Kurtz as inventors. Dr. Kurtz otherwise denies the allegations of Paragraph 113.

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

114.     Dr. Kurtz admits that the Stanford Oncologists assigned the '779 patent to Stanford. Dr. Kurtz otherwise denies the allegations of Paragraph 114.

115.     Dr. Kurtz admits that Stanford granted an exclusive license to Foresight for the '779 patent and all related patent applications. Dr. Kurtz otherwise denies the allegations of Paragraph 115.

116.     Dr. Kurtz denies the allegations of Paragraph 116. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61, and 98 here.

117.     Dr. Kurtz denies the allegations of Paragraph 117. Dr. Kurtz further incorporates his responses to Paragraph 6 here.

118.     Dr. Kurtz denies the allegations of Paragraph 118. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61, and 98 here.

119.     Dr. Kurtz denies the allegations of Paragraph 119. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61, and 98 here.

120.     Dr. Kurtz denies the allegations of Paragraph 120. Dr. Kurtz further incorporates his responses to Paragraphs 58, 61, and 98 here.

121.     Dr. Kurtz admits the allegations of Paragraph 121.

122.     Dr. Kurtz admits the allegations of Paragraph 122.

## RESPONSE TO PLAINTIFFS' CLAIMS FOR RELIEF

### First Claim for Relief

### Trade Secret Misappropriation Under 18 U.S.C. § 1836, et seq.

123.     Dr. Kurtz incorporates by reference his answers to the allegations of the preceding paragraphs of Roche's Complaint, as if fully set forth herein.

124.     Paragraph 124 contains legal conclusions to which no response is required. To the extent a response is required, Dr. Kurtz denies the allegations of Paragraph 124.

125.     Paragraph 125 contains legal conclusions to which no response is required. To the extent a response is required, Dr. Kurtz denies the allegations of Paragraph 125.

126.     Paragraph 126 contains legal conclusions to which no answer is required. To the extent an answer is required, Dr. Kurtz denies the allegations of Paragraph 126.

127.     Paragraph 127 contains legal conclusions to which no response is required. To the

1    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 127.

2        128.    Paragraph 128 contains legal conclusions to which no answer is required. To the extent

3    an answer is required, Dr. Kurtz denies the allegations of Paragraph 128.

4        129.    Paragraph 129 contains legal conclusions to which no answer is required. To the extent

5    an answer is required, Dr. Kurtz denies the allegations of Paragraph 129.

6        130.    Paragraph 130 contains legal conclusions to which no answer is required. To the extent

7    an answer is required, Dr. Kurtz denies the allegations of Paragraph 130.

8        131.    Paragraph 131 contains legal conclusions to which no answer is required. To the extent

9    a response is required, Dr. Kurtz denies the allegations of Paragraph 131.

10       132.    Paragraph 132 contains legal conclusions to which no response is required. To the

11   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 132.

12       133.    Paragraph 133 contains legal conclusions to which no response is required. To the

13   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 133.

14       134.    Paragraph 134 contains legal conclusions to which no response is required. To the

15   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 134.

16       135.    Paragraph 135 contains legal conclusions to which no response is required. To the

17   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 135.

18       136.    Paragraph 136 contains legal conclusions to which no response is required. To the

19   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 136.

20       137.    Paragraph 137 contains legal conclusions to which no response is required. To the

21   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 137.

22       138.    Paragraph 138 contains legal conclusions to which no response is required. To the

23   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 138.

24       139.    Paragraph 139 contains legal conclusions to which no response is required. To the

25   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 139.

26                              **Second Claim for Relief**

27           **Trade Secret Misappropriation Under Cal. Civ. Code §§ 3426-3426.11**

28       140.    Dr. Kurtz incorporates by reference his answers to the allegations of the preceding

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

1    paragraphs of Roche's Complaint, as if fully set forth herein.

2        141.    Paragraph 141 contains legal conclusions to which no response is required. To the

3    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 141.

4        142.    Paragraph 142 contains legal conclusions to which no response is required. To the

5    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 142.

6        143.    Paragraph 143 contains legal conclusions to which no response is required. To the

7    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 143.

8        144.    Paragraph 144 contains legal conclusions to which no response is required. To the

9    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 144.

10        145.    Paragraph 145 contains legal conclusions to which no response is required. To the

11    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 145.

12        146.    Paragraph 146 contains legal conclusions to which no response is required. To the

13    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 146.

14        147.    Paragraph 147 contains legal conclusions to which no response is required. To the

15    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 147.

16        148.    Paragraph 148 contains legal conclusions to which no response is required. To the

17    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 148.

