1  IRELL & MANELLA LLP
   Morgan Chu (CA 70446)
2  MChu@irell.com
   Alan Heinrich (CA 212782)
3  AHeinrich@irell.com
   Jordan Nafekh (CA 328151)
4  JNafekh@irell.com
   Henry White (CA 351549)
5  HWhite@irell.com
   1800 Avenue of the Stars, Suite 900
6  Los Angeles, California 90067-4276
   Telephone:    (310) 277-1010
7  Facsimile:     (310) 203-7199

8  *Attorneys for Dr. David Kurtz*

9

10

11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN JOSE DIVISION**

15  ROCHE MOLECULAR SYSTEMS, INC.     )  Case No. 5:24-cv-03972-EKL
    and ROCHE SEQUENCING SOLUTIONS,   )
16  INC.,                             )  **DR. DAVID KURTZ'S MOTION FOR**
                                      )  **JUDGMENT ON THE PLEADINGS**
17          Plaintiffs                )
                                      )
18      v.                            )
                                      )
19  FORESIGHT DIAGNOSTICS INC., DAVID )
    KURTZ, an individual, and BOARD OF)
20  TRUSTEES OF THE LELAND STANFORD   )
    JUNIOR UNIVERSITY,                )
21                                    )
          Defendants.                 )
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ...................................................................................................... 1

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................. 3

      A.    CAPP-Seq Technology ............................................................................... 3

      B.    Roche's Acquisition Of CappMed .............................................................. 4

      C.    PhasED-Seq And Founding Of Foresight .................................................. 5

      D.    Roche's Trade Secret Misappropriation Allegations ................................. 5

III.  LEGAL STANDARDS ........................................................................................... 6

IV.   ARGUMENT .......................................................................................................... 7

      A.    Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To
            Counts 1 & 2 For Trade Secret Misappropriation ...................................... 7

            1.    Roche Has Failed To Identify Any Plausible "Trade Secrets"
                  With The Required Particularity ...................................................... 7

                  a.    Roche's Identification Of Broad Categories Of Tools
                        Fails To Particularly Plead Trade Secrets As
                        Required .............................................................................. 8

                  b.    Roche Has Also Failed To Distinguish Its Conclusory
                        Trade Secrets From Matters Of General Knowledge ......... 8

            2.    There Are No Disputed Facts Suggesting Roche's Purported
                  Trade Secrets Have Independent Economic Value ......................... 13

            3.    There Are No Disputed Facts Showing Any Act Of
                  Misappropriation By Dr. Kurtz ....................................................... 13

                  a.    There Are No Disputed Facts Suggesting That
                        PhasED-Seq Was Developed Using Roche Trade
                        Secrets ................................................................................. 14

                  b.    Roche Has Failed To Plausibly Allege The Disputed
                        Patent Applications Disclosed Or Used Roche Trade
                        Secrets ................................................................................. 16

      B.    Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To
            Count 3 For Breach Of Contract ................................................................. 18

            1.    Roche Has Failed To Sufficiently Allege That It Performed
                  Its Obligations Under Its Agreement With Dr. Kurtz ..................... 18

**Page**

2.  Roche Has Failed To Sufficiently Allege That Dr. Kurtz
    Breached Any Provision Of His Agreement With Roche ......................... 19

    a.  There Are No Disputed Facts Suggesting Dr. Kurtz
        Disclosed Any Roche Trade Secrets ............................................. 19

    b.  Dr. Kurtz's Conception And Development Of
        PhasED-Seq Was Done At Stanford, Independently
        From His Roche Consulting .......................................................... 20

    c.  Dr. Kurtz Disclosed Phased-Seq To Roche Weeks
        After The Beginning Of His Employment With
        Roche ............................................................................................. 22

C.  Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To
    Count 4 For Breach Of Implied Covenant Of Good Faith And Fair
    Dealing ................................................................................................................ 23

V.  CONCLUSION ................................................................................................................ 23

1

2

**<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

4

**Cases**

5

6

*AlterG, Inc. v. Boost Treadmills LLC*,
   388 F. Supp. 3d 1133 (N.D. Cal. 2019) ......................................................................8

7

*Ashcroft v. Iqbal*,
   556 U.S. 662, 679 (2009) .............................................................................................24

8

9

*Attia v. Google LLC*,
   983 F.3d 420 (9th Cir. 2020)..........................................................................9, 11, 17

10

11

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
   583 F.3d 832 (Fed. Cir. 2009) ....................................................................................22

12

*Bladeroom Grp. Ltd. v. Facebook, Inc.*,
   2015 U.S. Dist. LEXIS 164602 (N.D. Cal. Dec. 7, 2015) ........................................16

13

14

*Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*,
   727 F.3d 917 (9th Cir. 2013)......................................................................................15

15

16

*Bonito Boats v. Thunder Craft Boats*,
   489 U.S. 141 (1989) ...................................................................................................15

17

*Brazil v. Dell Inc.*,
   2010 U.S. Dist. LEXIS 137616 (N.D. Cal. Dec. 21, 2010) ......................................21

18

19

*CleanFish, LLC v. Sims*,
   2020 WL 4732192 (N.D. Cal. Aug. 14, 2020)..............................................................7

20

21

*Cohen v. CBR Sys., Inc.*,
   625 F. Supp. 3d 997 (N.D. Cal. 2022) ..................................................................18, 22

22

*Colyer v. AcelRx Pharms., Inc*,
   2015 U.S. Dist. LEXIS 159640 (N.D. Cal. Nov. 25, 2015)..........................................4

23

24

*De Rocha Express, Inc. v. Combined Res., Inc.*,
   2024 U.S. Dist. LEXIS 187476 (N.D. Cal. Oct. 15, 2024) ........................................18

25

26

*Diaz v. Moore*,
   2024 U.S. Dist. LEXIS 54360 (C.D. Cal. Mar. 22, 2024) ...........................................7

27

*Educ. Impact v. Travelers Prop. Cas. Co. of Am.*,
   2016 U.S. Dist. LEXIS 55653 (N.D. Cal. Apr. 26, 2016)......................................7, 19

28

*FilmTec Corp. v. Allied Signal Inc.*,
　939 F.2d 1568 (Fed. Cir. 1991)............................................................21

*Forcier v. Microsoft Corp.*,
　123 F. Supp. 2d 520 (N.D. Cal. 2000) ..................................................9

*GENFIT S. A. v. CymaBay Therapeutics Inc.*,
　2022 WL 195650 (N.D. Cal. Jan. 21, 2022) .........................................13

*GeoVector Corp. v. Samsung Elecs. Co.*,
　234 F. Supp. 3d 1009 (N.D. Cal. 2017) ................................................4

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
　189 F.3d 971 (9th Cir. 1999)................................................................7

*Imax Corp. v. Cinema Technologies, Inc.*,
　152 F. 3d 1161 (9th Cir. 1998)..............................................................8

*Karns & Karns Ltd. Liab. P'ship v. Quintessa Mktg., Ltd. Liab. Co.*,
　2023 U.S. Dist. LEXIS 129668 (C.D. Cal. July 25, 2023) .....................18

*King v. Facebook, Inc.*,
　2019 U.S. Dist. LEXIS 209247 (N.D. Cal. Dec. 3, 2019) ......................23

*Knievel v. ESPN*,
　393 F.3d 1068 (9th Cir. 2005)..............................................................22

*Mallet & Co v. Lacayo.*,
　16 F.4th 36416 F.4th ................................................................10, 11

*Navigation Holdings, LLC v. Molavi*,
　445 F. Supp. 3d 69 (N.D. Cal. 2020) ...................................................16

*O'Very v. Spectratek Techs.*,
　No. CV 03-0540 .....................................................................................12

*Patton v. Experian Data Corp.*,
　2018 U.S. Dist. LEXIS 231731 (C.D. Cal. Dec. 4, 2018)......................19

*Pellerin v. Honeywell Int'l, Inc.*,
　877 F. Supp. 2d 983 (S.D. Cal. 2012) ...................................................8

*Power Integrations, Inc. v. De Lara*,
　2020 U.S. Dist. LEXIS 52724 (S.D. Cal. Mar. 26, 2020)......................20

*Rescue 1 Fin., LLC v. Complete Debt Relief, LLC*,
　2023 U.S. Dist. LEXIS 149612 (C.D. Cal. Aug. 24, 2023) .....................15

*Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*,
　733 F.3d 1251 (9th Cir. 2013)................................................................9

*Soc. Apps, LLC v. Zynga, Inc.*,
   2012 WL 2203063 (N.D. Cal. June 14, 2012) ............................................................8

*Space Data Corp. v. X*,
   No. 16-cv-03260-BLF, 2017 U.S. Dist. LEXIS 22571 (N.D. Cal. Feb. 16,
   2017),......................................................................................................................7, 8, 11

*Thompson v. Booke*,
   52 F. App'x 409 (9th Cir. 2002).............................................................................3, 7

*Threshold Enters. v. Pressed Juicery, Inc.*,
   445 F. Supp. 3d 139 (N.D. Cal. 2020) ........................................................................6

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010)......................................................................................9

**Statutes**

18 U.S.C. § 1839 .........................................................................................................13

Bayh-Dole Act.......................................................................................................2, 12

Cal. Civ. Code § 3426.1 ........................................................................................11, 13

Cal. Civ. Code § 3426.1(d) .........................................................................................13

California Uniform Trade Secrets Act .........................................................................2

**Rules**

Fed. R. Civ. P.  8 ...........................................................................................................8

Fed. R. Civ. P. 12(b)......................................................................................................6

Fed. R. Civ. P. 12(c)...................................................................................................2, 6

1

2

### **<u>NOTICE OF MOTION</u>**

3     PLEASE TAKE NOTICE THAT Dr. David Kurtz is moving for a judgment on the pleadings

4 pursuant to Fed. R. Civ. P. 12(c), with a hearing for the motion set on February 5, 2025, or as soon

5 thereafter as the matter may be heard, in the courtroom of the Honorable Eumi K. Lee, United States

6 District Judge for the Northern District of California located at 280 South 1st Street, San Jose, CA

7 95113. This motion is based upon this notice of motion, the supporting memorandum of points and

8 authorities, all pleadings and papers on file in this action, and upon such other matters as may be

9 properly presented to the Court.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I.    **INTRODUCTION**

2           Dr. David Kurtz, an oncologist and assistant professor at Stanford University, respectfully

3    requests that the Court grant judgment on the pleadings in his favor and against plaintiffs Roche

4    Molecular Solutions, Inc. and Roche Sequencing Solutions, Inc.'s (collectively, "Roche") on all

5    asserted claims. In this and related Case No. 5:24-cv-06117-EKL, Roche purports to assert a

6    blunderbuss of trade secret misappropriation, breach of contract, and business tort claims against Dr.

7    David Kurtz, his Stanford colleagues Drs. Diehn and Alizadeh, (together, the "Stanford

8    Oncologists"), Stanford University itself, and Foresight Diagnostics Inc. ("Foresight"), a start-up

9    competitor of Roche and exclusive Stanford licensee that the Stanford Oncologists co-founded in

10   2020. This case is a baseless attempt by Roche to interfere with Foresight's business because Roche

11   has been unable to compete with Foresight in the marketplace. The Court should grant Dr. Kurtz's

12   motion, before burdening the Court and the parties any further, because on the face of its Complaint

13   Roche has not stated any claim against them.

14          By way of brief background,[1] in 2015, Roche purchased a different, earlier-stage company

15   that Drs. Diehn and Alizadeh co-founded in 2013, Capp Medical ("CappMed"), which was the

16   exclusive licensee of Stanford-owned patent applications covering a cancer diagnostic technology

17   called "CAPP-Seq." Drs. Diehn and Alizadeh continued their research at Stanford, and years after

18   Roche's CappMed acquisition, they and Dr. Kurtz invented a new and different diagnostic

19   technology at Stanford called PhasED-Seq. Stanford patented PhasED-Seq and exclusively licensed

20   the patents to Foresight. PhasED-Seq is "much more sensitive" than the CAPP-Seq technology

21   Roche purchased nearly 10 years ago. Ex. L at 4.[2] Apparently being unable to compete in the

22   marketplace, and suffering from a case of buyers' remorse, Roche filed multiple lawsuits against the

23   Stanford Oncologists, Stanford, and Foresight, contending that PhasED-Seq was based on vaguely

24   described CAPP-Seq-related "trade secrets" that Roche purportedly acquired from CappMed.

25

26          [1] For further background on the case, Defendants refer the Court to the "speaking" answer
     of Dr. Kurtz, Dkt. 54.

27          [2] Lettered exhibits are attached to Plaintiffs' Complaint.  Numbered exhibits are attached to
28   the declaration of Alan Heinrich, filed concurrently herewith.

The claims against Dr. Kurtz—trade secret misappropriation, breach of contract, and breach of implied covenant of good faith and fair dealing—are implausible on their face and Dr. Kurtz is entitled to judgment on the pleadings under FRCP 12(c).

Roche's claims for trade secret misappropriation fail for three separate, independent reasons.

**First**, Roche fails to assert its trade secret claims with the particularity required at the pleading phase. This is not surprising, as Roche did not acquire any trade secrets in its CappMed acquisition. Before Roche acquired CappMed, there was nothing "secret" about CAPP-Seq: Stanford and the Stanford Oncologists had already publicly disclosed the details of that technology in academic papers and in a fulsome 547-page published patent application.[3] To underscore this point, the Stanford Oncologists' research leading to CAPP-Seq relied on federal funding and thus was subject to the provisions of the Bayh-Dole Act. As explained below, "***there is no ability of the contractor to keep a patentable invention a trade secret*** under the Bayh-Dole Act." 2 Federal Contract Management P 11.01 (Henry L. Goldberg ed., 2024).[4] Contrary to the central, faulty premise of Roche's lawsuit, research universities such as Stanford are simply not in the "trade secrets" business for technology already described in academic papers and filed patent applications.

For this reason, the Complaint includes none of the allegations courts require to separate any alleged CAPP-Seq "trade secrets" from what was already generally known in the art as a result of the robust disclosures in the CAPP-Seq publications. Instead, Roche's efforts to provide factual allegations concerning its trade secret encompass just two conclusory paragraphs, Compl. ¶¶ 58, 61, consisting of broad categories of trade secrets without more. Courts have repeatedly found allegations relying on mere categories that are devoid of detail insufficient at the pleading phase.

***Second,*** Roche fails to include any plausible factual allegations that Roche's insufficiently-pled trade secrets have independent economic value. With respect to this independent element required under both the Defend Trade Secrets Act and California Uniform Trade Secrets Act, Roche makes no effort to identify the independent economic value of its purported trade secrets (as distinct

---

[3] These CAPP-Seq publications are incorporated by reference in the Complaint and are also subject to judicial notice, and hence should be considered by the Court in ruling on this Motion. *See infra* at 4.

[4] Throughout this Motion, emphasis is added unless otherwise indicated.

1    from the publicly-disclosed CAPP-Seq platform itself), and its claims therefore fail.

2        **Third**, Roche fails to allege any acts of misappropriation by Dr. Kurtz. Roche fails to put

3    forth any non-conclusory allegations that he used any Roche "trade secrets" regarding CAPP-Seq in

4    the development of PhasED-Seq, rather than information that was already publicly available in

5    detailed CAPP-Seq publications. *See, e.g.,* Exs. 1-3. As such, Roche has failed to state trade secret

6    misappropriation claims 'against Dr. Kurtz. *Thompson v. Booke*, 52 F. App'x 409, 410 (9th Cir.

7    2002) (holding that conclusory allegations were insufficient to defeat a motion for judgment on the

8    pleadings).

9        Dr. Kurtz is also entitled to judgment on the pleadings for Roche's claim for Breach of

10   Contract. First, Roche has failed to allege in more than a conclusory manner that it performed its

11   obligations under its agreement with Dr. Kurtz. Second, Roche has failed to allege that Dr. Kurtz

12   breached his agreement with Roche because Roche fails to plead any facts to support the plausible

13   inference that Dr. Kurtz disclosed Roche Trade Secrets in the Disputed Applications; that Dr. Kurtz

14   had an obligation to assign the Disputed Patent Applications to Roche; or that Dr. Kurtz failed to

15   disclose PhasED-Seq to Roche.

16       This court should grant Dr. Kurtz's motion for judgment on the pleadings because Roche's

17   allegations fail to state any plausible claims against him.

