1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Susan van Keulen, Magistrate Judge

4

5   ROCHE MOLECULAR SYSTEMS,        )
    INC., et al.,                   )
6                                   )
                Plaintiffs,         )
7                                   )
    vs.                             )   Case No. C 24-03972-EKL
8                                   )
    FORESIGHT DIAGNOSTICS INC.,     )
9   et al.,                         )
                                    )
10              Defendants.         )
    _____)

11

12                                  San Jose, California
                                    Friday, December 6, 2024
13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:00 - 11:03 = 1 HOUR AND 3 MINUTES
15

16  APPEARANCES:

17  For Plaintiffs:

18                          Wilmer Cutler Pickering Hale
                               and Dorr LLP
                            2100 Pennsylvania Ave,
19                             Northwest
                            Washington, DC 20037
20                      BY:  CHARLIE T. COX, ESQ.

21                          Wilmer Cutler Pickering Hale
                               and Dorr LLP
22                          Seven World Trade Center
                            250 Greenwich Street
23                          New York, New York 10007
                        BY:  CHRISTOPHER R. NOYES, ESQ.
24                      BY:  ANNA E. MIZZI, ESQ.

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
 1  For Defendants:
                                Irell & Manella LLP
 2                              1800 Avenue of the Stars
                                Suite 900
 3                              Los Angeles, California 90067
                           BY:  ALAN J. HEINRICH, ESQ.
 4
                                Quinn Emanuel Urquhart &
 5                                Sullivan LLP
                                865 South Figueroa Street
 6                              Tenth Floor
                                Los Angeles, California 90017
 7                         BY:  DAVID M. ELIHU, ESQ.

 8  For the Board of            Pillsbury Winthrop Shaw
      Trustees of Leland          Pittman LLP
 9    Stanford Junior          Four Embarcadero Center
      University:              Twenty-Second Floor
10                             San Francisco, California
                                  94111
11                         BY:  DAVID J. TSAI, ESQ.
                           BY:  ALEKZANDIR J. L. MORTON, ESQ.
12

13  Transcribed by:            Echo Reporting, Inc.
                                Contracted Court Reporter/
14                             Transcriber
                                echoreporting@yahoo.com
15

