# EXHIBIT 1
# REDACTED

**Highly Confidential – Outside Counsel's Eyes Only**

CONFIDENTIAL
Execution Version

# CONSULTING SERVICES AGREEMENT
# [FORM FOR MAXIMILIAN DIEHN AND ARASH ALIZADEH]

This is a Consulting Services Agreement ("Agreement") effective this ___ day of ____, 2015 ("Effective Date") between Roche Molecular Systems, Inc. ("RMS"), a Delaware corporation, and [_____] ("Provider"), an individual.  All capitalized terms are defined herein.  The parties hereby agree as follows:

1.      Services.  Provider agrees to perform the services ("Services") as specified in Exhibit A attached and incorporated herein, which is a Statement of Work ("SOW").  Additional work may be added to this Agreement in the form of SOWs referencing this Agreement and signed by both parties.

2.      Services for RMS Affiliates.

2.1     Affiliates of RMS are entitled to contract for Services under this Agreement, and, in any such case, the Affiliate and Provider will be bound by the terms and conditions of this Agreement. In the event that Foundation (as defined below) contracts for Services under this Agreement and Provider is required to perform any Services hereunder for Foundation to develop Foundation products that would reasonably be expected to compete with CAPP-Seq Products (as defined in the Merger Agreement) (any such products, "Competitive Foundation Products"), then, in such case, the Competitive Foundation Products shall be treated as Capp-Seq Products for purposes of determining whether the Milestone Events (as defined in the Merger Agreement) set forth in Sections 1.5(e)(i)(3), 1.5(e)(i)(4) and 1.5(e)(i)(5) of the Merger Agreement have been achieved.

2.2     The term "Affiliate" means any corporation or other business entity controlled by, controlling or under common control with (whether directly or indirectly), RMS, and for this purpose "control" means direct or indirect beneficial ownership of more than 50% of the voting interest in such corporation or other business entity or having otherwise the power to govern the financial and the operating policies or to appoint the management of an organization. "Affiliate" shall include, without limitation, CAPP Medical, Inc. and shall not include (a) Chugai Pharmaceutical Co., Ltd, 1-1 Nihonbashi-Muromachi 2-Chome, Chuo-ku, Tokyo 103-8324, Japan ("Chugai") or (b) assuming consummation of the equity purchase transactions currently contemplated between an Affiliate of RMS and Foundation Medicine, Inc. ("Foundation"), Foundation, in each case, unless and until RMS provides written notice to Provider specifying Chugai or Foundation as an Affiliate of RMS.

3.      Independent Contractor.

3.1     Provider is an independent contractor with respect to RMS and is not an employee, agent, or joint venturer of RMS.  Neither Provider, nor any person designated by Provider to provide Services under this Agreement, is eligible for coverage or participation in any of RMS' benefit plans, programs, workers' compensation insurance, or any other benefits or compensation from RMS except as set forth in this Agreement.  RMS will not take any deductions from any compensation paid to Provider for taxes or related payroll deductions, and Provider shall be solely responsible for

1

any taxes resulting from the compensation under this Agreement and agrees to file all such forms and pay all such taxes as may be required.

3.2     Neither party shall have any right, power, or authority to create any obligation, express or implied, on behalf of the other, except to the extent provided in this Agreement.

4.     Provider's Performance of Services.

4.1     Provider shall perform all Services himself and shall not, without RMS' prior written consent, employ or utilize any employee, agent, subcontractor or other person in the performance of the Services.

4.2     In performing the Services hereunder, Provider shall not (and shall not induce RMS to) misappropriate, improperly use or disclose any confidential, secret, proprietary or otherwise non-public information or trade secrets of any other entity or person.  Provider further agrees not to bring onto RMS' premises or transfer onto RMS' technology systems any of the following that are subject to obligations of confidentiality or non-use to a third party or where such actions would constitute breach of such obligations or otherwise misappropriate third party intellectual property rights: any third party proprietary materials, confidential or proprietary information or trade secrets.

