# EXHIBIT 7
# REDACTED

CONFIDENTIAL

RESTATED CONSULTING SERVICES AGREEMENT

This Restated Consulting Services Agreement ("Agreement") is effective as of the 9th day of April, 2017 ("Effective Date") between Roche Seqencing Solutions, Inc. (RSS"), a Delaware corporation, and Arash Alizadeh ("Consultant"), an individual. All capitalized terms are defined herein. The parties hereby agree as follows:

**RECITALS**

A. Consultant was a substantial securityholder and founder of CAPP Medical, Inc., a Delaware corporation (the "Company"), and has also been involved in key research, development and inventive activity on behalf of the Company pertaining to the Company's technology and products.

B. In the course of such engagement by the Company, Consultant has developed, obtained and been given access to extensive and valuable know-how and confidential information (including trade secret information) belonging to the Company concerning the Company's technology and business.

C. Consultant, in the course of conducting the business of the Company, has also developed on behalf of the Company significant goodwill that is now a significant part of the value of the Company.

D. Pursuant to and subject to the terms and conditions of that certain Agreement and Plan of Merger, by and among Roche Molecular Systems, Inc. ("RMS"), Merger Sub, the Company and the Consultants' Agent (each as defined in the Merger Agreement), effective as of April 19, 215 (the "Closing Date") Company was acquired by and subsequently merged into RMS. In connection with the consummation of such merger, as set forth in the Merger Agreement, Consultant received (and will receive further) substantial cash consideration in exchange for Consultant's equity interest in the Company.

E. In connection with, and as a condition to the consummation of, the transactions contemplated by the Merger Agreement, and to enable RMS to secure more fully the benefits of such transactions, RMS and Consultant entered into a Consulting Service Agreement and a Noncompetition Agreement, both effective as of April 19, 2015 in order to further develop and protect the intellectual property and business of the Company and RMS.

F. Pursuant to the Consulting Services Agreement Consultant continued to be given access to and assist the Company in development of extensive and valuable intellectual property including know-how and confidential information (including trade secret information) belonging to RMS and concerning RMS' and its affiliates' technology and business including the technology and know-how acquired as part of the Merger.

F. The Parties wish to extend such consulting arrangement pursuant to the terms of this Agreement.

G. As a condition to such continued consulting arrangement and Consultant's access to confidential and proprietary information of RSS and its Affiliates and in order protect RMS's investment in such intellectual property, assets, business and goodwill including the RSS and RMS confidential and proprietary information possessed by Consultant, and which Consultant acknowledges possessing, this Agreement includes a reasonable restriction on the activities of Consultant that might compete with,

1

diminish or destroy the value of such intellectual property (including, without limitation, know-how and trade secrets) or harm such assets, business or goodwill of RSS and RMS.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Consultant agrees as follows:

1. <u>Definitions; Services; Noncompete</u>.

1.1 <u>Definitions</u>. Terms when used with initial capital letters will have the meanings set forth below or as otherwise defined in this Agreement.

1.1.1 "Affiliate" means any corporation or other business entity controlled by, controlling or under common control with (whether directly or indirectly), RSS, and for this purpose "control" means direct or indirect beneficial ownership of more than 50% of the voting interest in such corporation or other business entity or having otherwise the power to govern the financial and the operating policies or to appoint the management of an organization. "Affiliate" shall include, without limitation, CAPP Medical, Inc. and shall not include (a) Chugai Pharmaceutical Co., Ltd, 1-1 Nihonbashi-Muromachi 2-Chome, Chuo-ku, Tokyo 103-8324, Japan ("Chugai") or (b) assuming consummation of the equity purchase transactions currently contemplated between an Affiliate of RSS and Foundation Medicine, Inc. ("Foundation"), Foundation, in each case, unless and until RSS provides written notice to Consultant specifying Chugai or Foundation as an Affiliate of RSS.

1.1.2 "Inventions" means any inventions, works of authorship, trade secrets, know-how, and other items made, conceived, reduced to practice, authored or otherwise developed, discovered, or generated by Consultant, solely or jointly with others.

1.1.3 "IP Rights" means patent applications, patents, copyright applications, copyrights, trade secret rights, trademark rights and other intellectual property rights that exist by reason of, or may be claimed or obtained on any Invention.