18        149.    Paragraph 149 contains legal conclusions to which no response is required. To the

19    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 149.

20        150.    Paragraph 150 contains legal conclusions to which no response is required. To the

21    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 150.

22        151.    Paragraph 151 contains legal conclusions to which no response is required. To the

23    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 151.

24        152.    Paragraph 152 contains legal conclusions to which no response is required. To the

25    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 152.

26        153.    Paragraph 153 contains legal conclusions to which no response is required. To the

27    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 153.

28        154.    Paragraph 154 contains legal conclusions to which no response is required. To the

1    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 154.

2         155.    Paragraph 155 contains legal conclusions to which no response is required. To the

3    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 155.

4         156.    Paragraph 156 contains legal conclusions to which no response is required. To the

5    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 156.

6         157.    Paragraph 157 contains legal conclusions to which no response is required. To the

7    extent a response is required, Dr. Kurtz denies the allegations of Paragraph 157.

8                          **Third Claim for Relief**

9                          **Breach of Contract**

10        158.    Dr. Kurtz incorporates by reference his answers to the allegations of the preceding

11   paragraphs of Roche's Complaint, as if fully set forth herein.

12        159.    Paragraph 159 contains legal conclusions to which no response is required. To the

13   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 159.

14        160.    Paragraph 160 contains legal conclusions to which no response is required. Dr. Kurtz

15   further states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself but denies that the IP

16   assignment provisions of the Consulting Agreements are legally operative or enforceable.

17        161.    Paragraph 161 contains legal conclusions to which no response is required. Dr. Kurtz

18   further states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself.

19        162.    Paragraph 162 contains legal conclusions to which no response is required. Dr. Kurtz

20   further states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself.

21        163.    Paragraph 163 contains legal conclusions to which no response is required. To the

22   extent a response is required, Dr. Kurtz states that the Kurtz 9/23/2017 ESA (Exempt) speaks for itself

23   and denies the allegations of Paragraph 163.

24        164.    Paragraph 164 contains legal conclusions to which no response is required. To the

25   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 164.

26        165.    Paragraph 165 contains legal conclusions to which no response is required. To the

27   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 165.

28        166.    Paragraph 166 contains legal conclusions to which no response is required. To the

1   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 166.

2        167.   Paragraph 167 contains legal conclusions to which no response is required. To the

3   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 167.

4        168.   Paragraph 168 contains legal conclusions to which no response is required. To the

5   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 168.

6        169.   Paragraph 169 contains legal conclusions to which no response is required. To the

7   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 169.

8        **Fourth Claim for Relief**

9        **Breach of Implied Covenant of Good Faith and Fair Dealing**

10      170.   Dr. Kurtz incorporates by reference his answers to the allegations of the preceding

11   paragraphs of Roche's Complaint, as if fully set forth herein.

12      171.   Dr. Kurtz admits that he is a party to the Kurtz 9/23/2017 ESA (Exempt).

13      172.   Paragraph 172 contains legal conclusions to which no response is required. To the

14   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 172.

15      173.   Paragraph 173 contains legal conclusions to which no response is required. To the

16   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 173.

17      174.   Paragraph 174 contains legal conclusions to which no response is required. To the

18   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 174.

19      175.   Paragraph 175 contains legal conclusions to which no response is required. To the

20   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 175.

21      176.   Paragraph 176 contains legal conclusions to which no response is required. To the

22   extent a response is required, Dr. Kurtz denies the allegations of Paragraph 176.

23        **RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF**

24       Paragraphs a-t of the Complaint set forth the statement of relief requested by Roche to which

25   no response is required. To the extent a response is required, Dr. Kurtz denies each and every one of

26   Paragraphs a-t and denies that Roche is entitled to any relief whatsoever, including, without limitation,

27   the relief requested in its "Prayer for Relief."

28        **DEMAND FOR JURY TRIAL**

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT

1   Dr. Kurtz joins Roche's request for a trial by jury of any and all issues in this action so

2   triable.

3   **AFFIRMATIVE DEFENSES**

4   In support of each of the following defenses, Dr. Kurtz incorporates by reference their answers

5   to the allegations of the preceding paragraphs of Roche's Complaint, as if fully set forth herein. Dr.

6   Kurtz undertakes the burden of proof only as to those defenses deemed affirmative defenses by law,

7   regardless of how such defenses are denominated herein. Dr. Kurtz reserves all other defenses at law

8   or in equity that may exist now or in the future based upon discovery or further factual investigation

9   in this case.