18   **II.    FACTUAL BACKGROUND**

19       **A.    CAPP-Seq Technology**

20       In 2011, as part of their Stanford research, Drs. Diehn and Alizadeh developed a sequencing-

21   based method for tracking certain types of cancer-related mutations in circulating tumor DNA

22   ("ctDNA"). Ex. C at 19. They called the method CAPP-Seq, which is short for Cancer Personalized

23   Profiling by deep Sequencing. *Id* at 21. On March 15, 2013, Stanford filed a provisional patent

24   application on CAPP-Seq, U.S. Provisional Patent Application No. 61/798,925 (the "'925

25   Application") naming Drs. Diehn, Alizadeh and two other Stanford employees as inventors. *Compl.*

26   ¶ 31. In October 2013, Drs. Diehn and Alizadeh, along with Ashok Krishnamurthi, founded Capp

27   Medical, Inc. ("CappMed") to commercialize this new cancer diagnostic technology developed at,

28   and owned, by Stanford. *Id.* ¶¶ 30-31, 78. On March 12, 2014, Stanford filed PCT/US/2014/025020

1    (the "'020 Application"), which listed the same inventors as the '925 Application and claims priority

2    thereto. Ex. 1 at 1. The '020 and '925 Applications are thus incorporated by reference into the

3    Complaint because the Complaint admits Roche's rights in CAPP-Seq were through its license to

4    the '925 Application "and any U.S. or foreign application claiming priority therefrom." Compl. ¶

5    31. *See GeoVector Corp. v. Samsung Elecs. Co.*, 234 F. Supp. 3d 1009, 1016 n.2 (N.D. Cal. 2017)

6    ("because the '185 incorporates, and claims priority to the Korean Patent, I may also consider the

7    Korean Patent as incorporated by reference in the complaint."); *see also Colyer v. AcelRx Pharms.,*

8    *Inc,* No. 14-CV-04416-LHK, 2015 U.S. Dist. LEXIS 159640, at *10 (N.D. Cal. Nov. 25, 2015)

9    ("[Patent filings] are in the public record, and all are subject to judicial notice."). The '020

10   Application is 547 pages long and describes CAPP-Seq in robust detail. *See* Ex. 2.

11           **B.      Roche's Acquisition Of CappMed**

12          In 2014, CappMed and Roche entered into discussions about the possibility of Roche

13   acquiring CappMed. Compl. ¶ 33. In a September 2014 presentation to Roche, attached as Exhibit

14   C to the Complaint, Drs. Diehn and Alizadeh noted that CappMed's technology was "Exclusively

15   Licensed from Stanford," and described the CappMed Intellectual Property which Roche would

16   receive as part of an acquisition. Ex. C at 9. The CappMed Intellectual Property included filed and

17   to-be-filed patent applications on all aspects of CAPP-Seq, including selector design, library

18   preparation, a data analysis pipeline software named FACTERA, and several other CAPP-Seq-

19   related technologies. *Id.* at 58. The presentation also noted that details of CAPP-Seq were published

20   in a 2014 paper in *Nature Medicine*. *Id.* at 22, 30; Ex. 3. Notably, nowhere in the CappMed

21   presentation were any "trade secrets" mentioned. *Id.* And for good reason. On September 25, 2014,

22   just days after this meeting, the 547-page '020 Application published, which included hundreds of

23   pages of disclosure of CAPP-Seq's tumor selectors, tumor selector design software, data analysis

24   pipeline, and panel data. Ex. 2; *see infra* at 10-11.

25          In April 2015, months after the '020 Application published and publicly disclosed the details

26   of CAPP-Seq, Roche acquired CappMed. Compl. ¶ 36. As part of that acquisition, Roche acquired

27   CappMed's exclusive license to Stanford's CAPP-Seq patent applications. *Id.* Drs. Diehn and

28   Alizadeh were retained by Roche as consultants. *Id.* ¶ 4. Drs. Diehn and Alizadeh's consulting

1    agreements expressly acknowledged that they were "employee[s] of Stanford University...and

2    [were] subject to certain agreements, rules, policies, regulations, orders and guidelines of Stanford",

3    including those governing "ownership of intellectual property." Ex. A at 2.

4              **C.    PhasED-Seq And Founding Of Foresight**

5              After Roche's CappMed acquisition, Drs. Diehn and Alizadeh partnered with Dr. Kurtz to

6    develop a new assay called PhasED-Seq, "a liquid-biopsy powered platform that detects minimal

7    residual disease (MRD) from circulating tumor DNA (ctDNA)." Compl., ¶¶ 66-67. PhasED-Seq is

8    "much more sensitive" than CAPP-Seq and is able to detect "less than one cancer DNA sequence in

9    1 million non-cancer DNA sequences," compared to CAPP-Seq's ability to detect approximately

10   one in ten-thousand. Ex. L at 4.

11             On November 6, 2019, Stanford filed U.S. Provisional Patent Application 62/931,688, which

12   described PhasED-Seq and listed the Stanford Oncologists as inventors. *See* Compl. ¶ 73. Stanford

13   then filed several applications claiming priority to the '688 Application, some of which have issued

14   as patents and all of which have published. *Id.*, ¶ 74. After inventing and filing a provisional

15   application on PhasED-Seq, the Stanford Oncologists, among others, co-founded Foresight on May

16   8, 2020, with the goal of becoming the leader in cancer detection through ultra-sensitive liquid

17   biopsy. *Id.*, ¶ 9. Stanford has exclusively licensed these PhasED-Seq patents and patent applications

18   to Foresight. *Id.*, ¶ 115.

19             **D.    Roche's Trade Secret Misappropriation Allegations**

20             Now Roche, threatened by a startup competitor with a diagnostic assay 100 times more

21   sensitive than its assay, baselessly claims that PhasED-Seq was developed using so-called "Roche

22   Trade Secrets." Compl. ¶ 67, 94. The Complaint includes just two paragraphs on what it defines as

23   the "Roche Trade Secrets." In paragraph 58, Roche alleges these trade secrets as "at least, CAPP-

24   Seq tumor selectors, CAPP-Seq selector design software, Roche's data analysis pipeline, and panel

25   data (the 'Roche Trade Secrets')." *Id.* ¶ 58.The Complaint makes no attempt to distinguish alleged

26   "Roche Trade Secrets" from the hundreds of pages of detailed descriptions of CAPP-Seq's "tumor

27   selectors," "selector design software," "data analysis pipeline," and "panel data" that, months before

28   Roche acquired CappMed, Stanford had already published in the '020 Application and *Nature*

1    *Medicine* paper. *See infra* at 10-11.

2          Roche further alleges that "[o]ne specific aspect used as part of the Roche Trade Secrets is

3    confidential data relating to genetic mutations in patients with DLBC." Compl. ¶ 61. But Roche does

4    not state which of the Roche Trade Secrets it relates to or even that the purportedly "confidential

5    data" relates to any of the disputed issues. And although Roche alleges that the "Roche Trade Secrets

6    include both materials acquired as part of the CappMed Acquisition and Roche's improvements

7    thereto," (*Id.*. ¶ 58), Roche provides no factual content on the nature of Roche's conclusory

8    "improvements" to the implausible CAPP-Seq trade secrets allegedly "acquired as part of the

9    CappMed Acquisition."

10          Roche also fails to plead any factual bases for its accusations that Dr. Kurtz misappropriated

11    its ill-defined trade secrets in their development of PhasED-Seq. Instead, Roche offers only the

12    following conclusory allegations:

13          • A statement by Stanford that PhasED-Seq "builds upon" CAPP-Seq. *Id*. ¶ 69.

14          • The presence of a "BED file" in one of the Disputed Patent Applications. *Id*. ¶ 98.

15          • The allegation that "the research giving rise to the '730 application arose from [Drs.

16             Diehn, Alizadeh, and Kurtz's] use of Roche's CAPP-Seq technology in NSCLC patients'

17             and their efforts to 'extend ctDNA detection by CAPP-Seq." *Id*. ¶ 97.

18          Based in part on the sparsity of these allegations, on October 9, 2024, Defendants Foresight

19    and Stanford filed motions to dismiss all claims against them. Dkt. 57, 60. Dr. Kurtz now brings the

20    present motion for judgement on the pleadings because even accepting each of Roche's factual

21    allegations as true, judgment in his favor is warranted.