16

17

18

19

20

21

22

23

24

25
```

3

1  <u>Friday, December 6, 2024</u>                    <u>10:00 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK (via Zoom):  Please come to order.

5  Court is now in session.

6      Calling Civil 24-3972, Roche Molecular Systems,

7  Incorporated, et al., versus Foresight Diagnostics,

8  Incorporated, et al.

9      Counsel, please state your appearances for the record,

10 beginning with Roche Molecular.

11         MR. COX (via Zoom):  Your Honor, my name is

12 Charlie Cox, representing Roche.

13         THE COURT (via Zoom):  Mr. Cox, good morning.

14         MR. COX:  Good morning.

15         MR. NOYES (via Zoom):  Also Chris Noyes, your

16 Honor, also representing Roche.

17         THE COURT:  Mr. Noyes, hello.

18         MR. NOYES:  Good morning.

19         THE COURT:  Anyone else for Roche this morning?

20         MS. MIZZI (via Zoom):  Anna Mizzi for Roche.

21         THE COURT:  Ms. Mizzi, good morning.

22     All right. And who will have the mike today for Roche?

23         MR. COX:  I will be, your Honor.

24         THE COURT:  All right.  Thank you, Mr. Cox.

25     All right.  And for Foresight today, please?

4

1          MR. HEINRICH (via Zoom):  Alan Heinrich of Irell

2  and Manella on behalf of Foresight Diagnostics, and also on

3  behalf of Doctors Ash Alizadeh, Maximilian Diehn, and David

4  Kurtz.

5          THE COURT:  Thank you, Mr. Heinrich.  Good

6  morning.

7          MR. HEINRICH:  Good morning.

8          MR. ELIHU (via Zoom):  Good morning, your Honor.

9  This is David Elihu from Quinn, Emanuel, Urquhart and

10  Sullivan.  I am appearing on behalf of Foresight

11  Diagnostics.  Thank you so much.

12          THE COURT:  Mr. Elihu, good morning.

13     And, Mr. Heinrich, will you have the mike today?

14          MR. HEINRICH:  Mr. Elihu and I will be dividing up

15  the argument.

16          THE COURT:  Okay.

17          MR. HEINRICH:  He'll be arguing the prosecution

18  bar, and I'll be arguing the access issue.

19          THE COURT:  All right.  No problem.  Thank you.

20     And for the Board of Trustees for Stanford this

21  morning?

22          MR. TSAI (via Zoom):  Good morning, your Honor.

23  David Tsai with Pillsbury, Winthrop, Shaw, Pittman.  With me

24  is my colleague, Alekzandir Morton, and we represent the

25  Board of Trustees of the Leland Stanford Junior University.

5

1   Good morning.

2          THE COURT:   Thank you.   Good morning, gentlemen.

3       All right.   I think we are all here.   We're on today

4   for a discovery hearing pursuant to which Roche has proposed

5   a prosecution bar and a limited access -- or a limitation on

6   the access to certain materials by the individual

7   Defendants.

8       I've been through the papers and the other relevant

9   case filings, so I think I'm fairly familiar with the

10  background and the parties' respective positions.   So we'll

11  start -- let's start with the prosecution bar.   Let me give

12  you sort of my view of the landscape, and then I'll hear

13  from Roche, and then from the other Defendants, as

14  appropriate -- or from the Defendants, as appropriate.

15      So, obviously, I've got a lot of experience with

16  prosecution bars.   We see them.   We see the requests for

17  them.   They are, as everyone knows, they're very

18  prohibitive, which makes them very potent, and they must be

19  used conservatively, and applied, if at all -- what do I

20  want? -- with a fine brush, not a broad brush.

21      And I have seen and I have used prosecution bars in

22  trade secret cases, not just exclusively in patent cases.

23  However, even for a trade secret case, this case seems to

24  have somewhat of an unusual posture, to my view, and that's

25  what I'd like, to work through some of these issues.

6

1    The usual context, to the extent there is such a thing,

2  is typically where a defendant is producing a lot of its

3  technical information to demonstrate either it doesn't

4  practice a patent or, in a case like this, perhaps, that it

5  developed a process or a product on its own, without use of

6  any allegedly misappropriated trade secrets, or that its

7  process or product does not use the allegedly

8  misappropriated material.

9    And then, in that context, the Defendant seeks a

10  prosecution bar, which is -- well, it's, by its nature,

11  prospective, because the Plaintiff is going to see a lot of

12  what the Defendant is doing, and they don't want the

13  Plaintiff, obviously, amending their applications around

14  what they see or amending their claims, et cetera, and I

15  appreciate this comes up particularly in the case where the

16  parties are competitors, and I understand that in this

17  context.

18    Using that protection in the landscape I've described,

19  it's typically directed to prosecution counsel, who may be

20  on the litigation team, maybe to an in-house person who has

21  access to the materials and perhaps has some

22  responsibilities with regards to prosecution.

23    So that's, I think, a fair description of a general

24  scenario where it's used, and, again, here it's different.

25  We have a Plaintiff in a trade secret case seeking to bar

7

1  activities of at least counsel -- and I've got some

2  questions around that -- and we have pending patent

3  applications that are in dispute.

4      So my first question to Mr. Cox, I guess, is, as I'm

5  reading -- as I read through the joint statement and the

6  proposals, the proposal is for a bar that applies to

7  counsel, the idea that the individual Defendants are taken

8  care of, I think, under your restricted access proposal, but

9  am I understanding that or not understanding that correctly?

10          MR. COX:  That is correct.  The proposed bar would

11  apply to counsel.  It is our understanding that counsel

12  intend to be involved in patent prosecution, or at least

13  want the ability to continue to be involved in patent

14  prosecution in this space.  We asked about that on the

15  meet-and-confer, you know, to try to talk around the edges

16  of whether there was some way to reach a resolution, but we

17  never received a counterproposal on what would be an

18  acceptable scope on that front.

19          THE COURT:  Okay.  All right.  So, again, as I

20  read Roche's position, it's seeking the bar because it

21  claims that it will be producing sensitive information,

22  technical information, other than the alleged

23  misappropriated trade secrets.  Is that correct?  Am I

24  understand that?

25          MR. COX:  So the information that we expect to

8

produce is related to not only the misappropriated trade

secrets, but also as those trade secrets are incorporated

into Roche's current product that's on the market, AVENIO.

So there is voluminous technical information about how the

product works, and the trade secret information is included

in those documents.

THE COURT:  So -- and this really -- this is, I

think, what makes this complicated, the request for a bar,

and I think that this spills over into the access issue, is,

well, this is -- in my view, what makes it complicated is

you're talking about for all the material that Roche

produces.  I mean, it doesn't sound like it's -- you can

segregate the -- or can you segregate what you allege are

the -- is the misappropriated trade secrets from other

technical information that you think you're going to have to

produce?

MR. COX:  Your Honor, I can't say that I've seen

all the documents that we are collecting, but I know they

are voluminous, and I expect, you know, there may be

instances where we can segregate some of the trade secret

information.  But certainly some of the documentation is

voluminous and complicated, including source code.  So I

think it would be difficult, as a general matter, to say

that we could always parse, you know, with a fine-tooth

comb, at this stage in the litigation, what would be in the

9

1  production.

2          THE COURT:  Okay.  Give me an example of why -- or

3  what material that you anticipate Roche would produce.  I

4  know you talked about current product information.  Why

5  would that be relevant if it's not what was allegedly

6  misappropriated?  So, if it's something that Defendants