5.     Conflicting Obligations.

5.1     RMS acknowledges that Provider is an employee of Stanford University ("Stanford") and is subject to certain agreements, rules, policies, regulations, orders and guidelines of Stanford, including, without limitation, policies concerning consulting, conflicts of interest and ownership of intellectual property (collectively, the "Stanford Policies").  Provider shall use commercially reasonable efforts to provide RMS with any updates to the Stanford Policies of which Stanford notifies Provider after the Effective Date, whether in writing or by posting such updates online, promptly after they are provided to Provider or posted.  Without in any way limiting Provider's obligations or RMS' rights hereunder, if Provider is required by any of the Stanford Policies to make any disclosure or take any action that conflicts with the terms of this Agreement or with the Services, prior to making such disclosure or taking such action, Provider shall, to the extent permitted by the Stanford Policies, promptly notify RMS in writing, of such obligation, specifying the nature of such disclosure or action and identifying the applicable Stanford Policy under which such disclosure or action is required and shall reasonably cooperate with RMS in preventing such disclosure or conflict.

5.2     Provider shall not use any equipment, supplies, facilities or other resources of Stanford or any other third person in the performance of the Services, including, except as directed by RMS in advance in writing, any individual who is a Stanford faculty member, staff member, undergraduate or graduate student, post doctoral researcher, or other employee, agent or independent contractor of Stanford or any other third person.  Provider shall segregate all work related to the performance of the Services from any work performed by Provider as a Stanford employee or otherwise on behalf of Stanford and any work performed by Provider with any government funding in order to, in each case, minimize any conflicts, claims or disputes relating to disclosure or ownership of rights concerning any Confidential Information, RMS Work

2

Product, RMS Inventions, Prior RMS Inventions or IP Rights in any of the foregoing (all as defined in Section 7 below).

6. Compensation.

6.1 In consideration of the performance of the Services to RMS' satisfaction and of the assignments set forth below in Section 7, RMS agrees to pay to Provider the sums set forth in each SOW to this Agreement, including, without limitation, as set forth on Exhibit A attached hereto ("Compensation"). Compensation will be paid net 60 days from the receipt of Provider's invoice for such payment (disputed amounts may be withheld until mutually resolved). For the purpose of RMS controlling payments to Provider, a Purchase Order ("PO") will be issued to Provider (typically, one separate PO will be issued for each SOW, with Exhibit A being considered one SOW). Provider may not invoice RMS until a PO is issued, and Provider shall include the correct PO number on each invoice submitted or the invoice will be rejected. POs issued are for payment purposes only and their preprinted terms and conditions will not apply; however, any mutually agreed specific or special terms and conditions added to a PO shall apply, as described in Exhibit A or other applicable SOWs.

6.2 RMS has no obligation to pay for Services that RMS determines, in its reasonable judgment, are not properly performed. If RMS pays for any Services and subsequently determines that they were not properly performed, then RMS will be entitled, in its reasonable judgment, to re-performance of the Services by Provider.

6.3 All payments made by RMS under this Agreement will be reduced by any tax or other amounts required to be withheld by RMS under applicable law. During the term of this Agreement, payments for the Services shall represent fees for services as an independent contractor, and shall therefore be paid without any deductions or withholdings taken therefrom for taxes or for any other purpose except as required by law. Provider agrees to provide any tax and other forms that are reasonably required by RMS. The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

7. Assignment and Inventions.

7.1 Provider hereby assigns to RMS, its successors and assigns, all right, title, and interest in and to (a) any Inventions generated or arising in the course of or as a result of Services performed under this Agreement, regardless of when or where developed or whether or not any of RMS' equipment, supplies, facilities or other resources are used, and all printed, physical and electronic copies and other tangible embodiments thereof (collectively, "RMS Inventions"); (b) any Inventions conceived or developed in whole or in part by Provider during the Restricted Period (as defined in the Noncompetition Agreement entered into by and between RMS and Provider in connection with the transactions contemplated by the Merger Agreement (the "Noncompetition Agreement")) arising or resulting from Provider engaging in Competition (as defined in the Noncompetition Agreement) (without in any way limiting RMS' other rights and remedies under the Noncompetition Agreement); and (c) all IP Rights in all of the foregoing, to the full extent of the term for which such IP Rights may exist. Provider will promptly disclose any RMS Inventions to RMS in writing and subject to Section 9 (Confidentiality) of this Agreement.