1.1.4 "Permitted Academic Research" shall mean: any academic research activities conducted by Consultant in the scope of his employment with Stanford (defined below), including without limitation: (a) research collaborations with public non-profit consortia or organizations like ECOG, SWOG or Cancer Societies such as ASCO or ESMO; (b) pharmaceutical company sponsored clinical trials to gain access for patients to innovative new treatments; and (c) analysis of patient samples at Stanford that come from previously completed clinical studies by pharma companies. Notwithstanding the foregoing, Permitted Academic Research excludes prospective analysis of patient samples at Stanford for patient selection as part of clinical studies being conducted by pharmaceutical companies.

1.1.5 "Restricted Period" shall mean the Term of this Agreement, as defined in Section 10, below.

1.2    <u>Services</u>. Consultant agrees to perform the services ("<u>Services</u>") as specified in <u>Exhibit A</u> attached and incorporated herein, which is a Statement of Work ("<u>SOW</u>"). Subject to Consultant's agreement, additional work may be added to this Agreement in the form of SOWs referencing this Agreement and signed by both parties.

1.3    <u>Noncompete</u>. In view of the concern and context articulated in the Recitals section above of this Agreement and in consideration of Consultant's engagement to perform Service hereunder and confidentiality and other concerns attendant to Consultant's being given access to Confidential Information including trade secrets of RSS and its Affiliates, Consultant agrees that, during the Restricted Period, Consultant shall not:

    (a) engage (whether as an officer, director, securityholder, owner, co-owner, employee, or independent contractor or otherwise), in Competition; or

    (b) assist any commercial entity in Competition.

"Competition" shall be defined as Consultant's engagement in research (other than Permitted Academic Research), development or commercialization of assays, bio-markers or algorithms to detect, quantify, measure or analyze cell-free circulating nucleic acid derived from tumors.

Consultant also may, without violating this <u>Section 1</u>, own, as a passive investment, shares of capital stock of a publicly-held corporation that engages in such research, again provided Consultant is not engaged as a consultant or employed by such corporation or otherwise advising such entity with respect to activities that constitute Competition .

1.4    Consultant agrees that, in the event of any breach or threatened breach by Consultant of Section 1.3 (<u>Noncompete</u>): (a) RSS will suffer irreparable harm which cannot adequately be compensated by monetary damages; and (b) RSS and its Affiliates shall be entitled, without proof of actual damages, in addition to and without limiting any other remedy that may be available to it, including monetary damages, to seek: (i) a decree or order of specific performance or mandamus to enforce the observance and performance of such covenant, obligation or other provision; and (ii) an injunction restraining such breach or threatened breach.

2.    <u>Services for RSS Affiliates.</u>

2.1    Affiliates of RSS are entitled to contract for Services under this Agreement, and, in any such case, the Affiliate and Consultant will be bound by the terms and conditions of this Agreement.

3.    <u>Independent Contractor.</u>

3.1    Consultant is an independent contractor with respect to RSS and is not an employee, agent, or joint venturer of RSS. Neither Consultant, nor any person designated by Consultant to provide Services under this Agreement, is eligible for coverage or participation in any of RSS' benefit plans, programs, workers' compensation insurance, or any other benefits or compensation from RSS except as set forth in this Agreement. RSS will not take any deductions from any compensation paid to Consultant for taxes or related payroll deductions, and Consultant shall be solely responsible

for any taxes resulting from the compensation under this Agreement and agrees to file all such forms and pay all such taxes as may be required.

3.2   Neither party shall have any right, power, or authority to create any obligation, express or implied, on behalf of the other, except to the extent provided in this Agreement.

4.   Consultant's Performance of Services.

4.1   Consultant shall perform all Services himself and shall not, without RSS' prior written consent, employ or utilize any employee, agent, subcontractor or other person in the performance of the Services.

4.2   In performing the Services hereunder, Consultant shall not (and shall not induce RSS to) misappropriate, improperly use or disclose any confidential, secret, proprietary or otherwise non-public information or trade secrets of any other entity or person.  Consultant further agrees not to bring onto RSS' premises or transfer onto RSS' technology systems any of the following that are subject to obligations of confidentiality or non-use to a third party or where such actions would constitute breach of such obligations or otherwise misappropriate third party intellectual property rights: any third party proprietary materials, confidential or proprietary information or trade secrets.