10   **A.   Statute of Limitations**

11   All of Roche's claims against Dr. Kurtz are barred by the applicable statute of limitations.

12   Roche has had actual or inquiry notice of any alleged misappropriation of trade secrets or breaches of

13   contracts since at least December 2019, when multiple Roche employees were fully aware of the work

14   being done related to PhasED-Seq. Dr. Kurtz also informed Roche about his intellectual assignment

15   obligations to Stanford and his existing ctDNA work at Stanford in November 2017. In addition,

16   before he even started his contractor relationship with Roche on September 23, 2017, Roche was

17   already aware that Dr. Kurtz was a Stanford graduate student and as such subject to Stanford's

18   standard intellectual property policies and agreements.

19   **B.   Failure to State a Claim**

20   Roche has failed to state a claim upon which relief may be granted.

21   **C.   Failure to Particularize Trade Secrets**

22   Roche's claims are barred, in whole or in part, because Roche has failed to particularize the

23   alleged trade secrets and confidential information at issue.

24   **D.   Independent Development**

25   Roche's claims are barred, in whole or in part, because Dr. Kurtz has developed inventions

26   independently without using any of Roche's alleged trade secrets or confidential information.

27   **E.   Public Information**

28   Roche's claims are barred, in whole or in part, because Roche's alleged trade secrets and

DR. DAVID KURTZ'S ANSWER TO
PLAINTIFFS' COMPLAINT
Case No. 5:24-cv-03972-EKL

1  confidential information were in the public domain.

2  **F.    Failure to Maintain Confidentiality**

3  Roche's claims are barred, in whole or in part, because Roche's alleged trade secrets and

4  confidential information were disclosed to the public and not have not been maintained as confidential

5  and were not subject to reasonable measures to protect their confidentiality.

6  **G.    Readily Ascertainable**

7  Roche's claims are barred, in whole or in part, because Roche's alleged trade secrets and

8  confidential information are readily ascertainable.

9  **H.    Authorized Use**

10  Dr. Kurtz's use was at all times authorized by law and all agreements between the parties.

11  **I.    Laches**

12  Roche's claims are barred, in whole or in part, due to the doctrine of laches.

13  **J.    Consent, Acquiescence, and Waiver**

14  Roche consented to, acquiesced in or otherwise waived their right to challenge the conduct

15  about which they complain.

16  **K.    Equitable Estoppel**

17  Roche's claims are barred by the doctrine of equitable estoppel.

18  **L.    Failure to Mitigate Damages**

19  Roche's claims are barred, in whole or in part, because Roche has failed to mitigate its alleged

20  damages.

21  **M.    Unclean Hands**

22  Roche's claims are barred by the doctrine of unclean hands.

23  **N.    Full Performance**

24  Dr. Kurtz has duly and fully performed, satisfied, and discharged all obligations they may have

25  owed to Roche arising out of any and all agreements, representations, and/or contracts made with

26  Roche and Roche's breach of contract and breach of implied covenant and good faith claims are

27  therefore barred.

28  **O.    Failure of Conditions Precedent and Prior Breach by Roche**

1    Roche's claims are barred because Roche did not comply with terms of the agreements that

2  were conditions precedent to Dr. Kurtz's performance and/or because Roche breached the terms of

3  the Kurtz 9/23/2017 ESA (Exempt).

4    **P.    Duties Defined by Contract**

5    Roche's claims are barred, in whole or in part, because Dr. Kurtz had no duties toward Roche

6  beyond those specified in the contract.

7    **Q.    Unjust Enrichment**

8    Roche should recover nothing by way of its claims, because to allow such recovery would

9  give rise to Unjust Enrichment.

10    **R.    Other Affirmative Defenses**

11    Dr. Kurtz reserves the right to amend their answer and allege other affirmative defenses as

12  they become known during discovery.

13    **DR. KURTZ'S PRAYER FOR RELIEF**

14    As to Roche's Complaint, Dr. Kurtz prays:

15    A.    For judgment in their favor against Roche;

16    B.    That this Court make a finding that Roche's trade secret claims were asserted in

17        bad faith;

18    C.    That this Court award Dr. Kurtz his attorneys' fees and costs, including but not

19        limited to under 18 U.S.C. § 1836(b)(3)(D) and Cal. Civ. Code § 3426.4;

20    D.    That this Court award further sanctions against Roche pursuant to the Court's

21        inherent authority.

22  Dated: October 2, 2024                          Respectfully submitted,

23                                IRELL & MANELLA LLP

24

25                                By: */s/ Alan Heinrich*
                                   _____
26                                   Alan Heinrich

27                                   *Attorneys for Defendant Dr. David Kurtz*

28