22    **III.     LEGAL STANDARDS**

23          Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed . . . a

24    party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Because the motions are

25    functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its

26    Rule 12(c) analog." *Threshold Enters. v. Pressed Juicery, Inc*., 445 F. Supp. 3d 139, 144 (N.D. Cal.

27    2020). "When ruling on a motion for judgment on the pleadings, a court may consider documents

28    that the pleadings incorporate by reference, as well as matters that are subject to judicial notice."

1   *Diaz v. Moore*, No. 2:23-cv-10018-SPG-RAO, 2024 U.S. Dist. LEXIS 54360, at *6 (C.D. Cal. Mar.

2   22, 2024). Moreover, "in a motion for judgment on the pleadings, a court is entitled to consider

3   allegations made in an answer so long as they are not in dispute with the allegations in the

4   complaint." *Educ. Impact v. Travelers Prop. Cas. Co. of Am.*, No. 15-cv-04510-EMC, 2016 U.S.

5   Dist. LEXIS 55653, at *4 (N.D. Cal. Apr. 26, 2016). "A judgment on the pleadings is properly

6   granted when, taking all the allegations in the pleading as true, the moving party is entitled to

7   judgment as a matter of law." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978-79 (9th

8   Cir. 1999) (internal quotation marks and citations omitted). Further, conclusory assertions, without

9   more, are insufficient to defeat a motion on the pleadings. *Thompson*, 52 F. App'x at 410.

10  **IV.    ARGUMENT**

11          **A.    Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To Counts 1 &**
                   **2 For Trade Secret Misappropriation**

12

13          To state a claim for trade secret misappropriation, a plaintiff must allege "(1) the plaintiff

14  owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's

15  actions damaged the plaintiff." *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 U.S. Dist.

16  LEXIS 22571 at *3 (N.D. Cal. Feb. 16, 2017) (citation omitted). Roche fails to plead factual

17  allegations plausibly alleging that it either owned any actual "trade secret" or that Dr. Kurtz

18  committed any misappropriation. Thus, the pleadings raise no material issues of fact that would

19  allow Roche to prevail on either of Counts 1 or 2 (collectively, Roche's "trade secret claims"), and

20  Dr. Kurtz is entitled to judgment on the pleadings for these claims.

21          **1.    Roche Has Failed To Identify Any Plausible "Trade Secrets" With**
                   **The Required Particularity**

22

23          "[T]he burden is on Plaintiff to identify protectable trade secrets and show that they exist."

24  *CleanFish, LLC v. Sims*, 2020 WL 4732192, at *3 (N.D. Cal. Aug. 14, 2020) (citation omitted).

25  Roche's claim for trade secret misappropriation fails for the threshold reason that the Complaint does

26  not identify any trade secrets with the particularity required by the applicable pleading standard:

27          Before a defendant is compelled to respond to a complaint based upon claimed
            misappropriation or misuse of a trade secret ..., the complainant should describe the
28          subject matter of the trade secret with ***sufficient particularity to separate it from***
            ***matters of general knowledge in the trade*** or of special knowledge of those persons

who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.

*Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (citations omitted) (granting motion to dismiss trade secret claims). *See also, e.g., Imax Corp. v. Cinema Technologies, Inc.*, 152 F. 3d 1161 at 1164-65 (9th Cir. 1998) (citing same standard).

### a. Roche's Identification Of Broad Categories Of Tools Fails To Particularly Plead Trade Secrets As Required

Dr. Kurtz is entitled to judgment on the pleadings with respect to Roche's trade secret claims because Roche fails to identify any alleged "trade secrets" with sufficient particularity. Instead, the Complaint merely lists broad categories of diagnostic tools: "tools Roche used . . . include[ing], at least, CAPP-Seq tumor selectors, CAPP-Seq selector design software, Roche's data analysis pipeline, and panel data." Complaint ¶ 58. Allegations that set out "purported trade secrets in broad, categorical terms" that are merely "descriptive of the types of information that generally *may* qualify as protectable trade secrets" are insufficient to state a claim. *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) (emphasis in original). *See, e.g., AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1145-6 (N.D. Cal. 2019) (dismissing DTSA claim when plaintiff alleged "categories of information" rather than specific descriptions of its trade secrets and their relationship to plaintiff's technologies); *Space Data Corp.*, 2017 U.S. Dist. LEXIS 22571, at *4 ("high-level overview of … purported trade secrets, such as 'data on the environment in the stratosphere' and 'data on the propagation of radio signals from stratospheric balloon-based transreceivers'" did not satisfy the Rule 8 pleading standards); *Soc. Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012) ("A description of [a] category, or even of the subcategories of information within a category, does not comply with the requirement to identify the actual matter that is claimed to be a trade secret."). Dr. Kurtz is thus entitled to a judgment on the pleadings for Roche's trade secret claims.

### b. Roche Has Also Failed To Distinguish Its Conclusory Trade Secrets From Matters Of General Knowledge

Even if this Court were to find that Roche's asserted trade secrets provide the requisite detail to state a claim for trade secret misappropriation (which they do not), Roche's trade secret claims fail because they fail to distinguish the asserted trade secrets from matters that were already known.

1    Roche would only have a viable trade secret claim in technology related to CAPP-Seq "if [Roche]

2    reveals implementation details and techniques *beyond* what was disclosed in [a published patent

3    application or paper]." *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) (emphasis in original).

4    Not only has Roche failed to do so, it has not even tried.

5          As noted above, Roche has defined its alleged trade secrets as "CAPP-Seq tumor selectors,

6    CAPP-Seq selector design software, Roche's data analysis pipeline, and panel data." Compl. ¶ 58.

7    Roche's Complaint makes no attempt to separate such purported trade secrets from general

8    knowledge. Further, the categories Roche identifies as its alleged trade secrets **cannot** be trade

9    secrets because they were robustly disclosed in the CAPP-Seq publications and publicly available

10   patent applications filed before Roche even acquired CappMed. *See Forcier v. Microsoft Corp.*, 123

11   F. Supp. 2d 520, 528 (N.D. Cal. 2000) ("'trade secret' status was extinguished" when the information

12   had already been in the public domain by the time of the alleged misappropriation). These

13   publications' authenticity cannot be disputed, and they are publicly available; thus, they are properly

14   considered on a motion for judgment on the pleadings. *See Von Saher v. Norton Simon Museum of

15   Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (holding that a court may take judicial notice of

16   publications to establish what was in the public realm at the time); *Seven Arts Filmed Entm't Ltd. v.

17   Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (stating that, although courts are

18   required to accept as true well-pleaded allegations of material fact, courts are not "required to accept

19   as true allegations that contradict . . . matters properly subject to judicial notice . . .").

20         Roche is well aware of the public nature of these disclosures. For example, the CappMed

21   Presentation (Ex. C) states that CappMed had filed patent applications on "Selector design" (i.e.,

22   CAPP-Seq selector design software), "Additional selectors" (i.e., CAPP-Seq tumor selectors) and

23   "FACTERA" (which, as discussed below, (*infra* at 11), is part of the CAPP-Seq data analysis

24   pipeline) before Roche's acquisition of CappMed. Ex. C at 58.

25         On September 25, 2014, the 547-page '020 Application extensively described and publicly

26   disclosed each category of alleged "Roche Trade Secrets" identified in paragraph 58 of the

27   Complaint. Specifically:

28         **"CAPP-Seq tumor selectors" (Complaint ¶ 58)**: With respect to this purported Roche

Trade Secret, the '020 Application already explained that "Exemplary selector sets are provided in Tables 2, and 6-18. The Selector set comprising one or more genomic regions identified in Table 2 may be useful for [non-small cell lung cancer]." Ex. 2 at [00554]. Indeed, Tables 6 to 18 of the '020 Application set forth CAPP-Seq tumor selectors for such other cancers as breast cancer, colorectal cancer, diffuse large B-cell lymphoma, follicular lymphoma, pancreatic cancer and adenocarcinomas. *Id.*

Roche's Complaint makes no effort to identify with particularity any alleged "CAPP-Seq tumor selector" trade secrets separate from the published CAPP-Seq tumor selectors, much less permit Dr. Kurtz "to ascertain at least the boundaries within which the secret lies." *Mallet & Co v. Lacayo.,* 16 F.4th 364 at 382. And the fact that Stanford published 14 different CAPP-Seq tumor selectors in the '020 Application months before the CappMed acquisition renders Roche's conclusory assertion that its "Roche Trade Secrets" included "CAPP-Seq tumor selectors" that were "acquired as part of the CappMed Acquisition" highly implausible.