7  didn't have access to, the individual Defendants, while they

8  were working with Roche -- if they didn't have access to it,

9  why is that even a concern, or why is that getting produced

10 in this case?

11         MR. COX:  So the trade secrets include information

12 that has been developed over years and is incorporated in

13 the documentation related to the current product.  So, to

14 the extent that we need to explain how the trade secrets are

15 being used in commerce and have value, that sort of

16 information would be pertinent.

17         THE COURT:  All right.  Just take one -- so,

18 again -- okay.  Then that brings us to, I think, what makes

19 this so complicated.  If it's all integrated, as you say,

20 voluminous material, and some of it reflects specific trade

21 secrets, some of it reflects other technical information,

22 then the -- a prosecution bar at this stage would impact the

23 pending applications that are the subject of your request

24 for relief, necessarily.  Is that -- am I understanding that

25 correctly?

1       MR. COX:  That's correct, but we've proposed -- I

2  think our compromise proposal with respect to the individual

3  Defendants would allow them to participate in the ongoing

4  prosecution, subject to certain limitations that have been

5  found reasonable in this district.

6       THE COURT:  But what about counsel?

7       MR. COX:  I don't think it would allow counsel to

8  participate in the same way.

9       THE COURT:  So -- okay.  But the participation of

10  the individual Defendants, as you're proposed it under the

11  prosecution bar, or exempting them from the prosecution bar,

12  would be dependent on their -- on the limited access

13  proposal that you've made?

14       MR. COX:  So there is default access that's

15  provided for -- under the model order for information that

16  they already had, documents that were in their possession,

17  that they had access to, their custodial documents.  That's

18  standard in the model order.  Our understanding of what the

19  individual Defendants are seeking is broader access to all

20  the trade secret information that is disclosed in this case,

21  and that's where we proposed this sort of alternative

22  framework that was found appropriate in the Wisk Aero case.

23       THE COURT:  But the material is not -- you can't

24  segregate it, right?  I mean, I'm just trying to think.  As

25  a practical matter, you're saying, "Well, you can see what

11

1  you already had access to, but you can't see, or you can

2  only see under these very restrictive conditions, all the

3  other material.  But here's 40,000 documents, and some of it

4  you may have had access to, and some of it you didn't."  So,

5  I mean, as a practical matter, under your proposal, wouldn't

6  your entire production be subject to the restrictions, the

7  restricted access proposal?

8          MR. COX:  No.  So there would certainly be certain

9  documents that are in the possession of the individual

10  Defendants, or where they're shown to have received e-mails

11  or things like that, attachments to those e-mails.  Those

12  would fall pretty clearly under the model order's allowance

13  for access.  I think there's more voluminous materials, for

14  example, the source code, that, you know, there might be

15  records that show that they had certain access to pieces of

16  it, but that's where you get into, well, if you want broader

17  access to the full scope of trade secrets, we would have

18  to -- we would propose limiting that in some way.

19          THE COURT:  But who's going to make that

20  distinction?  Who's going to say, "You're going to turn

21  over" -- and, you know, this would just be one production,

22  right?  "You're going to turn over 40,000 documents."  Are

23  you identifying which ones you think they're entitled to see

24  and which ones they're not?

25          MR. COX:  I think they would be identifiable on

1 the base of the documents, or based on whether they were in

2 custodial files.  So the document itself would include the

3 individual Defendant, for example, or if it came from files

4 that were in their possession.

5          THE COURT:  Right, but are you going -- I mean,

6 again, move away from an e-mail that has their name on it,

7 right?  Talk about something that they would have had access

8 to.  I mean, I can think of all kinds of -- you know, every

9 day we boot up our computers, and there are files on there,

10 and there's access.

11          MR. COX:  So I think, typically, when I've

12 produced documents in other cases, we would include metadata

13 fields that include the custodian of the document.  That

14 would be one way to easily identify who had the document or

15 access to the document.  Is that what your question is

16 about?

17          THE COURT:  Well, I don't think -- it doesn't

18 sound like -- it sounds like there's a lot of material that

19 may or may not fall into a -- you know, may be out of --

20 have the Defendants' name on it, may be out of their

21 custodial file or a custodial file, from their group or

22 department, but, I mean, I don't know.  That's why I'm

23 trying to figure out how, as a practical matter, what you've

24 proposed -- I'm having a hard time seeing how it

25 realistically can be implemented, because it's not easy to

13

1  discern.

2      You're going to turn over a lot of documents.  There

3  may be some, but are you going to take the responsibility --

4  is Roche going to take the responsibility of saying, "Okay.

5  Out of this, you know, hundreds of thousands of documents,

6  these are the documents that we think they can see outside

7  of these restrictions, and the rest are restricted, have

8  restricted access"?

9          MR. COX:  So I think, as part of our production,

10 the documents would identify --

11         THE COURT:  I'm not talking about going and

12 hunting through metadata.  I'm talking about a specific

13 notification, express notification, from Roche to the

14 Defendants, so that there's no dispute, so later there isn't

15 a fight over what someone should or should not have seen

16 under restricted access.

17         MR. COX:  So I think that we can work through that

18 sort of identification based on our --

19         THE COURT:  Well, I -- go ahead.  Okay.  Well, we

20 drifted into -- not "drifted."  We turned into the access

21 restrictions, but as part and parcel of the discussion of

22 the prosecution bar, because, again, as I understand your

23 proposal, they work in tandem.

24         MR. COX:  Yes.

25         THE COURT:  Right?  Okay.

1    So, going back to the prosecution bar, your proposal is

2  that that would limit counsel, and that would require, I

3  think, as a practical matter -- that would impact counsel

4  and the prosecution of the patents that are right now

5  pending, all those applications that are pending that -- for

6  which Roche is seeking a declaratory judgment in terms of

7  ownership.  Is that right?

8         MR. COX:  That they would not be able to influence

9  the substance of those patent prosecutions?  Is that your

10  question?

11         THE COURT:  Yes.  I mean, they'd have to change

12  out their prosecution team, basically, right?

13         MR. COX:  My understanding is that counsel are not

14  currently the lead prosecutors on that, on those

15  applications.  So I think that their current active

16  prosecution team would not be disqualified under this bar.

17         THE COURT:  Okay.  And if there wasn't limited

18  access, if I don't find that the limited access proposal is

19  appropriate, that is, for the individuals to access Roche

20  information to which they may or may not have had access,

21  then would it -- then is your default that then they are --

22  then the prosecution bar kicks in as to them as well?

23         MR. COX:  So I think our compromise proposal for

24  written consent to exemption from the prosecution bar --

25  there are certainly aspects of that that we could apply if

15

1  they were only allowed access under the default provisions

2  under the model protective order, but that's not something

3  that Defendants ever raised or asked for in the process.  So