3

7.2    For the purposes of this Agreement, (a) "Inventions" means any inventions, works of authorship, trade secrets, know-how, and other items made, conceived, reduced to practice, authored or otherwise developed, discovered, or generated by Provider, solely or jointly with others; and (b) "IP Rights" means patent applications, patents, copyright applications, copyrights, trade secret rights, trademark rights and other intellectual property rights that exist by reason of, or may be claimed or obtained on any Invention.

7.3    At RMS' request, Provider will promptly execute all instruments and documents and perform all acts deemed by RMS to be necessary or reasonably useful: (a) to perfect RMS' right, title, and interest in and to RMS Inventions and IP Rights therein in any country or (b) to prepare, apply for, prosecute, obtain, maintain, defend, and enforce such IP Rights as RMS may desire in any country.  Provider hereby appoints RMS as his attorney-in-fact solely for purpose of taking any action where Provider has failed to comply with any of the foregoing. RMS will pay all costs and expenses of preparation, application, prosecution, maintenance, defense, and enforcement of such IP Rights.

7.4    A copy of the current version of Section 2870 of the California Labor Code ("Section 2870") is attached hereto as Exhibit B. Provider agrees that because he is not an employee of RMS, but is instead an independent contractor, Section 2870 will not apply to any invention unless applicable law requires that it apply to that invention and that invention fully qualifies for protection under Section 2870.  Provider further agrees that, with respect to any such invention, he bears the burden of proving such application and qualification.  If applicable law requires that Section 2870 apply to a particular invention that qualifies fully for protection under Section 2870, such that such RMS may not legally require Provider to assign to Roche the Provider's rights to such invention, then despite anything in this Agreement, Provider will not be required to assign that invention to RMS.  If applicable law does not require that Section 2870 apply to a particular invention, or if that invention does not fully qualify for protection under Section 2870, such that RMS can legally require Provider to assign its rights to such invention to RMS, then this Agreement will be applied to that invention as if Section 2870 did not exist.

8.    Representations and Warranties.  Provider covenants, represents and warrants that:

8.1    Provider does not own or control any intellectual property conceived or developed prior to the Effective Date of this Agreement that is relevant to the Services or to the Inventions. Without limiting the foregoing, to the extent the foregoing representation and warranty is incorrect, Provider hereby assigns to RMS, its successors and assigns, all of Provider's right, title, and interest in and to any such intellectual property that is owned or controlled by Provider;

8.2    Provider will provide the Services in accordance with all applicable laws and regulations;

8.3    All corruption, extortion, and embezzlement are prohibited.  Provider shall not offer, pay, or accept bribes or participate in other illegal inducements.  Provider shall conduct its business consistent with fair competition and in compliance with all applicable antitrust laws.  Provider shall employ fair business and employment practices including, but not limited to, equal employment opportunity.  In addition, Provider must abide by the integrity standards in the Roche Supplier Code

4

of Conduct set forth at (**http://www.roche.com/roche_supplier_code_of_conduct.pdf**).  RMS will provide Provider prior written notice of any change to the Roche Supplier Code of Conduct;

8.4     Provider, at his sole expense, will acquire and maintain in good standing, all permits, licenses and other entitlements required by law for the performance of Services;

8.5     *[Intentionally omitted]*;

8.6     Provider will comply at all times with Section 4.2, and the Services and RMS Inventions will not misappropriate third party proprietary materials, confidential or proprietary information or trade secrets;

8.7     Provider has no other agreement or relationship with, or commitment to, any other entity or person, including Stanford or any current or prior employer, that conflicts with his obligations to RMS under this Agreement or his ability to become a consultant of RMS, and perform the Services. This Agreement is valid and enforceable.  Provider represents that this Agreement and Provider's performance of the Services do not and will not violate the Stanford Policies;

8.8     Provider has all right, power and authority necessary to enter into and perform this Agreement; and

8.9     Provider has never been and is currently not debarred, excluded, or otherwise disqualified by the United States Food and Drug Administration or other regulatory or certification authority.