5.   Conflicting Obligations.

5.1   RSS acknowledges that Consultant is an employee of Stanford University ("Stanford") and is subject to certain agreements, rules, policies, regulations, orders and guidelines of Stanford, including, without limitation, policies concerning consulting, conflicts of interest and ownership of intellectual property (collectively, the "Stanford Policies").  Consultant shall use commercially reasonable efforts to provide RSS with any updates to the Stanford Policies of which Stanford notifies Consultant after the Effective Date, whether in writing or by notifying Consultant that Stanford has posted such updates online, promptly after they are provided to Consultant or Consultant is notified of such posting.  Without in any way limiting Consultant's obligations or RSS' rights hereunder, if Consultant is required by any of the Stanford Policies to make any disclosure or take any action that conflicts with the terms of this Agreement or with the Services, prior to making such disclosure or taking such action, Consultant shall, to the extent permitted by the Stanford Policies, promptly notify RSS in writing, of such obligation, specifying the nature of such disclosure or action and identifying the applicable Stanford Policy under which such disclosure or action is required and shall reasonably cooperate with RSS in preventing such disclosure or conflict.

5.2   Consultant shall not use any equipment, supplies, facilities or other resources of Stanford or any other third person in the performance of the Services, including, except as directed by RSS in advance in writing, any individual who is a Stanford faculty member, staff member, undergraduate or graduate student, post doctoral researcher, or other employee, agent or independent contractor of Stanford or any other third person.  Consultant shall segregate all work related to the performance of the Services from any work performed by Consultant as a Stanford employee or otherwise on behalf of Stanford and any work performed by Consultant with any government funding in order to, in each case, minimize any conflicts, claims or disputes relating

to disclosure or ownership of rights concerning any Confidential Information, RSS Work Product, RSS Inventions, Prior RSS Inventions or IP Rights in any of the foregoing (all as defined in Section 7 below).

6. Compensation.

6.1 In consideration of the performance of the Services to RSS' satisfaction and of the assignments set forth below in Section 7, RSS agrees to pay to Consultant the sums set forth in each SOW to this Agreement, including, without limitation, as set forth on Exhibit A attached hereto ("Compensation"). Compensation will be paid net 60 days from the receipt of Consultant's invoice for such payment (disputed amounts may be withheld until mutually resolved). For the purpose of RSS controlling payments to Consultant, a Purchase Order ("PO") will be issued to Consultant (typically, one separate PO will be issued for each SOW, with Exhibit A being considered one SOW). Consultant may not invoice RSS until a PO is issued, and Consultant shall include the correct PO number on each invoice submitted or the invoice will be rejected. POs issued are for payment purposes only and their preprinted terms and conditions will not apply; however, any mutually agreed specific or special terms and conditions added to a PO shall apply, as described in Exhibit A or other applicable SOWs.

6.2 RSS has no obligation to pay for Services that RSS can reasonably demonstrate are not performed pursuant to the requirements set forth in this Agreement.

6.3 All payments made by RSS under this Agreement will be reduced by any tax or other amounts required to be withheld by RSS under applicable law. During the term of this Agreement, payments for the Services shall represent fees for services as an independent contractor, and shall therefore be paid without any deductions or withholdings taken therefrom for taxes or for any other purpose except as required by law. Consultant agrees to provide any tax and other forms that are reasonably required by RSS. The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.

7. Assignment and Inventions.

7.1 Consultant hereby assigns to RSS, its successors and assigns, all right, title, and interest in and to (a) any Inventions generated or arising in the course of or as a result of Services performed under this Agreement, regardless of when or where developed or whether or not any of RSS' equipment, supplies, facilities or other resources are used, and all printed, physical and electronic copies and other tangible embodiments thereof (collectively, "RSS Inventions"); (b) any Inventions conceived or developed in whole or in part by Consultant during the Restricted Period (arising or resulting from Consultant engaging in Competition (without in any way limiting RSS' other rights and remedies from breach of the Section 1.2); and (c) all IP Rights in all of the foregoing, to the full extent of the term for which such IP Rights may exist. Consultant will promptly disclose any RSS Inventions to RSS in writing and subject to Section 9 (Confidentiality) of this Agreement.