**"CAPP-Seq selector design software" (Complaint ¶ 58)**: The '020 Application includes many paragraphs directed to CAPP-Seq selector design software, another one of the purported Roche Trade Secrets. For example, a section expressly entitled "CAPP-Seq Selector Design" begins at paragraph [00823] of the '020 Application. The Application explains, "We employed a six-phase design strategy to identify and prioritize genomic regions for the CAPP-Seq NSCLC selector as detailed below . . . The following algorithm was used to design the CAPP-Seq selector . . . ." Ex. 2 at [00824]-[00825]. Similarly, the '020 Application also includes 38 paragraphs that provide additional details on CAPP-Seq selector design in a section entitled "*Methods for producing a selector set." Id.* at [00555 – 00593].

Again, Roche utterly fails to identify with particularity any "CAPP-Seq selector design software" trade secrets separate from the details of such software published in the '020 Application.

**"data analysis pipeline" (Complaint ¶ 58)**: The '020 Application also includes many paragraphs describing in detail the CAPP-Seq data analysis pipeline. Figure 6 is described as the "CAPP-Seq computational pipeline," and "schematically illustrate[s]" the "[m]ajor steps of the bioinformatics pipeline for mutation discovery and quantitation in plasma.*" Id.* at [00448 and Fig. 6].

1      Likewise, a detailed section on "Bioinformatics and Statistical Methods starts at [00807], and

2  a section on the "CAPP-Seq Computational Pipeline" starts at [00827].

3      One particular component of the CAPP-Seq data analysis pipeline is called FACTERA, which

4  stands for FACile Translocation Enumeration and Recovery Algorithm. The FACTERA algorithm is

5  described in detail starting at [00829].

6      Once again, Roche has failed to identify with particularity any alleged CAPP-Seq "data

7  analysis pipeline" trade secrets separate from the details of the CAPP-Seq pipeline published in the

8  '020 Application, and thus again fails to meet its pleading burden.

9      **"panel data" (Complaint ¶ 58)**: Roche's reference to "panel data" is insufficiently particular

10  to satisfy the pleading standard. *See Space Data Corp.,* 2017 U.S. Dist. LEXIS 22571 at *4 (plaintiff's

11  identified trade secrets of "data on the environment in the stratosphere" and "data on the propagation

12  of radio signals from stratospheric balloon-based transceivers" was insufficiently particular to satisfy

13  pleading standards). And again, Roche does not even attempt to identify "panel data" trade secrets

14  separate from the examples of panel data in Tables 19-21 of the '020 Application. Ex. 2 at [00771].

15      Thus, none of the vaguely-identified "Roche Trade Secrets" set out in ¶ 58 actually qualifies

16  as a trade secret. *See* Cal. Civ. Code § 3426.1 (defining a "trade secret" as information which

17  "Derives independent economic value, actual or potential, from not being generally known to the

18  public or to other persons who can obtain economic value from its disclosure or use"). Given that

19  CAPP-Seq was publicly described before Roche acquired any rights to CAPP-Seq, Roche only has

20  a viable trade secret claim in technology related to CAPP-Seq "if [Roche] reveals implementation

21  details and techniques *beyond* what was disclosed in [a published patent application or paper]." *Attia,*

22  983 F.3d at 426 (emphasis in original). Instead of revealing such required trade secret details, Roche,

23  like the plaintiff in *Mallet & Co.*, "fails to explain how we or anyone else is to distinguish between

24  what is generally known or available information and what it contends to be protectable trade secrets.

25  With a wave of the hand, it declares everything to be secret know-how." *Mallet & Co.*, 16 F.4th at

26  384. Roche's failure to describe its trade secrets with sufficient particularity to establish how they

27  go beyond that which was disclosed in the CAPP-Seq publications is fatal to its misappropriation

28  claim. *See id.* ("When the breadth of a trade secret description is so far-reaching that it includes

1    publicly available information (like patent disclosures) and admitted industry knowledge, that

2    information is not specific enough to be accorded trade secret status.").

3        It makes perfect sense that Roche cannot properly allege any trade secrets from its CappMed

4    acquisition. Drs. Diehn and Alizadeh developed the technology at Stanford, a research university

5    committed to publishing and patenting its research, not maintaining trade secrets over such work.

6    Underscoring this fact is that the Stanford CAPP-Seq technology that was the subject of the CappMed

7    acquisition was developed using federal funding and thus subject to the provisions of the Bayh-Dole

8    Act. *See* Ex. 1 at [0001] ("This invention was made with government support under grant number

9    W81XWH-12-1-0285 awarded by the Department of Defense."). The Bayh-Dole Act governs

10   intellectual property rights between the Federal Government and those who conceive or reduce to

11   practice inventions while using federal funding. A contractor using federal funds to create an invention

12   has two options: either (a) elect title to any patentable subject invention conceived or reduced to

13   practice with federal funding, or (b) give the Government the right to do so while retaining a non-

14   exclusive license. 2 Federal Contract Management P 11.01. "Thus, ***there is no ability of the contractor***

15   ***to keep a patentable invention a trade secret*** under the Bayh-Dole Act." *Id.* Accordingly, Stanford

16   was unable to keep any trade secrets related to its federally-funded invention of the CAPP-Seq

17   technology licensed to CappMed (and from CappMed to Roche). Thus, Roche could not have acquired

18   trade secrets related to CAPP-Seq from the CappMed Acquisition, despite its repeated allegations to

19   the contrary. Its trade secret misappropriation claim therefore fails.

20       In sum, Roche failed to describe its trade secrets with sufficient particularity to separate them

21   from what was already publicly disclosed. The Complaint does not allow Dr. Kurtz to ascertain the

22   boundaries of Roche's alleged trade secrets, and Dr. Kurtz is therefore entitled to judgment on the

23   pleadings for Roche's trade secret claims. *O'Very v. Spectratek Techs.*, No. CV 03-0540 CBM

24   (PJWx), 2003 U.S. Dist. LEXIS 27839, at *17 (C.D. Cal. Aug. 7, 2003) (granting Defendant's motion

25   for judgment on the pleadings where "Plaintiffs fail to separate its trade secret allegations from the

26   trade's general knowledge of the subject matter and to identify the trade secret with any

27   particularity.").

28

DR. DAVID KURTZ'S MOTION FOR
JUDGMENT ON THE PLEADINGS
Case No. 5:24-cv-03972-EKL

**2.    There Are No Disputed Facts Suggesting Roche's Purported Trade Secrets Have Independent Economic Value**

Separate and independent from Roche's failure to identify any asserted trade secrets with requisite particularity, its trade secret claims also fail because Roche has failed to plausibly allege that these trade secrets have independent economic value. *See* 18 U.S.C. § 1839(3); see also Cal. Civ. Code § 3426.1(d) (defining a trade secret as information which derives "independent economic value, actual or potential, from not being generally known to [others]"). With respect to this prong of its DTSA and CUTSA claims, Roche has alleged just one conclusory sentence, alleging that these trade secrets, together, have independent economic value "in the development of precise and accurate tools for cancer detection and monitoring":

> 60. The Roche Trade Secrets have independent economic value to Roche from not being generally known to the public, to Roche's competitors, or to other persons who can obtain economic value from the trade secrets, including the CAPP-Seq tumor selectors, CAPP-Seq selector design software, data analysis pipeline, and panel data. The Roche Trade Secrets all have economic value in the development of precise and accurate tools for cancer detection and monitoring.

Compl. ¶ 60.

However, this broad assertion of economic value of alleged trade secrets is insufficient because Roche has failed to allege how any alleged Roche Trade Secret has independent value as distinct from the publicly-disclosed CAPP-Seq technology as a whole. *GENFIT S. A. v. CymaBay Therapeutics Inc.*, 2022 WL 195650, at *3 (N.D. Cal. Jan. 21, 2022) (dismissing trade secret claims because plaintiff failed to allege adequately "how any individual component [trade secret] part …, standing on its own, has any independent economic value . . . different from the value that [plaintiff] attaches to its Protocol as a whole").