4  the proposal came up in conjunction with broader sets of

5  materials.

6          THE COURT:  Okay.  All right.  Well, I've asked

7  you a lot of questions because I think that this is a real

8  challenge to implement, both the bar and the restricted

9  access under these facts, but you may have -- there may be

10  more, particularly starting with the bar and then moving to

11  access, that you wanted to share with the Court.  So I'll

12  let you get back to your planned presentation, Mr. Cox.  You

13  can go from there.

14          MR. COX:  Thank you, your Honor.  Just briefly, I

15  would note that the -- this trade secret and breach of

16  contract case does involve the type of highly sensitive

17  technical information, including source code, that's exactly

18  the kind of information that can inform and influence patent

19  prosecution, even advertently, and provide --

20          THE COURT:  Let me interject a question.  Did

21  these individual Defendants work with source code?  Did they

22  have access to or did they help to develop source code?

23          MR. COX:  We believe they did, your Honor.

24          THE COURT:  Okay.  All right.  Go ahead.

25          MR. COX:  And Roche has already provided detailed

1 information about its trade secrets in response to
2 Defendants' interrogatories.  If we are sort of concerned
3 about the edges of the prosecution bar that are in the model
4 protective order, we thought that following the model
5 protective order seemed like a common-sense way to move
6 things forward without burdening the Court, but we've never
7 received any sort of detailed counterproposal about the
8 scope of prosecution activities that would be barred, or the
9 substantive technical scope of the bar.  Our understanding
10 is that Defendants have wholly rejected the bar from the
11 outset, and haven't provided any sort of other proposed
12 modifications that we could work with.
13          THE COURT:  Okay.
14          MR. COX:  And there is a real risk here, to the
15 extent that, you know, we believe that Defendants have
16 disclosed some information that Roche held as trade secret
17 through their prosecution activities, but Foresight and the
18 Defendants are also working in tandem not just on developing
19 a competing product to Roche's AVENIO product, but,
20 including Stanford, are involved in active patent
21 prosecution, and they could always file new patents.
22          THE COURT:  Okay.
23          MR. COX:  And so we do think the parties tend to
24 agree on whether prosecution bar is appropriate, and there's
25 a reason that the model protective order includes a model

17

1  prosecution bar, which we tried to follow, and that model

2  seems to strike the right balance, and Roche followed that

3  model.

4          THE COURT:  Okay.  And further comment on the

5  proposed limited access?

6          MR. COX:  So, for the individual Defendants, we

7  think that the standard provisions under every tier of

8  confidentiality provide the access that the individual

9  Defendants would need to assist counsel in their case.  To

10 the extent they want broader access, the restrictions that

11 were in place in Wisk v. Archer were put in place near the

12 close of fact discovery, when, obviously, the parties had

13 gone through fact discovery, and refined the issues that

14 were in dispute, and we've actually proposed terms that are

15 less restrictive, in that there the Court ordered that the

16 trade secrets could only be reviewed for 15 minutes at a

17 time, each.  So we've proposed less restrictive terms than

18 that.

19    We don't think that changing the designation tiers, as

20 Defendants have proposed, is the right course here.  The

21 confidential tier under the protective order does not

22 provide the levels of protection that are appropriate for

23 highly sensitive technical information at issue in this

24 case.  It doesn't limit access to employees or impose any

25 restrictions on individuals who are involved in competitive

18

1 decision making or patent prosecution.

2     I think there are few circumstances that can justify

3 giving an adversary's employees broad access to a

4 competitor's trade secret information, and I think the case

5 law that Defendants are relying on doesn't support the broad

6 access that they're seeking, and so, in <u>Medtronic</u>, for

7 example, the Defendant entity and individual were not --

8 were found not to actually be competitors, whereas here,

9 obviously, we have competitors that are involved in the

10 case, and the Court in <u>Profil Institute</u> in the Southern

11 District of California wasn't addressing a model protective

12 order that is at issue in this district, where there's

13 already access provided for the information that the

14 individuals had.

15     And so we're not trying to completely restrict their

16 access to the information.  I think what we've tried to do

17 is strike a balance consistent with the model order that's

18 appropriate in this case.  So the model protective order,

19 together with Roche's proposed compromise, provide the

20 access that the individual Defendants are seeking, with

21 reasonably safeguards that have been ordered by courts in

22 this district.  With that, if there's any further

23 questions --

24         THE COURT:  That's helpful.  I remain somewhat

25 concerned, again, on the practical implementation, given the

19

1  restrictions that have been proposed, and, again, that the

2  material -- it doesn't surprise me that the material can't

3  easily be segregated.  I certainly understand how that comes

4  about.  But, you know, it's -- how are the Defendants

5  supposed to know what they can and cannot see, and,

6  notwithstanding metadata and custodial files, you know, it's

7  hard to -- I don't know what the -- what all you're saying

8  they have access to, and it doesn't sound like there's been

9  any meaningful discussion between the parties as to what

10  that is.  I mean, I would assume it would tie to your

11  description of the trade secrets, because they can only be

12  misappropriated, obviously, if they had access to them at

13  some point.

14      All right.  That is helpful, though.  Thank you, Mr.

15  Cox.

16      All right.  Mr. Heinrich, let me hear from you, please.

17          MR. HEINRICH:  So I'll address the access issue.

18          THE COURT:  Please.

19          MR. HEINRICH:  So I think your Honor's final

20  comment cuts to the core of the issue here.  Roche is

21  accusing these three oncologists, Stanford researchers, of

22  misappropriating trade secrets.  So, by definition, Roche is

23  saying that they know these trade secrets and have

24  misappropriated them.  They should be able to have full

25  access to the trade secrets that Roche is accusing them of

20

1  misappropriating, so they can defend themselves.

2          THE COURT:  But, as a practical matter, as a

3  practical matter, right, to Mr. Cox's point of "All right.

4  And here's -- you want" -- "you," Foresight -- "want to see

5  the documents that demonstrate economic value.  Okay.  Well,

6  here's our super secret -- you know, super secret recipe

7  that incorporates the trade secrets.  You know, it's our

8  newest, coolest detection tool, and this is how they've been

9  employed and used, and here are the marketing plans around

10 it, and where we're headed, et cetera."

11    So it seems like there is easily -- we easily get to a

12 lot of additional information that's relevant and you're

13 going to want, that the Defendants would not have seen

14 during the time that they were working for Roche.

15         MR. HEINRICH:  Well, we've addressed that in our

16 protective order, because we have an additional tier of

17 highly confidential "attorneys' eyes only" designation.  So,

18 for documents that they're relying on, other purposes such

19 as independent economic value, they can designate under that

20 heightened tier, but for documents that evidence that trade

21 secrets that Roche claims that the doctors knew, in many

22 cases, they were the ones that developed the trade secrets,

23 the alleged trade secrets, published them.

24    Their publications -- we talked about source code.

25 There's source code publicly available on Stanford's