9.      Nondisclosure of Confidential Information.

9.1     "Confidential Information" means technical, financial, or business information, whether in writing, orally or in any other form, and whether or not labeled "Confidential", that is (a) disclosed by or on behalf of RMS or any of its Affiliates to Provider, (b) known to Provider as a consequence of or through performance of this Agreement or (c) developed or created by Provider in the course of performing Services hereunder, and which (i) is not publicly known or (ii) otherwise relates to the Inventions that are subject to the assignment obligations in Section 7.1.  Confidential Information includes, without limitation, information, falling under clauses (a) through (c) above, about or relating to assays, biomarkers or algorithms for detecting, quantifying, measuring or analyzing cell-free nucleic acid derived from tumors developed or created in whole or in part by Provider in rendering Services hereunder and any other information relating to RMS and/or its Affiliates' business, processes, knowledge, systems, designs, methods, formulas, patents, inventions, materials, research plans or activities, prices, sales, costs, promotional methods, and customers.

9.2     The following is not Confidential Information:
   a) Information generally available to the public at the time of disclosure, or which after disclosure by RMS to Provider becomes generally available to the public through no fault or omission attributable to Provider;
   b) Information made available to Provider from any third party having a right to do so without any obligation of confidentiality back to RMS or any of its Affiliates; or

5

c) Information unrelated to the Services performed by Provider which is developed independently by Provider, as demonstrated by written records, without access to or use of RMS' or any of its Affiliates' Confidential Information.

9.3     Provider shall (a) protect the confidentiality of the Confidential Information, (b) not disclose Confidential Information other than as provided in this Agreement and (c) use and disclose the Confidential Information only for the purposes of and as necessary for providing the Services.

10.     <u>Term and Termination.</u>  The term of this Agreement begins on the Effective Date and continues for two years ("<u>Term</u>"), unless earlier terminated.  This Agreement or any SOW may be terminated (i) by mutual written consent of the parties, or (ii) by either party, for its convenience, by giving five business days prior written notice to the other party; *provided, however*, that if this Agreement is terminated for convenience by Provider, Provider shall forfeit 100% of the Holdback Cash (as defined in the Merger Agreement) immediately upon such termination.  Upon termination of this Agreement, RMS shall have no further liability to Provider, other than to pay amounts due for Services prior to termination or with respect to any liability arising from RMS' breach of this Agreement prior to the date of such termination.

11.     <u>Indemnification.</u>  Provider shall defend, indemnify, and hold harmless RMS, its Affiliates, and its and their respective officers, directors, employees, and agents and each of them from and against any and all losses, claims, demands, suits, actions, liabilities, judgments, damages, costs, and expenses (including reasonable attorney fees) (collectively "<u>Losses</u>") resulting or arising from (a) any claim made against RMS for actual or alleged injury to, or death of, any person, or damage to any property caused by Provider or Provider's employees or contractors; (b) any breach of this Agreement by Provider; or (c) any conflict between this Agreement and any of the following: any agreement between Provider and Stanford or any obligations that Provider has to Stanford, including, without limitation, the Stanford Policies.

12.     <u>Waiver of Damages.</u>  **EXCEPT FOR (A) EITHER PARTY'S BREACH OF HIS OR ITS CONFIDENTIALITY OBLIGATIONS UNDER <u>SECTION 9</u>, (B) CLAIMS ARISING UNDER <u>SECTION 11</u>, OR (C) PROVIDER'S BREACH OF <u>SECTION 4.2</u> OR <u>5.2</u>, NEITHER PARTY WILL BE DIRECTLY LIABLE TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OR THE LOSS OF ANTICIPATED PROFITS ARISING FROM ANY BREACH OF THIS AGREEMENT BY SUCH PARTY, EVEN IF SUCH PARTY IS NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER ANY REMEDY SET FORTH IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.**

**FURTHER, PROVIDER SHALL NOT BE LIABLE HEREUNDER FOR ANY AMOUNT, IN THE AGGREGATE, IN EXCESS OF PROVIDER'S HOLDBACK CASH (AS DEFINED IN THE MERGER AGREEMENT) EXCEPT WITH RESPECT TO: (I) CLAIMS ARISING OUT OF PROVIDER'S FRAUD OR WILLFUL OR INTENTIONAL MISCONDUCT, WITH RESPECT TO WHICH, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS <u>SECTION 12</u>, NO LIMITATIONS OR WAIVER OF DAMAGES OR LOSSES SHALL APPLY; AND (II) ANY CLAIMS ARISING FROM A BREACH OF ANY INDEMNIFIABLE OBLIGATION (AS**