7.2 At RSS' request, Consultant will promptly execute all instruments and documents and perform all acts deemed by RSS to be necessary or reasonably useful: (a) to perfect RSS' right, title, and interest in and to RSS Inventions and IP Rights therein in any country or (b) to prepare, apply

for, prosecute, obtain, maintain, defend, and enforce such IP Rights as RSS may desire in any country. Consultant hereby appoints RSS as his attorney-in-fact solely for purpose of taking any action where Consultant has failed to comply with any of the foregoing. RSS will pay all costs and expenses of preparation, application, prosecution, maintenance, defense, and enforcement of such IP Rights.

7.3    A copy of the current version of Section 2870 of the California Labor Code ("Section 2870") is attached hereto as Exhibit B. Consultant agrees that because he is not an employee of RSS, but is instead an independent contractor, Section 2870 will not apply to any invention unless applicable law requires that it apply to that invention and that invention fully qualifies for protection under Section 2870. Consultant further agrees that, with respect to any such invention, he bears the burden of proving such application and qualification. If applicable law requires that Section 2870 apply to a particular invention that qualifies fully for protection under Section 2870, such that such RSS may not legally require Consultant to assign to Roche the Consultant's rights to such invention, then despite anything in this Agreement, Consultant will not be required to assign that invention to RSS. If applicable law does not require that Section 2870 apply to a particular invention, or if that invention does not fully qualify for protection under Section 2870, such that RSS can legally require Consultant to assign its rights to such invention to RSS, then this Agreement will be applied to that invention as if Section 2870 did not exist.

8.    Representations and Warranties.    Consultant covenants, represents and warrants that:

8.1    Omitted;

8.2    Consultant will provide the Services in accordance with all applicable laws and regulations;

8.3    All corruption, extortion, and embezzlement are prohibited. Consultant shall not offer, pay, or accept bribes or participate in other illegal inducements. Consultant shall conduct its business consistent with fair competition and in compliance with all applicable antitrust laws. Consultant shall employ fair business and employment practices including, but not limited to, equal employment opportunity. In addition, Consultant must abide by the integrity standards in the Roche Supplier Code of Conduct set forth at (**http://www.roche.com/roche_supplier_code_of_conduct.pdf**). RSS will provide Consultant prior written notice of any change to the Roche Supplier Code of Conduct;

8.4    Consultant, at his sole expense, will acquire and maintain in good standing, all permits, licenses and other entitlements required by law for the performance of Services;

8.5    Consultant will comply at all times with Section 4.2, and the Services and RSS Inventions will not misappropriate third party proprietary materials, confidential or proprietary information or trade secrets;

8.6    Consultant has no other agreement or relationship with, or commitment to, any other entity or person, including Stanford or any current or prior employer, that conflicts with his obligations to

6

RSS under this Agreement or his ability to become a consultant of RSS, and perform the Services. This Agreement is valid and enforceable. This Agreement and Consultant's performance of the Services do not and will not violate the Stanford Policies, provided that notwithstanding anything to the contrary in this Agreement (including anything in this Section 8.6 and in 8.7 below), the foregoing representation, warranty, and covenant is made to Consultant's reasonable knowledge only, which reasonable knowledge was reasonably investigated by Consultant.

8.7  Consultant has all right, power and authority necessary to enter into and perform this Agreement; and

8.8  Consultant has never been and is currently not debarred, excluded, or otherwise disqualified by the United States Food and Drug Administration or other regulatory or certification authority.

9.  <u>Nondisclosure of Confidential Information.</u>

9.1  "<u>Confidential Information</u>" means technical, financial, or business information, whether in writing, orally or in any other form, and whether or not labeled "Confidential", that is (a) disclosed by or on behalf of RSS or any of its Affiliates to Consultant, (b) known to Consultant as a consequence of or through performance of this Agreement or Services hereunder or (c) developed or created by Consultant in the course of performing Services hereunder, and which (i) is not publicly known or (ii) otherwise relates to the Inventions that are subject to the assignment obligations in <u>Section 7.1</u>. Confidential Information includes, without limitation, information, falling under <u>clauses (a)</u> through <u>(c)</u> above, about or relating to assays, biomarkers or algorithms for detecting, quantifying, measuring or analyzing cell-free nucleic acid derived from tumors developed or created in whole or in part by Consultant in rendering Services hereunder and any other information relating to RSS and/or its Affiliates' business, processes, knowledge, systems, designs, methods, formulas, patents, inventions, materials, research plans or activities, prices, sales, costs, promotional methods, and customers.