**3.    There Are No Disputed Facts Showing Any Act Of Misappropriation By Dr. Kurtz**

To state a claim for trade secret misappropriation under either the CUTSA or DTSA, a plaintiff must plead plausible factual allegations that the party against whom the claim is asserted committed some act of misappropriation of information which is "not . . . generally known" to the public. 18 U.S.C. § 1839; Cal. Civ. Code § 3426.1. Roche's claims fail because Roche pleads no

factual allegations supporting Roche's allegations that PhasED-Seq and the inventions disclosed in the Disputed Patent Applications were developed using any Roche Trade Secrets.

Roche's claim against Dr. Kurtz is premised on two theories: (1) "Defendants made use [*sic*] Roche's confidential CAPP-Seq data and analytical tools in developing PhasED-Seq" (Compl. ¶ 69); and (2) Dr. Kurtz's involvement in Stanford's filing of the Disputed Patent Applications, which allegedly disclose technology "developed using data and analytical tools that had previously been sold to Roche through its acquisition of CappMed and provided to Roche during the term of the Consulting Agreements and Kurtz Agreement." (*Id.* ¶¶ 73, 96). But the Complaint is devoid of factual allegations that render either theory plausible, *e.g.*, that the development of PhasED-Seq and inventions disclosed in the Disputed Patent Applications actually did use any Roche Trade Secret, or any other confidential data or tools.

### a. There Are No Disputed Facts Suggesting That PhasED-Seq Was Developed Using Roche Trade Secrets

The lynchpin of Roche's theory that development of PhasED-Seq used Roche Trade Secrets is a public statement by Stanford: "A December 11, 2023, public statement by Stanford touts the PhasED-Seq technology asserting that that 'PhasED-Seq ***builds upon a technique called CAPP-Seq*** . . . indicating that Defendants made use Roche's confidential CAPP-Seq data and analytical tools in developing PhasED-Seq." Compl. ¶ 69 (emphasis in original); *see also id.* ¶ 82 (proposing to "extend" CAPP-Seq). But Roche's conclusion from this statement is a non-sequitur. A statement that PhasED-Seq "builds upon" or "extends" "CAPP-Seq" does not make it plausible that PhasED-Seq was built on or is an extension of any alleged CAPP-Seq ***trade secret***. As discussed above, even before Roche's acquisition of CappMed, CAPP-Seq technology was already in the public domain when it came to trade secret protection: CAPP-Seq had already been described in detail in published patent applications and in a peer-reviewed paper before Dr. Kurtz's contracting relationship with Roche. Thus, Roche cannot base its claim that PhasED-Seq uses Roche Trade Secrets on a bare assertion that PhasED-Seq builds upon CAPP-Seq.

Further, allowing a trade secret misappropriation claim to survive based on allegations that a defendant's technology "builds upon" a technique disclosed in a published patent application,

without alleging any facts leading to a plausible inference that the defendant also used trade secrets beyond what was disclosed in the application, would run against the core purpose behind the patent system. Patents and their applications are disclosed to the public *precisely so that others may* "build upon" and improve the invention. *See Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 150-51 (1989) ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation *and disclosure* of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years.").

If a party builds a product upon an invention disclosed in a patent, it may be liable for patent infringement, but if and only if its product falls within the scope of an issued claim of the patent. Here, notably, Roche does not accuse Dr. Kurtz of infringing any *patented* CAPP-Seq technology, and Roche cannot recover trade secret protection for technology already disclosed to the public in published patent applications.

Each of the other "factual allegations" Roche puts forth to support its theory that PhasED-Seq was developed with Roche Trade Secrets are no more than "naked assertions devoid of further factual enhancement," which are not entitled to any weight. *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs*., 727 F.3d 917, 927 (9th Cir. 2013) (allegations made on information and belief, in the absence of facts to provide context, were insufficient to avoid dismissal). *See e.g.* Compl. ¶ 68 ("On information and belief, during the term of the Consulting Agreements and the Kurtz Agreement, Drs. Diehn, Alizadeh, and Kurtz developed PhasED-Seq using tools, software, and data previously acquired by Roche as part of the CappMed Acquisition.").

Thus, without factual allegations supporting Roche's claim that PhasED-Seq actually used CAPP-Seq *trade secrets*, rather than simply building on a publicly disclosed technology, Roche has failed to plausibly allege that PhasED-Seq actually "rel[ies] on" or was "developed…using" Roche Trade Secrets. *See Rescue 1 Fin., LLC v. Complete Debt Relief, LLC,* No. SACV 23-00982-CJC (KESx), 2023 U.S. Dist. LEXIS 149612, at *12-13 (C.D. Cal. Aug. 24, 2023) (dismissing trade secret claim where "Plaintiff [did] not sufficiently allege why the inference that Defendants must be using its trade secrets rather than merely using [non-trade secret knowledge] is reasonable.").

**b.     Roche Has Failed To Plausibly Allege The Disputed Patent Applications Disclosed Or Used Roche Trade Secrets**

The only remaining act of misappropriation by Dr. Kurtz alleged by Roche is his involvement in the Disputed Patent Applications filed by Stanford. Roche supports its allegation that the Disputed Patent Applications contain Roche Trade Secrets with only two factual allegations: (1) the inclusion of a "BED File" in Table 3 of one of the Disputed Patent Applications (Compl. ¶ 98); and (2) "Drs. Diehn, Alizadeh, and Kurtz informed the federal government that the research giving rise to the '730 application arose from their use of Roche's CAPP-Seq technology 'in NSCLC patients' and their efforts to 'extend ctDNA detection by CAPP-Seq.'" (*Id*. ¶ 97). These allegations do not state a claim for trade secret misappropriation as a matter of law.

First, Roche has failed to allege facts sufficient to lead this Court to the plausible inference that Table 3 of the '730 Application constituted a trade secret. Roche conclusorily claims that "Table 3 is identical to a BED File provided to Roche by Drs. Diehn, Alizadeh, and/or Kurtz and maintained by Roche as confidential and used as part of and to develop the Roche Trade Secrets." Compl. ¶ 98. Roche leaves the Court to guess which of "Drs. Diehn, Alizadeh, and/or Kurtz" provided this BED File to Roche (which is particularly puzzling considering their very different roles at Roche) and how this file was "maintained by Roche as confidential". *Id.* Either of these deficiencies alone is fatal to any claims of misappropriation based on the BED File. *See Navigation Holdings, LLC v. Molavi,* 445 F. Supp. 3d 69, 80 (N.D. Cal. 2020) (dismissing trade secret misappropriation claim where plaintiff failed to "plead distinct facts as to each Defendant that would give rise to trade secret misappropriation."); *see also Bladeroom Grp. Ltd. v. Facebook, Inc.*, 2015 U.S. Dist. LEXIS 164602, at *3 (N.D. Cal. Dec. 7, 2015) (holding that the allegation that the information is "confidential" is a "legal conclusion" and "insufficient" for a trade secret pleading).

Roche further has failed to allege how the data stored on this BED File has any independent economic value from not being known to the general public. *See e.g. supra* at 13. Roche describes the BED File as "browser extensible data files" disclosing coordinates of a "unified targeted sequencing panel." *See id.* ¶¶ 61, 98. In other words, the BED File is a list of genomic coordinates for inclusion in a panel of capture probes—another "tumor selector" such as the dozen-plus tumor

1  selectors published as tables in the '020 Application. *See supra* at Section IV.A.1.b. Roche has failed

2  to allege how the particular "BED File" it now points to "[d]erives independent economic value,

3  actual or potential, from not being generally known to the public" apart from, for example, these

4  publicly disclosed tables. *See supra* at Section IV.A.2. Roche's "BED File" trade secret theory falls

5  far short of meeting the requisite pleading standard.[5]

6        Second, Roche's allegation that the research leading to the Disputed Patent Applications

7  arose from the Stanford Oncologists' "use of Roche's CAPP-Seq technology 'in NSCLC patients'

8  and their efforts to 'extend ctDNA detection by CAPP-Seq'" are similarly insufficient to plausibly

9  support a claim of misappropriation. As discussed above, a statement that the Stanford Oncologists'

10  research sought to "extend" "CAPP-Seq" does not make it plausible that the research, or the resulting

11  Disputed Patent Applications, included any CAPP-Seq trade secret. *See supra* at 14.

12        It is equally unclear how use of Capp-Seq technology specifically "in NSCLC patients"

13  plausibly suggests misappropriation of any Roche Trade Secret. The Complaint does not allege that

14  Dr. Kurtz had access to Roche confidential information regarding using Capp-Seq with NSCLC

15  patients during their work at Roche. In fact, the only time NSCLC is mentioned in the Complaint

16  (aside from references to research at the NIH) is in paragraph 34: "CappMed further represented that

17  it had developed eight CAPP-Seq tumor selectors, ***including three for non-small cell lung cancer***

18  ***(NSCLC)***." Compl. ¶ 26. But the '020 Application had already publicly disclosed methods for using

19  the NSCLC selector, and they therefore cannot constitute a Roche Trade Secret. *See supra* at 11:

20  "We employed a six-phase design strategy to identify and prioritize genomic regions for the CAPP-

21  Seq NSCLC selector as detailed below . . . The following algorithm was used to design the CAPP-

22  Seq selector . . . ." Ex. 2 at [00824]-[00825].

23        Accordingly, Roche's allegations that the Stanford Oncologists conducted research using

24  "CAPP-Seq technology 'in NSCLC patients'" provides no support to Roche's claim that Dr. Kurtz

25  misappropriated any Roche Trade Secrets. *See Attia,* 983 F.3d at 426.