21

websites, but they should be able to see what Roche claims
are the trade secrets that they allegedly misappropriated,
and they can redact documents appropriately so that, if
there's a document that both evidences the trade secrets
that the doctors allegedly accessed, installed, developed,
whatever, that can be, you know, left in the document.

Other materials that they think is relevant, they think
are relevant to their case, can be redacted and produced an
"outside attorneys' eyes only" basis, and this happens all
the time.  Documents are produced with redactions that only
outside attorneys can see.  This is, I think, fairly
straightforward, but the problem with Roche's approach here,
I can speak to that with a concrete example.

So, in their trade secret disclosure statement, they
included over 100 exhibits, totaling over 5,000 pages, and
in many cases, their trade secret disclosure statement says,
"Well, there's a trade secret involving broad category X
somewhere in this exhibit," 100, 200, 300-page exhibit.
They have -- you know, we're currently under -- operating
under a rule where I cannot share those 5,000-plus pages
with the Stanford oncologists who allegedly misappropriated
trade secrets contained somewhere in those 5,000 pages, and
it's just not a workable situation.  They're not able to
defend themselves.

I want to emphasize that --

1          THE COURT:  So what's a practical solution to
2  that?  If there's -- if there should be restrictions -- and
3  it sounds like there's actually not a disagreement, that the
4  individual Defendants -- or just bear with me for a moment.
5  Let's assume that the individual Defendants should have
6  restricted access to anything that's not "Here's what you
7  had access to and you misappropriated."  Okay?  So, in your
8  example, where there's a 300-page document that says, "Look.
9  This is our evidence of trade secret X.  It's in these 300
10 pages," as a practical matter, how does it happen?  Who is
11 responsible for saying, "These are the pages that they can
12 see, and these are the pages that are AEO"?

13          MR. HEINRICH:  Roche is responsible for that,
14 because Roche should identify where in those 300 pages are
15 the actual trade secrets.  They should be doing that anyway.
16 We have a dispute that's getting teed up on the adequacy of
17 their trade secret disclosure, but it's their obligation to
18 say, "Pages 19, this subsection, that's a trade secret that
19 we're alleging was misappropriated."  That's their burden,
20 and then they can produce the rest of the document on an
21 "outside attorneys' eyes only" basis.

22      The issue here -- it's very narrow -- that the doctors
23 should be able to see what trade secrets Roche claims that
24 they already know, and misappropriated, and Roche has the
25 burden.  They -- and this is -- these are claims that

23

1 they've asserted, they've signed under Rule 11.

2     They should have a well-developed theory on what

3 individual the doctors accessed and misappropriated, and

4 it's not enough to say, "Well, they can see anything that

5 they were the author of or they previously reviewed,"

6 because our position is that, for some of these documents

7 and some of these alleged trade secrets, they actually never

8 had access to them, but they should still get to see what

9 Roche is accusing them of, to develop the full scope of

10 their defenses.

11     They're pointing to things that are common knowledge in

12 the industry.  These doctors are the foremost experts in

13 this technology, because these are cancer diagnostic

14 technologies that they themselves developed.  So, if Roche

15 is accusing them of misappropriating a trade secret, they

16 should get to see, and study in as much detail as they need,

17 what that alleged trade secret is, and then anything else

18 that is not a trade secret that they're accused of

19 misappropriating, that Roche is producing for some other

20 purpose, fine.  They can produce that on an "outside

21 attorneys' eyes only" basis.

22     And one other point.  Counsel raised what is really a

23 red herring.  The issue isn't about Foresight employees

24 seeing these materials.  The issue is the doctors seeing the

25 trade secrets that Roche claims that they misappropriated.

24

1 We'd be happy to have, you know, a separate category,

2 separate designation under the protective order, to make

3 that clear, but what we want is, they should be able to see

4 what they have allegedly stolen.

5         THE COURT:  Right, and I gave that some thought.

6 You know, you can either create another category going from

7 confidential up, or you can do it from AEO down, right?

8         MR. HEINRICH:  Right.

9         THE COURT:  You can say -- you can call this

10 "AEO," but "AEO, slash, trade secret" means that these four

11 people can see it.

12         MR. HEINRICH:  Exactly.

13         THE COURT:  But I -- again, I'm trying to figure

14 out, how are we not in here every other week with 5,000

15 documents, arguing over what is and is not a trade secret at

16 each page?

17         MR. HEINRICH:  I actually don't think that there

18 is going to be a dispute, and here's why.

19         THE COURT:  Okay.  I'm going to write that down,

20 Mr. Heinrich.  I'm writing it down.

21         MR. HEINRICH:  Well, on this particular issue.

22 There will definitely be a dispute on the adequacy of their

23 trade secret disclosure statement itself, but on -- just on

24 the access point --

25         THE COURT:  Yes.

1    MR. HEINRICH:  -- Roche gets to decide what it
2 claims is its trade secret, and it shows them -- shows that
3 information to the individual Defendants.  If Roche wants to
4 redact everything, produce everything on an "outside
5 attorneys' eyes only" basis, that's fine with me, because
6 that just means that they've, you know, finally recognized
7 that there was no trade secrets that were misappropriated.
8    So Roche gets to be as narrow or broad as they want
9 with their production, but what they produce under this
10 category -- I'll call it a "highly confidential trade secret
11 designation" -- that's going to now be the universe of the
12 trade secrets that they accuse the doctors of
13 misappropriating.  So that's why I think this narrow issue
14 shouldn't really be generating a dispute.
15    THE COURT:  All right.  Before I turn to
16 prosecution bar and Mr. Elihu, Mr. Cox, why wouldn't -- why
17 doesn't the proposal, Defendants' proposal, work, which is,
18 I think, perhaps, the practical solution, which is to --
19 Roche has its production, and I take your point.  It's got
20 trade secret confidential information that is -- that
21 Defendants did not see and you don't want to them to see.
22 You don't want them working their way through that, and
23 that's understandable in this context.
24    So wouldn't it make sense for Roche to designate at
25 production as to what they can see and what they cannot see?

1   And that is creating another level.  It's carving out --

2   it's either super, super confidential or AEO plus the

3   individual Defendants category.  That would seem to be a

4   workable way to get Roche the protections it seeks in terms

5   of this other material.

6           MR. COX:  Yes, your Honor, and sorry if I confused

7   my answer to the question earlier, but I do think, to the

8   extent your question was whether we would explain what

9   documents were in Defendants' possession, and what

10  information they had, we would be willing to do that, and we

11  can designate as you suggest, or, under our proposal, we can

12  explain which documents fall under that exception in the

13  model order where they had the documents or had access.

14          THE COURT:  Those documents -- so we'd have a

15  category of strictly AEO, that the individuals did not get

16  to see, because it's new trade secrets, if you will, and

17  then there would be a category of -- and maybe that's --

18  well, let's just call that "AEO," and then there's -- but

19  there's AEO trade secret, which would be the lawyers and the

20  individual Defendants, and that --

21          MR. COX:  Yes, your Honor.

22          THE COURT:  -- that would be the misappropriated

23  trade secrets --

24          MR. COX:  Yes.