**DEFINED IN THE MERGER AGREEMENT) OF PROVIDER SET FORTH HEREIN, WITH RESPECT TO WHICH, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION 12, RMS AND AFFILIATES SHALL HAVE THE RIGHT TO RECOVER DAMAGES AND LOSSES IN EXCESS OF PROVIDER'S HOLDBACK CASH TO THE EXTENT AND AS SET FORTH IN THE MERGER AGREEMENT.**

13.     Notice.  A party must give any notice under this Agreement by facsimile, overnight courier, regular mail, certified mail, or by personal delivery at the address set forth above.  All notices to RMS are to be sent to the attention of "General Counsel".  Notices will be deemed received: (a) if sent by facsimile, at the start of the recipient's next business day; or (b) if delivered by overnight courier or certified mail, when notice is signed for by or on behalf of the receiving party; or (c) if delivered by regular mail, three business days after the postmark date; or (d) if delivered personally, when delivered.

14.     Right of Disclosure.  RMS is entitled to disclose, without limitation, both internally and externally, the type of relationship and any compensation and reimbursement.  Such disclosure may include disclosure under state and federal laws such as the Physician Payment Sunshine Act.  Provider may disclose only the terms or existence of this Agreement as required by law, or after prior written notice to, and the consent of, RMS.

15.     Publicity.  Provider will not issue any press release regarding RMS or this Agreement without RMS' prior written consent.  Neither party will use or publish the name of the other party or his or its officers, directors, employees, agents or consultants (as applicable), its logos or trademarks or trade names in promotion, publicity, advertising or for any other purpose without the other party's prior written consent.

16.     Survival.  Sections 3, 4.2, 7, 8 (solely with respect to Provider's acts and omissions taken prior to the expiration or termination of this Agreement), 9 and 11 through 24 shall survive expiration or earlier termination of this Agreement.

17.     No Waiver.  No term or condition of this Agreement shall be deemed waived unless such waiver is in writing and signed by the party against whom the waiver is to be enforced.  A waiver by either party of any term or condition of this Agreement in any one instance will not be deemed or construed to be a waiver of such term or condition in any subsequent instance.

18.     Severability.  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement.

19.     Assignability.  Provider may not assign or transfer (directly or indirectly) this Agreement or any Services hereunder without the prior written consent of RMS.  Any attempted or purported assignment of this Agreement or any Services by Provider without the prior written consent of RMS is null and void.  RMS and its Affiliates may freely share with each other the information that Provider provides to them under this Agreement.  RMS may assign this Agreement, in whole or in part, to any Affiliate without the consent of Provider.

20.     Force Majeure.  Neither party shall be liable for failure or delay in performance under this Agreement due to causes beyond the reasonable control of the party affected ("Force Majeure Event") such as acts of nature, acts of civil unrest and violence, acts of government, labor disputes, or any other such causes.  The affected party shall provide prompt notice if a Force Majeure Event causes it to be unable to perform any obligation.  Performance shall be promptly resumed after the Force Majeure Event has been remedied; otherwise, this Agreement may be terminated as provided in Section 10.

21.     Entire Agreement.  This Agreement and the other agreements referenced herein (including the Noncompetition Agreement and the Merger Agreement), and all Exhibits and SOWs referenced in any of the foregoing, constitute the parties' entire understanding as of the Effective Date with respect to the subject matter hereof and supersede all prior agreements, negotiations, understandings, representations, statements, and writings between the parties relating to such subject matter.  No amendments or modifications to this Agreement are binding except in writing signed by authorized representatives of all parties. In the event of a conflict between this Agreement, on the one hand, and the Noncompetition Agreement or Merger Agreement, on the other hand, the terms and conditions of this Agreement shall take precedence to the extent of such conflict.  Except for Section (b) (Ownership) and Section (c) Proprietary Information and any other confidentiality obligations and intellectual property-related obligations set forth in the letter agreement regarding Consulting Services dated April 28, 2014 entered into between Provider and Capp Medical, Inc. (the "Former Consulting Agreement"), which provisions and obligations shall survive and remain in full force and effect (solely as to Inventions (as defined in the Former Consulting Agreement) and Proprietary Information (as defined in the Former Consulting Agreement) that arose, were obtained or disclosed under or in connection with such Former Consulting Agreement and the Services (as defined in the Former Consulting Agreement) and rendered thereunder), the Former Consulting Agreement is hereby terminated..