9.2  The following is not Confidential Information:
  a) Information generally available to the public at the time of disclosure, or which after disclosure by RSS to Consultant becomes generally available to the public through no fault or omission attributable to Consultant;
  b) Information made available to Consultant from any third party having a right to do so without any obligation of confidentiality back to RSS or any of its Affiliates; or
  c) Information which is not developed or created by Consultant in the course of performing Services hereunder and which is developed independently by Consultant, as demonstrated by written records, without access to or use of RSS' or any of its Affiliates' Confidential Information.

9.3  Consultant shall (a) protect the confidentiality of the Confidential Information, (b) not disclose Confidential Information other than as provided in this Agreement and (c) use and disclose the Confidential Information only for the purposes of and as necessary for providing the Services.

10. <u>Term and Termination.</u>  The term of this Agreement begins on the Effective Date and continues until the one (1) year anniversary of the Effective Date (such period of time, he "<u>Term</u>"), unless earlier terminated.  This Agreement or any SOW may be terminated (i) by mutual written consent of the parties, or (ii) by either party, for its convenience, by giving thirty days prior written notice to the other party. Upon termination of this Agreement, and without limiting either Party's liability for breach of this Agreement nor either Party's obligations that accrued prior to or that survive termination, neither Party will have further obligations to the other Party.

11. Omitted.

12. <u>Waiver of Damages.</u>  **EXCEPT FOR (A) EITHER PARTY'S BREACH OF HIS OR ITS CONFIDENTIALITY OBLIGATIONS UNDER <u>SECTION 9</u>, (B) PROVIDER'S BREACH OF <u>SECTION 4.2</u> OR <u>5.2</u>, NEITHER PARTY WILL BE DIRECTLY LIABLE TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OR THE LOSS OF ANTICIPATED PROFITS ARISING FROM ANY BREACH OF THIS AGREEMENT BY SUCH PARTY, EVEN IF SUCH PARTY IS NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER ANY REMEDY SET FORTH IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.**

13. <u>Notice.</u>  A party must give any notice under this Agreement by facsimile, overnight courier, regular mail, certified mail, or by personal delivery at the address set forth above.  All notices to RSS are to be sent to the attention of "General Counsel".  Notices will be deemed received: (a) if sent by facsimile, at the start of the recipient's next business day; or (b) if delivered by overnight courier or certified mail, when notice is signed for by or on behalf of the receiving party; or (c) if delivered by regular mail, three business days after the postmark date; or (d) if delivered personally, when delivered.

14. <u>Right of Disclosure.</u>  RSS is entitled to disclose, without limitation, both internally and externally, the type of relationship and any compensation and reimbursement.  Such disclosure may include disclosure under state and federal laws such as the Physician Payment Sunshine Act.  Consultant may disclose only the terms or existence of this Agreement as required by law, or after prior written notice to, and the consent of, RSS.

15. <u>Publicity.</u>  Consultant will not issue any press release regarding RSS or this Agreement without RSS' prior written consent.  Neither party will use or publish the name of the other party or his or its officers, directors, employees, agents or consultants (as applicable), its logos or trademarks or trade names in promotion, publicity, advertising or for any other purpose without the other party's prior written consent.

16. <u>Survival.</u>  Sections 1.1, 1.3, 1.4, 4.2 and Articles 3, 7, 8 (solely with respect to Consultant's acts and omissions taken prior to the expiration or termination of this Agreement), 9 and 11 through 24 shall survive expiration or earlier termination of this Agreement.

17. <u>No Waiver.</u>  No term or condition of this Agreement shall be deemed waived unless such waiver is in writing and signed by the party against whom the waiver is to be enforced.  A waiver by

8

either party of any term or condition of this Agreement in any one instance will not be deemed or construed to be a waiver of such term or condition in any subsequent instance.

18.     Severability.    The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement.

19.     Assignability.  Consultant may not assign or transfer (directly or indirectly) this Agreement or any Services hereunder without the prior written consent of RSS.  Any attempted or purported assignment of this Agreement or any Services by Consultant without the prior written consent of RSS is null and void.  RSS and its Affiliates may freely share with each other the information that Consultant provides to them under this Agreement.  RSS may assign this Agreement, in whole or in part, to any Affiliate without the consent of Consultant.