26

27       **5** As explained in detail in Drs. Kurtz's Answer (Dkt. 54) at ¶ 98, the BED File in question was not even owned by Roche. Dr. Kurtz developed it at Stanford as part of his graduate research,

28  after and unrelated to the CappMed acquisition. Moreover, multiple Roche employees expressly acknowledged that Stanford, not Roche, owned the BED File.

**B.  Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To Count 3 For Breach Of Contract**

Roche's breach of contract claim fails because Roche has not alleged any facts to support its conclusory allegations that Dr. Kurtz breached the terms of any agreement between him and Roche. "In order to state a claim for breach of contract, plaintiff must allege: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damage to plaintiff therefrom." *De Rocha Express, Inc. v. Combined Res., Inc*., No. 24-cv-02037-JST, 2024 U.S. Dist. LEXIS 187476, at *4 (N.D. Cal. Oct. 15, 2024).

**1.  Roche Has Failed To Sufficiently Allege That It Performed Its Obligations Under Its Agreement With Dr. Kurtz**

Roche's claim fails because Roche fails to sufficiently allege that it performed its obligations under the agreement. *De Rocha Express, Inc.*, 2024 U.S. Dist. LEXIS 187476, at *4 ("plaintiff's performance or excuse for nonperformance" is a required element for breach of contract). The ***only*** allegation Roche pleads with respect to this required element is that "[a]t all relevant times, Roche has performed its obligations under the Kurtz Agreement." Compl. ¶ 168. But Roche cannot prevail on this "indispensable part of its breach of contract claim" without pleading any supporting factual allegations. *See Karns & Karns Ltd. Liab. P'ship v. Quintessa Mktg., Ltd. Liab. Co*., No. 2:23-cv-04434-SPG-KS, 2023 U.S. Dist. LEXIS 129668, at *9 (C.D. Cal. July 25, 2023) ("Plaintiff does not specify which duties it performed under the Contract, only that it 'performed all conditions, covenants, and promises.'…Such a conclusory allegation fails to satisfy federal pleading standards.").

In fact, on the face of the pleadings, Roche ***did not*** perform under the agreement. While Roche attached parts of Dr. Kurtz's agreement with Roche to its Complaint, *see* Ex. B, Roche did not present the complete agreement. The further provisions of Roche and Dr. Kurtz's agreement are attached here as Ex. 4 (the "Kurtz ESA"). The Kurtz ESA is incorporated by reference into Roche's complaint because (1) its authenticity cannot be questioned and (2) Roche's Third, Fourth, and Sixth claims for relief depend expressly on the fact that Dr. Kurtz is a Roche employee. *See Cohen v. CBR Sys., Inc.*, 625 F. Supp. 3d 997, 1000 & n.3 (N.D. Cal. 2022) (contract incorporated by reference into complaint where contract "forms the basis" of breach of contract claim).

1    The Kurtz Agreement states that: "In consideration of [Dr. Kurtz's] employment or continued

2    employment by Roche and of salary, wages or other compensation to be paid by Roche to me, [Dr.

3    Kurtz] hereby agree[s] as follows…" Ex. B at 1. The Kurtz ESA further provides that "Employer

4    agrees to pay [Dr. Kurtz] a weekly rate of $1440.00…" Ex. 4 at 1. Roche has failed to allege that it

5    paid Dr. Kurtz $1440/week "at all relevant times." Compl. ¶ 168. Nor could it allege that it did so,

6    because Roche stopped paying Dr. Kurtz a weekly rate just a few weeks into his relationship with

7    Roche. Dkt. 54, ¶ 54.[6] The pleadings thus reveal that Roche failed to perform its obligations under its

8    agreement with Dr. Kurtz; Roche's conclusory assertion to the contrary is insufficient to defeat a

9    motion for judgment on the pleadings. *See Patton v. Experian Data Corp.*, No. SACV 17-01559-

10   JVS(DFMx), 2018 U.S. Dist. LEXIS 231731, at *11 (C.D. Cal. Dec. 4, 2018) (dismissing breach of

11   contract claim where "[Claimant] fails to sufficiently plead that it performed its obligations under the

12   contract or was excused from performing.").

### 2.   Roche Has Failed To Sufficiently Allege That Dr. Kurtz Breached Any Provision Of His Agreement With Roche

15   Roche's breach of contract claim further fails because Roche has failed to plausibly allege any

16   breach by Dr. Kurtz. Roche alleges Dr. Kurtz breached the Kurtz Agreement by disclosing trade

17   secrets, assigning the Disputed Patent Applications to Stanford, and failing to disclose PhaseED-Seq

18   related information to Roche. Roche fails to plead factual allegations that make these allegations

19   plausible.

### a.   There Are No Disputed Facts Suggesting Dr. Kurtz Disclosed Any Roche Trade Secrets

21   Roche alleges that Dr. Kurtz breached his contracting agreement with Roche by "using and

22   disclosing the Roche Trade Secrets in patent applications upon which he was a named inventor and

23   by assigning his interest in the Disputed Patent Applications to Stanford." Compl. ¶ 166. This

24   allegation is unsupported because it is simply a repackaging of Roche's trade secret claims as a breach

---

[6] "[I]n a motion for judgment on the pleadings, a court is entitled to consider allegations made in an answer so long as they are not in dispute with the allegations in the complaint." *Educ. Impact v. Travelers Prop. Cas. Co. of Am.,* No. 15-cv-04510-EMC, 2016 U.S. Dist. LEXIS 55653, at *4 (N.D. Cal. Apr. 26, 2016).

of contract. Roche has not identified any Roche Trade Secrets or alleged facts plausibly suggesting that the Disputed Patent Applications implicate any Roche Trade Secrets. *See supra at* 8-18.

> **b. Dr. Kurtz's Conception And Development Of PhasED-Seq Was Done At Stanford, Independently From His Roche Consulting**

Roche's further alleges Dr. Kurtz "fail[ed] to assign to Roche the inventions disclosed and claimed in the Disputed Patent Applications and the PhasED-Seq techniques described therein." Compl. ¶ 165. Roche alleges that this purported failure stems from Dr. Kurtz's obligation to assign to Roche any invention which "(i) relates to (a) Roche's business or (b) an actual or demonstrably anticipated research or development on the part of Roche, or (ii) results from work that [Dr. Kurtz] (a) performed for Roche, (b) did not develop exclusively on [Dr. Kurtz's] own time, or (c) created through access to or use of Roche's equipment, supplies, facilities or trade secret information." *Id.* ¶ 159. But Roche again fails to plead factual allegations that render its claims plausible.

Regarding (i), Roche never defines "Roche's business" or any actual or demonstrably anticipated research or development on the part of Roche. These "vague and conclusory" allegations are insufficient to show "*how* [Dr. Kurtz] breached the [agreement]" and are insufficient to defeat a motion for judgment on the pleadings. *Power Integrations, Inc. v. De Lara*, No. 20-cv-410-MMA (MSB), 2020 U.S. Dist. LEXIS 52724, at *45 (S.D. Cal. Mar. 26, 2020).