25          THE COURT:  -- or what you say they have access

27

1 to?

2          MR. COX:  That's correct.

3          THE COURT:  All right.  That would seem workable.

4 And that's workable for Roche, so we don't need a super

5 restrictive "You can only see things in the room, no notes,"

6 et cetera.  We don't need that under this proposal.

7          MR. COX:  If I'm understanding the proposal

8 correctly, it would be that, to the extent we're producing

9 documents that we're alleging Defendants had access to, we

10 would designate those separately as under this tier of

11 attorneys and trade secrets.

12          THE COURT:  Right.  And so they could see that

13 without draconian restrictions.  I mean, they'd be

14 restricted by the normal terms of the protective order.

15          MR. COX:  That's correct.

16          THE COURT:  All right.  And then, for everything

17 else that you claim is, you know, highly sensitive

18 confidential information, it would be attorneys' eyes only,

19 so, again, we don't need these restrictions on the

20 individuals' access to it?

21          MR. COX:  Correct.

22          THE COURT:  Mr. Heinrich, am I understanding that

23 correctly?

24          MR. HEINRICH:  Yes.  So, just -- I think we seem

25 to all be saying the same thing.

1        THE COURT:  I hope so.

2        MR. HEINRICH:  But, you know, I think it is

3 straightforward that for, let's say -- let's say three

4 categories of documents.  Let's say --

5        THE COURT:  Let's say -- I'm sorry.  What?

6        MR. HEINRICH:  Let's take three categories of

7 documents, documents that the doctors -- Roche claims the

8 doctors have already seen, or maybe authored, in some cases,

9 or supervised.  That would be -- those entire documents

10 would produced pursuant to this new category under the

11 protective order.  So that would be, you know, let's say,

12 highly confidential trade secrets.

13    Documents that Roche is producing that don't contain

14 the trade secrets that they are accusing the doctors of

15 misappropriating, those documents would be produced if Roche

16 thinks that they're responsive and they want to rely on

17 them.  They would be produced under an outside "attorneys

18 eyes only" designation.  The doctors would not be --

19        THE COURT:  If they have confidential sensitive

20 information.

21        MR. HEINRICH:  Yes, yes.  Of course, yes.  Yes, of

22 course.  Of course.

23    And then, for documents that Roche is relying on to

24 evidence the trade secrets that they claim are

25 misappropriated, but there's only certain portions of those

documents that evidence those trade secrets, then the trade

secret portions of the documents would be produced to the

doctors, and the rest of the document would be redacted, and

then produced unredacted, with an "outside attorneys' eyes

only" designation.

THE COURT:  Yes.  I think, as a practical matter,

that's how it plays out.

MR. HEINRICH:  Yes.  We certainly think that

works.

THE COURT:  Okay.  And that, though somewhat

cumbersome, at least at the start, I think, would work, and

give -- provides Roche the protection it seeks, and gives

Defendants the access that they need, and they need,

obviously, in terms of working with counsel, in terms of

preparing their defense.  Okay.  All right.  I think that

makes sense.

Mr. Cox, you agree?

MR. COX:  Yes.

THE COURT:  Okay.  Excellent.

I think where we're headed is, I'm going to have --

I'll have, on this issue, at least, Foresight draft this,

take drafting responsibility, have the parties, obviously,

take another stab at getting me a protective order, a

stipulated protective order, with the language as reflected

on the record.

1     Okay.  Now let's return to prosecution bar, because it

2  still raises some issues.  We've addressed access, so we're

3  not talking about Defendants being covered by the bar.

4  We're talking about counsel.

5     And, Mr. Elihu, let me hear Defendants' position.  I

6  mean, I see it in the papers, but, to Mr. Cox's point,

7  they've -- you know, it's a -- it's a narrow -- it's the

8  lawyers prosecuting, and that -- you know, is that different

9  from the litigation team?  What's the concern here, given

10  the -- we've got competitors and we've got what's

11  undoubtedly a lot of patenting going on on both sides?

12         MR. ELIHU:  Your Honor, yes.  Thank you so much

13  for treating this issue seriously on the prosecution bar,

14  because I think you started off by saying that these

15  prosecution bars -- you know, you've got to approach that

16  with a fine brush, and I think that the prosecution bar that

17  has been proposed is very much a blunt instrument and, by

18  design, almost like a poison pill.  I'm going to explain

19  why.

20     To start, they haven't cited a case where prosecution

21  bars in trade secret cases or contract cases were entered

22  into over objection of one side, and I think there's a

23  reason for that, and I think there's a principle that should

24  guide the discussion, is, in a patent case, the patent is

25  presumptively valid, and if you -- in the Deutsche Bank

1  federal circuit opinion, and even in the case they cited

2  themselves, Applied Signal, 2011 WL 197811, *3, those cases

3  say, if you're going to even think about giving a

4  prosecution bar, the scope of any restriction has to be

5  commensurate with the patents in suit and the subject of the

6  patent matters in suit.

7      Here, as I think Mr. Heinrich explained and kind of

8  foreshadowed to you, there is a significant dispute with

9  respect to the trade secret disclosure they have made,

10  whether it's adequate, and I -- we could go on and we could

11  talk about that, and I'm frankly prepared on part of that

12  right now, if you'd like, but the bigger concern is that the

13  subject matter that they have proposed, which is that

14  circulating tumor DNA -- like, they literally want a

15  complete prohibition.

16      And then they have terms such as "cap seek" and "phase

17  seek," which are, you know, brand name terms which are

18  disputed between the parties, and what they're asking this

19  Court to do is, in a premature restrictive fashion,

20  basically just cut off -- and, by the way, not just for

21  counsel, but also for experts -- and I would love to do a

22  survey of experts to say, "Well, if you became an expert in

23  this case, you're not going to be able to at all prosecute

24  patents related to circulating tumor DNA for cancer

25  detection."  Good luck finding an expert that's going to

32

1 be --

2           THE COURT:  Well, and I take your point, Mr.

3 Elihu, but Mr. Cox's point was "Okay.  If it needs a finer

4 brush, give us some finer parameters," and that often,

5 obviously, is part of the process in formulating a bar, as

6 there's a lot of back-and-forth to get that point of the

7 pencil quite, quite sharp and fine.

8           MR. ELIHU:  Yes, your Honor, and I think that

9 that's a good point, and I think the reason why we are where

10 we are is because there is such significant concern.  So, if

11 your Honor has any inclination to grant any prosecution bar

12 of any kind at some point, we can't even start to have a

13 discussion, because that would have to be guided by their

14 disclosure of trade secrets, which they haven't done yet.

15 How can you even start talking about what the scope of the

16 prosecution bar would be until that has been -- there has

17 been discussion?  I think -- well, to give an example of --

18           THE COURT:  So let me ask a practical question,

19 and then I do want to hear the example.  You can go back.

20 But has Judge Lee -- did she go down the 2019.210 path?  Has

21 she asked for that, or where are you in terms of --

22           MR. ELIHU:  There's letter writing on that issue,

23 your Honor.  Judge Lee actually -- unless others here want

24 to correct me, I didn't quite -- I don't think she made a

25 definitive decision on whether you would be -- I think it's

1  your issue.  She didn't resolve it.

2      I'm not sure whether that's something for your Honor or

3  for Judge Lee, but I understand you're very familiar with

4  it, anyway.  But I think that issue will be very, very

5  important in determining all the parameters, not just a