22.     Governing Law; Venue; Waiver of Jury Trial.

22.1    This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

22.2    Any action, suit or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement (including any action, suit or other legal proceeding based upon fraud) shall be brought or otherwise commenced exclusively in any state or federal court located in the County of New Castle, State of Delaware.  Each party to this Agreement:  (i) expressly and irrevocably consents and submits to the exclusive jurisdiction of each state and federal court located in the County of New Castle, State of Delaware (and each appellate court located in the County of New Castle, State of Delaware) in connection with any such action, suit or other legal proceeding; (ii) agrees that each state and federal court located in the County of New Castle, State of Delaware shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a defense or otherwise), in any such action, suit or other legal proceeding commenced in any state or federal court located in the County of New Castle, State of Delaware, any claim that such party is not subject personally to the jurisdiction of such court, that such action, suit or other legal proceeding has been brought in an inconvenient forum, that the venue of such action, suit or other

8

legal proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

22.3 TO THE MAXIMUM EXTENT PERMITTED BY LAW, PROVIDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT.

23. <u>Merger Agreement.</u>  Provider acknowledges and agrees that this Agreement is being entered into in connection with, and as a condition to the consummation of, the transactions contemplated by that certain Agreement and Plan of Merger, dated as of the date of this Consulting Services Agreement, by and among RMS, Caduceus Acquisition Corp., a Delaware corporation, CAPP Medical, Inc., a Delaware corporation (the "<u>Company</u>"), and Shareholder Representative Services, LLC, as the Securityholders' Agent (the "<u>Merger Agreement</u>"), and to enable RMS to secure more fully the benefits of such transactions, RMS has required that Provider enter into this Agreement; and Provider is entering into this Agreement in order to induce RMS to consummate the transactions contemplated by the Merger Agreement, as RMS believes the execution of this Agreement is necessary to protect the goodwill of the Company and its business.

24. <u>Counterparts.</u>  This Agreement and any Exhibits and SOWs may be executed in one or more counterparts, each of which when executed and delivered by facsimile, electronic transmission or by mail delivery, will be an original and all of which shall constitute the same Agreement.

*(signatures on the following page)*

The parties have executed this Agreement, by their duly authorized representatives, to be effective as of the Effective Date.

**ROCHE MOLECULAR SYSTEMS, INC.**          **PROVIDER:**

By: _____                By: _____
      (signature)                                    (signature)

Name: _____                Name: _____
      (printed name)                                 (printed name)

Title: _____               Title: _____

Date: _____                Date: _____

**CONFIDENTIAL**
**Execution Version**

# EXHIBIT A

## SERVICES AND PAYMENTS

1. DESCRIPTION OF SERVICES TO BE RENDERED BY PROVIDER:

   (a) Provider will provide such services as may be requested by RMS from time to time related to RMS's research, development or commercialization of assays or biomarkers to detect, quantify, measure or analyze cell-free circulating nucleic acid derived from tumors.

   (b) Provider will not be required to perform Services more frequently than one business day in each business week; such day will be mutually agreed by RMS and Provider and may change from time to time depending on Provider's obligations to Stanford and vacation schedule and RMS's needs.

   (c) Notwithstanding anything to the contrary herein, Provider may refuse to perform Services requested by RMS hereunder if such Services would conflict with updates to the Stanford Policies made after the Effective Date; provided, however, that (i) Provider shall use commercially reasonable efforts to consult with Stanford with respect to such update and to obtain a waiver from Stanford in connection therewith (a "Waiver") and (ii) if, after 30 days from the effective date of such update, Provider has not obtained a Waiver in a form reasonably acceptable to RMS, then (A) any such refusal to perform Services will constitute "Cause" (as defined in the Merger Agreement) for purposes of the Merger Agreement; and (B) notwithstanding Provider's right to refuse to perform Services as set forth in this clause (c), the underlying conflict giving rise to such right shall be treated as a conflict between this Agreement and the Stanford Policies for purposes of the rights to indemnification contained herein and in Section 10.2(a)(vi) of the Merger Agreement.

2. PAYMENT TERMS:



11

**Highly Confidential – Outside Counsel's Eyes Only**

**CONFIDENTIAL**
**Execution Version**

# EXHIBIT B

## CALIFORNIA LABOR CODE SECTION 2870
## INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."