20.     Force Majeure.  Neither party shall be liable for failure or delay in performance under this Agreement due to causes beyond the reasonable control of the party affected ("Force Majeure Event") such as acts of nature, acts of civil unrest and violence, acts of government, labor disputes, or any other such causes.  The affected party shall provide prompt notice if a Force Majeure Event causes it to be unable to perform any obligation.  Performance shall be promptly resumed after the Force Majeure Event has been remedied; otherwise, this Agreement may be terminated as provided in Section 10.

21.     Entire Agreement.  This Agreement and all Exhibits and SOWs referenced in any of the foregoing, constitute the parties' entire understanding as of the Effective Date with respect to the subject matter hereof and supersede all prior agreements, negotiations, understandings, representations, statements, and writings between the parties relating to such subject matter.  This Agreement does not supersede nor replace the Merger Agreement nor any other written agreement that is still in effect between the Parties or their Affiliates. Obligations of prior written agreement that have terms intended to survive termination or expiration of such prior written agreements (including, without limitation terms pertaining to assignment of intellectual property rights or protection of confidential information) shall continue to survive pursuant to the terms of such prior written agreements.

22.     Governing Law; Venue; Waiver of Jury Trial.

22.1    This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

22.2    Any action, suit or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement (including any action, suit or other legal proceeding based upon fraud) shall be brought or otherwise commenced exclusively in any state or federal court located in the County of New Castle, State of Delaware.  Each party to this Agreement:  (i) expressly and irrevocably consents and submits to the exclusive jurisdiction of each state and federal court located in the County of New Castle, State of Delaware (and each appellate court located in the County of New Castle, State of Delaware) in connection with any such action, suit or other legal proceeding; (ii) agrees that each state and federal court located in the County of New Castle, State of Delaware shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a

9

defense or otherwise), in any such action, suit or other legal proceeding commenced in any state or federal court located in the County of New Castle, State of Delaware, any claim that such party is not subject personally to the jurisdiction of such court, that such action, suit or other legal proceeding has been brought in an inconvenient forum, that the venue of such action, suit or other legal proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

22.3 TO THE MAXIMUM EXTENT PERMITTED BY LAW, PROVIDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT.

24. <u>Counterparts.</u> This Agreement and any Exhibits and SOWs may be executed in one or more counterparts, each of which when executed (whether by hand or by reliable electronic means of execution) and delivered by facsimile, electronic transmission or by mail delivery, will be an original and all of which shall constitute the same Agreement.

*(signatures on the following page)*

The parties have executed this Agreement, by their duly authorized representatives, to be effective as of the Effective Date.

**ROCHE SEQUENCING SOLUTIONS, INC.**　　**ARASH ALIZADEH** (Consultant)

By: _Ulrich-Peter Rohr_　　　　　　　　　　　By: _Ash Alizadeh_
　　(signature)　　　　　　　　　　　　　　　　　(signature)

Name: _Ulrich-Peter Rohr_　　　　　　　　　Name: _Ash Alizadeh_
　　(printed name)　　　　　　　　　　　　　　(printed name)

Title: _CMO_　　　　　　　　　　　　　　　　Title: _MD/PhD_

Date: _06 May 2017_　　　　　　　　　　　　Date: _06 May 2017_

11

**CONFIDENTIAL**

EXHIBIT A

SERVICES AND PAYMENTS

1.    DESCRIPTION OF SERVICES TO BE RENDERED BY PROVIDER:

(a)    Consultant will provide such services as may be requested by RSS or its Affiliates from time to time related to RSS's or its Affiliates' research, development or commercialization of assays or bio-markers to detect, quantify, measure or analyze nucleic acid derived from tumors.

(b)    Consultant will not be required to perform Services more frequently than one business day in each business week; such day will be mutually agreed by RSS and Consultant and may change from time to time depending on Consultant's obligations to Stanford and vacation schedule and RSS's needs.

2.    PAYMENT TERMS:



12

**Highly Confidential – Outside Counsel's Eyes Only**

DocuSign Envelope ID: 0E3E0E1E-9FE4-4F6D-8206-8D65D406D388
Case 5:24-cv-03972-EKL   Document 159-6   Filed 05/08/25   Page 14 of 17

**CONFIDENTIAL**

# EXHIBIT B

## CALIFORNIA LABOR CODE SECTION 2870
## INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."



**Certificate Of Completion**

Highly Confidential – Outside Counsel's Eyes Only

Highly Confidential – Outside Counsel's Eyes Only

Highly Confidential – Outside Counsel's Eyes Only