Regarding (ii), Roche fails to allege that the Disputed Patent Applications were conceived or developed (a) as a result of work that Dr. Kurtz performed for Roche, (b) not on Dr. Kurtz's own time, or (c) using Roche equipment, supplies, facilities, or trade secret information. In fact, on the face of the complaint, Roche's allegations suggest the exact opposite—that Dr. Kurtz developed PhasED-Seq at Stanford.

The Complaint admits that the Disputed Patent Applications were "made with Government support under CA241076 and CA188298, two projects supported by National Institutes of Health." Compl. ¶ 68. Both of these projects were filed by the Stanford Oncologists "*on behalf of Stanford.*" *Id.* ¶ 74.[7] Further, the Complaint admits that the Disputed Patent Applications were filed *by Stanford*

---

[7] While the Complaint does not allege that NIH project number CA188298 was filed on behalf of Stanford, the project is incorporated by reference into the Complaint and clearly shows on its face that the project was filed on behalf of Stanford. *See* Maximilian Diehn et al,

and assigned by the Stanford Oncologists *to Stanford*. Thus, absent a single factual allegation plausibly supporting the assertion that these inventions arose from Dr. Kurtz's work at Roche, the only plausible inference which can be drawn from the Complaint is that the Disputed Patent Applications were created at Stanford, for Stanford, using Stanford equipment. Without any allegations which could lead this Court to plausibly infer that the Disputed Patent Applications were "generated or ar[ose] in the course of or as a result of services performed under the Consulting Agreements," the undisputed facts show that Dr. Kurtz had no contractual obligation to assign the Disputed Patent Applications to Roche. Dr. Kurtz is thus entitled to a judgment on the pleadings regarding this claim. *Brazil v. Dell Inc.,* No. C-07-01700 RMW, 2010 U.S. Dist. LEXIS 137616, at *9 (N.D. Cal. Dec. 21, 2010) (granting judgment on the pleadings for defendant where "plaintiffs do not allege the breach of a valid contract").

Because the facts alleged by Roche can only lead to a plausible inference that the inventions disclosed in the Disputed Patent Applications were developed at Stanford, Roche can only prevail on a breach of contract claim if the invention assignment provisions of Dr. Kurtz's contracting agreement with Roche covered inventions developed using Stanford resources. However, any purported agreement which would require Dr. Kurtz to assign inventions made using Stanford resources to Roche would be void *ab initio* because, pursuant to a senior invention assignment agreement with Stanford, Dr. Kurtz had already granted a present assignment of all future rights in such inventions to Stanford. *See FilmTec Corp. v. Allied Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) (where a party makes a present assignment of future inventions in an agreement, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law.").

A review of Dr. Kurtz's senior invention assignment agreement ("SU18") to Stanford confirms Stanford's ownership of the inventions disclosed in the Disputed Patent Applications, which were made using Stanford resources. Dr. Kurtz's SU18 is attached hereto as Ex. 5, and is

---

*Noninvasive monitoring of lung cancer patients treated with radiotherapy,* National Institute of Health (last visited Oct. 21, 2024), https://reporter.nih.gov/search/uK8u8QAyWk2iLwT0zo7Ivg /project-details/8888879#details.

incorporated by reference into Roche's Complaint because the (1) Roche cannot dispute its authenticity, and (2) Stanford Oncologists' assignment of PhasED-Seq is central to each of Roche's claims. The Stanford Oncologists assigned their interests in PhasED-Seq to Stanford pursuant to their SU18's, and thus Roche's claim "depends on the contents" thereof. Further, Roche's claims specifically refer to the SU18's. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."); *see also See Cohen v. CBR Sys., Inc.*, 625 F. Supp. 3d 997, 1000 & n.3 (N.D. Cal. 2022) (contract incorporated by reference into complaint where contract "forms the basis" of breach of contract claim). It thus should be considered when ruling on this Motion.

It cannot be disputed that Stanford's controlling assignment agreement for faculty, including the Stanford Oncologists, provides:

> I will disclose to Stanford all potentially patentable inventions conceived or first reduced to practice in whole or in part in the course of my University responsibilities or with more than incidental use of University resources. ***I hereby assign to Stanford all my right, title and interest in such patentable inventions*** and to execute and deliver all documents and do any and all things necessary and proper on my part to effect such assignment.

Ex. 5. The "hereby assign" language of these assignments conveyed a *present assignment* of the Stanford Oncologists' entire rights in their future inventions, including PhasED-Seq, to Stanford. *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 842 (Fed. Cir. 2009).

As a matter of law, then, Dr. Kurtz could not have breached his agreement with Roche by not assigning their PhasED-Seq inventions to Roche because, as Roche was well aware, he had already presently assigned all such future inventions to Stanford. Thus, when he entered into his agreement with Roche, he had no rights in any such future Stanford inventions to assign to Roche.

### c. Dr. Kurtz Disclosed Phased-Seq To Roche Weeks After The Beginning Of His Employment With Roche

Roche further alleges that Dr. Kurtz breached his agreement by failing to disclose certain

information relating to PhasED-Seq, *see* Compl. ¶ 164, 167, but Roche's conclusory assertions cannot overcome the undisputed factual allegations of Dr. Kurtz's pleading.

On November 8, 2017, weeks after Dr. Kurtz entered into his contracting agreement with Roche, he emailed his point of contact at Roche Human Resources, Leah Galas, to inform her that his work at Stanford "relate[d] to circulating tumor DNA" and that he did "have existing work that can potentially turn into filings for patents, that are unrelated to Roche" but that he was "not sure that Stanford would allow [him] to disclose all of these here as well." Dkt. 54, ¶ 54. Dr. Kurtz was referring to his development of PhasED-Seq at Stanford. *Id.* Not only does this tend to prove that Dr. Kurtz had already conceived PhasED-Seq prior to his employment with Roche; but in the same email, Dr. Kurtz disclosed that "any work [he] performs at Stanford that has potential IP needs to ***continue*** to belong to Stanford ***and not Roche, even in a related area.***" *Id.* Thus, Dr. Kurtz's November 2017 email put Roche on notice that Dr. Kurtz had work related to ctDNA at Stanford which was already Stanford property. Hearing nothing from Roche, Dr. Kurtz sent a follow-up email a week later. *Id.* Roche never responded to these emails or raised any objection to Dr. Kurtz's disclosure of PhasED-Seq and Stanford's ownership thereof.

**C.    Judgment In Favor Of Dr. Kurtz Is Warranted With Respect To Count 4 For Breach Of Implied Covenant Of Good Faith And Fair Dealing**

Roche bases its Breach of Implied Covenant of Good Faith and Fair Dealing claim on the same acts of alleged breach as it does its Breach of Contract claim. *Compare* Compl. ¶¶ 164-167 *with id.* ¶¶ 172-175. Because Roche has failed to show that Dr. Kurtz breached any provisions of his contracting agreements, this claim based on the same acts fails as well. *See King v. Facebook, Inc*., No. 19-cv-01987-WHO, 2019 U.S. Dist. LEXIS 209247, at *4 (N.D. Cal. Dec. 3, 2019) (dismissing claim where "[Plaintiff] fails to identify a contractual provision that [Defendant] allegedly violated."). Judgment in favor of Dr. Kurtz is thus warranted.

**V.    CONCLUSION**

Roche's complaint is a prime example of the reasoning behind the *Iqbal/Twombly* pleading standard. If established businesses with deep coffers were allowed to "unlock the doors of discovery" against distinguished practicing oncologists and researchers (as proxies in a battle against an

1   emerging competitor) "armed with nothing more than conclusions," thus dragging them into a costly
2   litigation, then startups and their academic founders would routinely be buried by established
3   competitors based on frivolous claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Roche's
4   Complaint makes grand accusations against Dr. Kurtz, but when the Complaint is stripped of
5   conclusory allegations of law and unreasonable leaps of logic, it is bereft of facts that plausibly
6   support Roche's claims. Accordingly, there are no material factual issues which could attach liability
7   to Dr. Kurtz for any of Roche's Claims. The Court should grant judgment on the pleadings for each
8   of Roche's claims asserted against Dr. Kurtz.

10  Dated: October 23, 2024                     Respectfully submitted,

11                                              IRELL & MANELLA LLP

13                                              By: */s/ Alan Heinrich*
                                                    Alan Heinrich

15                                              *Attorneys for Dr. David Kurtz*