6  subject matter scope, your Honor, but also the duration,

7  right?  So I think that --

8          THE COURT:  So it's not going to come up -- the

9  challenge to sufficiency of trade secrets is not going to

10 come up in a motion to dismiss, in a dispositive motion.  Is

11 that --

12         MR. ELIHU:  Well, I think that they have recently

13 amended their complaint, based off of the 12(b)(6) and

14 motion for judgment on the pleadings.  We think that their

15 amended complaint -- and you're going to see a week from

16 Monday -- is fatally deficient, you know, and they can't

17 even cure it anymore, because of the deficiencies.

18     I think that that issue should really be teed up, but I

19 think it also will -- it's not just the subject matter, your

20 Honor.  It's not this -- you know, a case that involved a

21 trade secret related to automobile steering wheel.  Their

22 current scope is "Well, counsel and experts will never be

23 able, for two years after they received the information --

24 can't prosecute patents related to automobiles, not just the

25 steering wheel, automobiles."  Roche did not invent cancer

34

1  detection in a liquid biopsy, and that's this --

2            THE COURT:  I understand.  I understand.

3            MR. ELIHU:  Okay.

4            THE COURT:  But, again, that usually comes down to

5  the back-and-forth, and I take your point.  Well, then, we

6  need a clear statement, and it sounds like -- I mean, if

7  it's -- well, I'll let -- I'll see how the parties tee up

8  the question, and Judge Lee and I will figure out, you know,

9  whose desk it lands on.

10            MR. ELIHU:  Right.

11            THE COURT:  They often come up, obviously, in the

12 discovery context, and they often come up to me whether it's

13 a 2019.210 statement or not, but yes, there has to be a

14 sufficient statement, but we also are not going to be

15 arguing over sufficiency of statement for the duration of

16 discovery, because, you know, we're not going to use that

17 to -- well, at some point, it will -- it has to be

18 sufficient, and that is, the trade secret are -- have to be

19 sufficiently disclosed, and discovery goes forward.  It's

20 not an ongoing, never-ending battle.

21            MR. ELIHU:  Your Honor, you're right, and that's

22 why I think the legislature set it up that way, right, is

23 that you get the statement once, and sufficient discovery

24 begins.  So, if we do it in the proper sequence, I think,

25 presumably, it should be resolved sooner, rather than later,

1 I suppose.

2      So I think that's kind of where we stand on it.  I

3 think, you know, putting aside the lack of authority and

4 just to wrap up, I think there also -- it's important that

5 the scope and duration not be overly burdensome, if there

6 ever is a prosecution bar, and the reason I say that is, I

7 acknowledge that the model order for patent and trade secret

8 cases has this language on -- so it's "two years," right?

9 That's the language that's in there.  It's "two years."

10 That seems highly restrictive.

11      I think that, you know -- look.  I'm a member of the

12 patent bar.  I don't prosecute day to day.  I haven't

13 prosecuted, but Quinn Emanuel, as a firm, has a lot of

14 clients in this area.  If I, you know -- and the language

15 that they have proposed is "indirectly" -- not only

16 "directly or directly (sic) or indirectly being involved at

17 all in prosecution," I think.

18      So it's not just the subject matter, but, if there ever

19 is going to be a prosecution bar, there would be some

20 additional position that would -- hopefully, we could

21 resolve together, without coming to your Honor on that

22 specific issue.  But I think -- right now we think that

23 the -- even the suggestion of this fraud protective order --

24 the reason we didn't even, you know, provide some sort of

25 response is because we can't provide a response.  They said

1  they wanted the subject matter to be on -- way beyond the

2  scope of even this case.

3      And so I think that's -- with that, I'm happy to take

4  questions, you know, each component of that.

5          THE COURT:  So Foresight and the other Defendants

6  remain in the position that it's too early to talk about a

7  prosecution bar, because you don't have sufficient clarity

8  on the trade secrets.  Is that right?

9          MR. ELIHU:  Right.  Yes, right.  I think our

10  position is, as said in our statement, we don't think that

11  there is precedent in the Ninth Circuit for prosecution

12  bars, and there's really --

13          THE COURT:  And let me just address that point.  I

14  understand.  I obviously read that point.  I thought, "Well,

15  I know I've granted them."  Part of that is the practicality

16  of -- bars are typically -- they're in a protective order.

17  I have a hearing with the parties like this.  We argue about

18  parameters.  We get those set, and it ends up in a

19  stipulated protective order.

20      It doesn't end up -- you know, it's not an opinion.  It

21  doesn't get published, and, you know, we've worked through

22  it, and it hasn't been appealed.  So I appreciate that

23  there's not a lot of paper around a trade -- excuse me -- a

24  prosecution bar in this context.  Part of that is just the

25  practical way that prosecution bars --

1          MR. ELIHU:  Right, right.

2          THE COURT:  -- get prosecuted.

3          MR. ELIHU:  Right, yes.  But -- yes.  So, if

4    that -- so, if your Honor is inclined, and it's comfortable

5    in granting it even if it's, you know, in a trade secret or

6    contract case, I think you're right.

7        I think that it's certainly premature to even discuss

8    the scope of what that might be until there is a proper

9    trade secret disclosure, which has not happened today, and

10   then, once we see that disclosure -- and that disclosure

11   will -- or would, ostensibly, your Honor, reveal things like

12   when those trade secrets, they contend, were, you know,

13   developed, right?  Because a lot of these things that, you

14   know --

15          THE COURT:  Well, then you have to roll up your

16   sleeves and meet and confer --

17          MR. ELIHU:  Right, right.

18          THE COURT:  -- and figure out a proper scope, if

19   it's appropriate.

20          MR. ELIHU:  Yes.  And I think the other issue to

21   that, and just to show you, probably, what -- because this

22   might become an issue later.  They have actually alleged

23   these trade secrets were published, right?  You know, so

24   they're saying that the disclosure itself to the public was

25   the misuse, in their complaint, and so that kind of begs the

38

1  question of what the purpose of the prosecution bar is,

2  other than to poison-pill and restrict Defendants and

3  counsel from prosecuting patents that they're trying to

4  grab, get a last grab at.

5      THE COURT:  Well, I anticipate that the

6  argument -- the response -- and I won't speak for Mr. Cox,

7  because he's perfectly capable, but the response I would

8  certainly expect on that is "Yes, the misappropriated trade

9  secrets were published, and we're going to show you a bunch

10 of other stuff that we don't want to be showing up in

11 amended patent applications."  I mean, you know that.

12      MR. ELIHU:  Yes.

13      THE COURT:  So -- but your position is premature,

14 maybe not appropriate at all, and, bottom line, premature

15 today.

16      Mr. Cox, just enlighten me with regards to disclosure

17 of trade secrets, status of disclosure of the

18 misappropriated trade secrets.  Other than in the pleading,

19 then, was it also part of a -- you know, your initial

20 disclosures under Rule 26, or where -- what has happened on

21 that front?

22      MR. COX:  We have also responded to an

23 interrogatory asking for identification of the trade

24 secrets, so that is, I think, the vehicle where Mr. Elihu

25 was referring to some recent correspondence.

39

1          THE COURT:  Okay.  And when did you serve that

2  response?

3          MR. COX:  It was --

4          MR. ELIHU:  October 30th.  I remember that day, I

5  think.

6          THE COURT:  Half quiz (sic).  Thank you.

7          MR. ELIHU:  I think that was when.

8          MR. COX:  I was going to say it was more than a

9  month ago.  I know that.  It was before we provided the

10  dispute protective order.

11          THE COURT:  All right.  So you provided an

12  interrogatory response, and Defendants have received that,

13  and then it sounds like you all have been meeting and

14  conferring over the sufficiency of that disclosure,

15  certainly by letters.  Is that fair?

16          MR. COX:  We have not had a meet-and-confer yet,

17  but we did very recently receive a letter about the

18  disclosure.

19          THE COURT:  Okay.  All right.  Well, that issue,

20  in terms of sufficiency, isn't -- doesn't sound like it's

21  ripe yet, and the parties are going to keep doing what they

22  do, as they are required by the rules and by the standing

23  order, certainly my standing order, in terms of if it is

24  going to take the form of a discovery dispute, which these

25  often do.  So I will leave that in your capable hands.

1    I remain concerned about a prosecution bar at this
2  stage.  Obviously, I don't -- I haven't seen the scope of
3  the -- well, the interrogatory response, though you may have
4  provided it to me and I didn't review it closely, but with
5  regards to a description.  But the parties are working
6  through that, so I am going to defer any ruling on a
7  prosecution bar at this time, for the parties to continue to
8  address.
9    This case may well present a factual scenario where a
10 bar would be justified, but I -- again, because it is trade
11 secrets, and there will be a lot of other information
12 provided, but, always with a bar, the key is that -- is the
13 detail, as I said at the beginning, a fine brush.  You know,
14 it has to be very strictly -- so that experts, in
15 particular, really understand what they're signing up for,
16 and what they can or cannot do, and it may be that, in your
17 industry, two years is -- you know, is a millennia, and it
18 should be a lot less, but that is all for the parties to
19 address.
20   It may also be that -- you know, I have some concern
21 because we have pending patent applications that are the
22 focus of the remedy that is sought, that a bar has to be
23 workable so those -- so it doesn't act as an injunction on
24 the prosecution of those applications, and that's -- you
25 know, that is a concern I have from the 10,000-foot level

41

1  where I'm looking at this, is it again would have to be

2  tailored to allow the parties to go ahead and pursue those

3  applications, or allow, you know, with appropriate counsel

4  and appropriate safeguards in place, so defined trade

5  secrets are not utilized.

6      So I'm going to defer any ruling.  I think it's not yet

7  ripe, because the parties have to work out the trade secret

8  definition issue in the first instance.

9          MR. ELIHU:  Your Honor, may I just ask a quick

10  question on that issue?

11          THE COURT:  Of course.

12          MR. ELIHU:  The parties are well aware of your

13  rules regarding discovery disputes, and the 10-page limit on

14  submission, and I've seen orders that your Honor has issued

15  where parties asked for more and you said no, I believe, or

16  maybe that's -- you know, that might have happened.

17          THE COURT:  Well, that doesn't surprise me.

18          MR. ELIHU:  And so the reason I ask is because

19  they have alleged, you know, 10 trade secrets, and so far

20  we've identified six distinct categories of deficiencies,

21  and, you know, it's just not going to be possible for us to

22  explain why it's so deficient in five pages, for Defendants

23  jointly, and so I'm just wondering, what's the best vehicle?

24  Should we just -- would you be amenable to, if the parties

25  decide the issue is ripe, you know, in a month or whenever,

42

1    at some point in the future, to ask for additional leniency

2    on the page limit?

3            THE COURT:  Yes, and I appreciate that, and that's

4    a good question, again, just the practical implementation,

5    right, how are we going to manage this going forward?  And

6    what I expect from the parties is a joint statement under --

7    you know, not to exceed 10 pages, that identifies the issues

8    and says, "Look.  We're fighting over the trade secrets.

9    There are, you know, 25 trade secrets at issue.  They fall

10   into, you know, 15 different categories" -- or sometimes

11   it's 25 different categories -- "and, you know, we've got --

12   we need, you know, time to address these," which I

13   completely understand, but I need a constructive proposal

14   from the parties.

15       You have to keep in mind, every week I have a stack of

16   discovery disputes, and for every single one of them, to the

17   lawyers involved, it is my most important case, and I know

18   that this case really is important, and so are all the

19   others.

20       So that -- you know, the answer is, is there any hope

21   of relief from 10 pages?  Yes.  But how do you start?  You

22   start with a joint statement.  You all meet and confer,

23   "What do we think we need?  How do we want to address this?

24   Let's make a proposal to the judge," and, you know, do you

25   want to be able to provide me declarations?  Do you want

43

1  to -- you know, do you just want to do it by argument?  Do

2  you want -- you know, I want to hear how you want to tee up

3  the issue, and then we'll figure out what makes sense.

4           MR. ELIHU:  Much appreciated.

5           THE COURT:  All right?  All right.

6       Mr. Cox, anything else for Roche today?

7           MR. COX:  No, your Honor.

8           THE COURT:  Okay.  Mr. Heinrich, Mr. Elihu,

9  anything else for Defendants?

10           MR. HEINRICH:  Just a clarification.  It seems to

11  me that where we're at now is we'll get your Honor a revised

12  protective order that does not include a prosecution bar at

13  this time, but includes this additional layer, this category

14  of designation.  We'll file that as a stipulated protective

15  order, and then we can move forward.  I can assure you that

16  the doctors are very anxious to see the Roche interrogatory

17  response, and they're going to ask me that in about 10

18  minutes, "When can we see that?"  So I just want to make

19  sure we can get this teed up so that they can get access

20  ASAP.

21           THE COURT:  I think that is the way forward.  I

22  will issue a short order, summarizing, but I've essentially

23  ruled.  We worked out the language on access, and I'm going

24  to defer the prosecution bar.  I am not opposed to the

25  stipulated order having a section for prosecution bar,

44

deferred, as a placeholder, you know, and it may or may not

come to fruition, but then everybody understands it may be

there.

     So I'll issue a short summary order, but you have my

rulings, and I think you understand the path forward, and if

and when you tee something up, I'll get a look at it, and

Judge Lee and I do talk, so we'll, you know, figure out --

it depends, at least, on the form it comes in.

     Anything from the Stanford Defendants, would like to be

heard?  Mr. Tsai?

          MR. TSAI:  No.  No, your Honor.  We're all set on

our side.  Thank you for your time.

          THE COURT:  Okay.  Keep your head down.

Excellent.  Good choice.

     All right, everyone.  Thank you very much for your time

and preparation today.  I do appreciate it, and you've

packed a lot in those 10 pages.  You did it, and you did it

better on these complicated issues than many others.  So I

do know that that takes time and effort, and I appreciate

that.  Thank you.

     Okay.  Then we are finished for today, and adjourned.

Thank you.

          ALL:  Thank you, your Honor.

     (Proceedings concluded at 11:03 a.m.)

45

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the above pages of

5    the official electronic sound recording provided to me by

6    the U.S. District Court, Northern District of California, of

7    the proceedings taken on the date and time previously stated

8    in the above matter.

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15

16            Echo Reporting, Inc., Transcriber

17              Tuesday, December 10, 2024

18

19

20

21

22

23

24

25